### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| [1]  JOHN ALEX UPPERMAN, individually; | ) |
| [2]  ILLINI HOLDINGS, LLC; | ) |
| [3]  THRIVE REALESTATE, LLC; | ) |
| [4]  WILDWOOD ASSETS, LLC; | ) |
| [5]  TU PROPERTIES, LLC; | ) |
| [6]  OAK STREET | ) |
| [7]  CAPITAL, LLC; and | ) |
| [8]  12 OAK LENDING, LLC | ) |
| | ) |
| Plaintiffs, | )  Case No. 26-cv-00383-SH |
| v. | ) |
| | ) |
| [9}  MARC KULICK, individually; | ) |
| [10] VESTA REALTY, LLC; | ) |
| [11] VESTA HOLDINGS, LLC; | ) |
| [12] LOUIS INVESTMENTS, LLC; and | ) |
| [13] ASSET HOLDER, LLC | ) |
| | ) |
| Defendants. | ) |

## VERIFIED COMPLAINT

Plaintiffs John Alex Upperman ("Upperman"), individually, and Illini Holdings, LLC, Thrive Real Estate, LLC, Wildwood Assets, LLC, TU Properties, LLC, Oak Street Capital, LLC, and 12 Oak Lending, LLC (collectively, "Plaintiffs"), bring this civil action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, and applicable state law, against Defendant Marc Kulick ("Kulick"), Vesta Realty, LLC ("Vesta Realty"), Louis Investments, LLC ("Louis Investments"), Vesta Holdings LLC ("Vesta Holdings"), and Asset Holder, LLC ("Asset Holder," and together with the foregoing defendants, "Defendants") for injuries to Plaintiffs' business and property caused by Kulick's pattern of racketeering activity conducted through an association of fact of at least four enterprises engaged in interstate commerce, Vesta Realty, Louis Investments, Vesta Holdings, and Asset Holder.

**INTRODUCTION**

1.    This action arises from a years'-long scheme by Kulick to exploit his position as the sole manager of a vertically integrated real estate enterprise—comprising more than 30 projects and over 9,600 residential units historically valued at approximately $925 million—to systematically loot investor capital, divert rent revenues, make unauthorized borrowings at usurious rates, grant unauthorized liens on portfolio assets, sell debt positions at fire-sale prices, falsify or obstruct access to books and records, and conceal the resulting financial collapse from investors, lenders, and co-owners. Kulick utilized the various legal entities through which the venture conducts business as his personal piggy bank, diverting funds to finance his lifestyle. For years, Kulick successfully concealed his misconduct by moving cash from entity to entity akin to check kiting, by ignoring required accounting practices and controls, and by meeting investor information requests with blandishments, bluster, and bullying. One disaffected investor described Kulick's management as "a rat's nest of fraud and deceit."

2.    A forensic accounting report commissioned by an unauthorized lender has identified "Ponzi-like indicia" in accounts controlled by Kulick, including $3.1 million in payments of Kulick's personal American Express bills and automobile loans in a two-month period, $1.2 million in cash transfers to Kulick's personal bank accounts, $58.7 million in outflows from an account with an average daily balance of only $82,288, and 98 overdraft fees, reflecting extraordinary account velocity inconsistent with legitimate operations. A copy of the Report is attached as **Exhibit A** and incorporated by reference.

3.    In a desperate Hail Mary attempt to keep the scheme afloat, Kulick made a deal-with convicted fraudster Efraim Diveroli,[1] with Kulick secretly taking out loan shark loans of

---

[1] The name Diveroli is familiar because his multi-million-dollar fraud of the United States Department of Defense is described in a film called "War Dogs." He received a sentence of four years in federal prison for his crimes, including

millions of dollars at interest rates hundreds of times that which is considered to be usurious in nearly every state in the country.[2]  Kulick pledged interests he did not own and upon which Diveroli has filed claims.

4.    The predicate acts alleged herein—wire fraud, mail fraud, diversion of rents, falsification of books and records, unauthorized loans and liens, fire-sale loan transfers, and obstruction of contractual information rights—constitute a pattern of racketeering activity that has directly and proximately caused Plaintiffs to suffer: (a) loss of approximately $1.369 million in equity investments; (b) non-repayment of approximately $2.525 million in outstanding loans; (c) triggering of personal guaranty liability on loans exceeding $490 million in the aggregate; (d) loss of distributions and promote fees; and (e) litigation costs imposed by Kulick's past and ongoing misconduct.  These losses are also being suffered by hundreds of innocent investors that put money into Vesta Realty projects based on Kulick's representations concerning his honesty, integrity, and ability to manage a large, sophisticated real estate enterprise.

5.    By this Complaint, Plaintiffs seek treble damages under 18 U.S.C. § 1964(c), equitable relief including the appointment of a federal equity receiver, an accounting, imposition of a constructive trust, and such other relief as this Court deems just and proper.

---

additional time for violating his release terms by attempting an illegal arms deal.  Kulick never disclosed the Diveroli loan transactions to the Plaintiffs or any of the investors that are now victims of Kulick's past, and ongoing frauds.

[2] The interest rates varied between 1,500 percent compounded monthly to 7,000 percent compounded daily.  Only six states do not prohibit usurious loans: (1) Delaware; (2) South Dakota, (3) Nevada; (4) Utah; (5) Wisconsin and (6) Idaho.  The most common upper limit in the other 44 states is 15%. Diveroli's rate even exceeded criminal Loan Shark rates in Las Vegas which range from 200 to 2,000 percent compounded annually. Diveroli chose the laws of Delaware to control the contract with Kulick in an effort to evade Oklahoma's and Kansas' usury laws.  It was a game of spy vs spy as to who could out defraud the other.  The ultimate victims were every investor and every mortgage holder and every renter of the underlying apartment buildings in Oklahoma.

**JURISDICTION AND VENUE**

6.    This Court has original federal-question jurisdiction under 28 U.S.C. § 1331 because this action arises under the civil RICO statute, 18 U.S.C. §§ 1961–1968.

7.    Venue is proper in this District under 28 U.S.C. § 1965(a) because Defendant Kulick resides in Oklahoma, and most of the physical properties are located in Tulsa, Oklahoma. Moreover, the ends of justice require that other parties residing in other districts be brought before this Court pursuant to 28 U.S.C. § 1965(b), because the RICO enterprise operates across multiple states—including Delaware, Kansas, Oklahoma, and Arkansas—and effective adjudication of the pattern of racketeering activity and appointment of a federal equity receiver require consolidation of all claims in a single forum.

8.    This Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367(a) because those claims arise from the same nucleus of operative facts as the RICO claims and form part of the same case or controversy.

9.    This Court has personal jurisdiction over Defendant Kulick because he resides in the Northern District of Oklahoma. He directed the racketeering activity at issue into this District, organized and controlled entities operating in this District.

10.    This Court has the inherent equitable power to appoint a federal equity receiver under Federal Rule of Civil Procedure 66 and 28 U.S.C. §§ 754, 959, and 1692.

**PARTIES**

A.    **Plaintiffs**

11.    Plaintiff John Alex Upperman is a sophisticated real estate investor residing in Prairie Village, Kansas. Upperman was one of the original members of Vesta Capital, holding a 29.05% economic interest, and holds a 5% economic interest and 5% voting percentage in Vesta

Realty. Through his controlled entities – Plaintiffs Illini Holdings, LLC; Thrive Real Estate, LLC; Wildwood Assets, LLC; TU Properties, LLC; and Oak Street Capital, LLC, Upperman invested approximately $1,369,488 of personal capital across multiple Vesta Realty deals and has current loans outstanding to Vesta Holdings of approximately $2,525,000. Additionally, because Upperman trusted Kulick, Upperman signed as a personal guarantor on almost every property-level loan in the portfolio, exposing him to substantial recourse liability as a result of Kulick's fraudulent conduct.

**B.    Defendants**

12.    Defendant Kulick is an individual residing in Tulsa, Oklahoma. Kulick is the RICO *"person"* within the meaning of 18 U.S.C. § 1961(3) who conducted and participated in the conduct of the enterprise's affairs through a pattern of racketeering activity. Kulick serves as the sole Manager of Vesta Realty, the sole Member and Manager of Louis Investments, the sole Manager of Vesta Holdings, and the sole Manager of Asset Holder, and exercises complete operational control over day-to-day management, banking, books and records, accounting, investor communications, financial statements, and property operations across the entire Vesta enterprise, consisting of approximately thirty (30) multi-family rental properties located in Oklahoma, Kansas, and Arkansas. Kulick oversees all aspects of the businesses, including asset management, operations, and acquisitions.  Kulick is the RICO defendant and a joint defendant in the other causes of action.

13.    Defendant Vesta Realty is a Kansas limited liability company that functions as the operational hub of the enterprise. Vesta Realty is the sole employer of all employees within the enterprise and maintains custody and control of the enterprise's books and records. Through Vesta Realty, Kulick exercises pervasive control over the venture, from the day-to-day management and

operation of individual portfolio properties to all corporate-level functions, including cash management, financial reporting, and investor relations. Upperman holds a 5% economic interest and 5% voting percentage in Vesta Realty.

14.    Defendant Louis Investments is a Kansas limited liability company of which Kulick is the sole Member and Manager. Louis Investments serves as the Manager of each of the limited liability companies that hold the underlying portfolio properties. Through Louis Investments, Kulick controls the property-level entities and directs the disposition of rents, the incurrence of debt, and the grant of liens on portfolio assets.

15.    Defendant Vesta Holdings is an Oklahoma limited liability company and may be served c/o Vesta Realty, LLC 6911 S. 66th E Avenue, Suite 100, Tulsa Oklahoma, 74133. On information and belief, Defendant Kulick is Vesta Holdings' sole Member and Manager. On information and belief, Vesta Holdings was created by Kulick to replace Vesta Capital as the entity to raise capital, thereby denying Plaintiffs, and other investors, visibility into the enterprise's finances that would reveal fraudulent transactions and his use of Vesta Holdings as an instrumentality of his schemes.

16.    Defendant Asset Holder is an Oklahoma limited liability company, created and controlled by Defendant Kulick, that has an interest in the underlying properties.  Kulick is the Manger of Asset Holder. In the transactions with YSA discussed below, Asset Holder is designated as the "Borrower" under the Loan and Security Agreement.   As borrower, Asset Holder allegedly holds the right, title, and interest (the "Unencumbered Interests") in membership interests in several of the property-level entities, including Capitol on 28th Investors, LLC; Remington Ranch Investors, LLC; Copperfield Investors, LLC; and Putnam Investors, LLC.

**FACTUAL ALLEGATIONS**

**A.    Upperman's Introduction to Kulick**

17.    Upperman first became involved with Marc Kulick in 2017 after being introduced by Josef Loeffler, a Kansas City investor.  Together Loeffler, Upperman, and Kulick created what would become the Vesta enterprise, with operations managed solely by Kulick. At the time, Kulick presented as a gifted communicator with a compelling background. He had spent his entire adult life in multifamily real estate, beginning as an assistant leasing manager and working his way up to a vice president role at a large real estate firm. To Upperman, Kulick appeared to have a rare combination of financial fluency and true operational experience. Unlike many real estate sponsors who primarily understood underwriting and spreadsheets, Kulick seemed to deeply understand the day-to-day property management function that actually drives value in multifamily assets.

18.    Upperman's early trust in Kulick was based on observed performance, third-party validation, and visible execution. In the first Vesta transaction, Marquis on Memorial, Upperman invested his own capital and helped introduce the opportunity to several close friends and family members. Those investors had direct access to Kulick and spoke with him before investing. Kulick moved to Tulsa and lived on the property for several years after acquisition, which reinforced the impression that he was unusually hands-on, scrappy, and committed to execution.

19.    In the early years, Vesta's growth appeared to be methodical. Kulick slowly built out the team and acquired additional properties, but he did not appear to be moving faster than the organization could handle. Distributions were consistent. Investors were happy. Many investors reinvested in follow-on deals and referred additional investors. When Upperman visited Vesta properties in Oklahoma, the properties appeared well maintained, and the level of detail appeared

strong. Property reviews were often significantly better than competing properties in the same submarkets. To Upperman, this confirmed that Kulick's operational thesis was working.

20.     Loeffler's involvement also added credibility. Loeffler and his family had been successful in real estate, and they appeared to be active and sophisticated participants in the early Vesta deals. Upperman understood Loeffler to be a significant supporter of Kulick, and Loeffler's involvement gave Upperman additional comfort that the platform had experienced oversight.

21.     Upperman is not and was not the manager of any of the properties acquired and managed by Vesta. He did not and does not control Vesta's bank accounts. He did not and does not control property operations, accounting, accounts payable, lender communications, debt service, distributions, books and records, or employee decisions. Those functions were controlled by Kulick through Vesta Realty, Louis Investments, Vesta Holdings, and the property-level entities. Upperman's role was based on capital relationships, investor communication, personal investment, and, in many cases, guaranties.

22.     Beginning in 2023, Upperman became increasingly concerned about Kulick's communication and follow-through. Vesta had previously paid consistent monthly or quarterly distributions on certain properties. But after Copperfield was acquired, distributions became inconsistent almost immediately. Kulick attributed the delays to banking transitions, heavy capital improvement projects, lender reimbursement delays, unit turns, and other market forces. These explanations were plausible because capital expenditures are capitalized rather than expensed, meaning a property could show positive net income on a trailing 12-month income statement (known in the industry as a "T12") while still consuming cash through capital expenditures. Kulick and his team provided capital expenditure information that appeared to support the explanations.

23.    In late 2024, Upperman began lending money directly to Vesta Holdings or specific Vesta deals. Upperman did so not because he was expanding the relationship, but because he believed he had an obligation to help protect existing deals in which investors he introduced to Vesta transactions were already exposed. The multifamily market was extremely challenging, particularly for properties acquired in 2021 and 2022 with floating-rate debt, expensive rate caps, and near-term maturities. Many multifamily operators across the country were dealing with the same pressures Kulick described. Upperman was making similar loans outside of Vesta, so Vesta's need for bridge capital did not initially appear unique or inherently suspicious.  Kulick always had an explanation – however now with the benefit of hindsight and some transparency obtained by others through litigation, it is clear that Kulick's explanations were never the full truth.

24.    The turning point came in March 2026. Fannie Mae foreclosures were filed against properties that Upperman believed were among the healthiest in the portfolio from a debt service coverage perspective. This was extremely confusing and frustrating because those foreclosures did not fit the property-level financial picture Upperman had been seeing. Around the same time, Kulick disclosed a $3.25 million account receivable at Lexington Commons. His only explanation was that funds had been transferred to Vesta Holdings. He did not provide a satisfactory explanation for why those funds had been transferred or how they would be repaid in connection with a potential sale of Lexington.

25.    In March 2026, Upperman also learned from a former employee disturbing information about Kulick's personal conduct, including reports that Kulick had lost nearly $1 million in a single night gambling in Las Vegas, details about lavish personal spending, and claims that construction funds were not being used for construction and insurance proceeds were not being used to repair property damage. At that point, Upperman began to understand that the problems

were not merely a difficult market, poor communication, or liquidity stress. It was a web of deception by Kulick.

**B.      The Enterprise Structure and Kulick's Control**

26.      Beginning in approximately 2017, Kulick and investor Josef Loeffler[3] formed Vesta Capital, LLC ("Vesta Capital") and Vesta Realty as the primary vehicles for acquiring, financing, and managing a portfolio of multifamily residential properties. Day-to-day control was vested fully in Kulick as Vesta Realty's sole Manager.

27.      Shortly thereafter, Loeffler solicited Upperman's investment in Vesta Realty property acquisitions and to be a member of Vesta Realty and Vesta Capital.  Initially, this relationship was profitable for Upperman; Kulick appeared to be responsibly managing the properties under his control, in fact lived at one of the properties so that he could give it his full personal attention and succeeded in selling several properties which resulted in investors earning a significant return on their investments.  Because of the initial successes of the Vesta enterprise, Upperman agreed to tap into his vast network and introduce investors to future Vesta acquisitions using Vesta-prepared materials, with investors subscribing directly with Vesta.  Unfortunately, as set forth below, Kulick's behavior changed dramatically – and for the worse – as the Vesta empire grew larger.

---

[3] Loeffler has filed a civil fraud action against Kulick in the Johnson County, Kansas District Court, case number JO-2026-CV-000792. "This action arises from a systematic scheme by Kulick to exploit the trust of his business partner, Loeffler, and dozens of passive investors by operating a network of real estate investment entities for Kulick's personal enrichment while concealing the true financial condition of those entities from the very people whose money he was spending. Kulick cultivated a public image of philanthropic generosity and professional achievement, while simultaneously presiding over a collapsing portfolio, concealing financial distress from investors, and diverting entity funds for personal expenditures." (Id. at p. 1.)

28.    Each multifamily property acquired by Vesta Capital/Vesta Realty was placed in a separate, project-specific LLC (each, a "Property Entity"),[4] each with its own distinct investor group and ownership structure. This structure required strict financial controls, separate bank accounts, transparent reporting, and entity-level financial segregation. Through Louis Investments, which serves as Manager of each Property Entity, Kulick exercised complete, unchecked control over the entire enterprise.

29.    The enterprise currently comprises more than 30 projects and over 9,600 residential units across Oklahoma, Kansas, and Arkansas, with properties historically valued at approximately $925 million. Kulick controlled all cash management, financial reporting, property management, accounting, books and records, and investor communications.

30.    The Second Amended and Restated Vesta Realty Operating Agreement (the "Operating Agreement") required Member consent for: (a) loans or advances to or investments in any other Person; (b) acquisition of real property interests; (c) sale or disposition of real property; and (d) borrowing funds or granting any mortgage, deed of trust, security interest, or similar lien on Company property. Transparent Collaboration LLC (controlled by Loeffler) held 54.5% of Vesta Realty's voting power, meaning no act requiring Member consent could be validly authorized without supermajority approval.

C.    The Manager's Memorandum and Failed Internal Controls

31.    In January 2018, after Loeffler discovered that Kulick had diverted approximately $200,000 of company funds to personal expenses, Loeffler, Upperman, and Kulick executed a Manager's Memorandum requiring Kulick to: hold weekly budget meetings; hire an independent CFO/controller; produce all credit card statements; maintain segregated bank accounts and credit

---

[4] Each of the known Property Entities is set forth on **Exhibit F** to this Complaint.

cards for each entity; make distributions only in accordance with operating agreements; and use transparency tools for accountability.

32.    While it appears Kulick initially complied with the Manager's Memorandum, over time, his actions have strayed farther and farther away from what it requires. Kulick did retain an independent controller, but he either failed to recognize or ignored Kulick's continued diversions. Kulick subsequently fired the independent controller – the very person whose oversight was supposed to prevent the misconduct now alleged.

**D.    Misappropriation of Funds – The Forensic Report**

33.    As time has gone on, the situation at Vesta has gone from troubling to absolutely dire. As the Vesta Realty empire grew to approximately 30 properties, Kulick discovered additional opportunities to misappropriate rents for personal gain. As he has continued to misappropriate rents, he has left the properties in a vulnerable position in which insufficient cash is remaining to meet essential property-level obligations, including debt service, utilities, and maintenance. The failure to meet these obligations has had a snowball effect, where tenants fed up with frequent utility interruptions, overflowing trash bins, non-functioning amenities, and unresponded-to maintenance requests have broken their leases or elected not to renew, and new tenants who have learned of Kulick's mismanagement have not taken the former tenants' places. Declining occupancy at many of the properties has exacerbated the Vesta Realty liquidity crisis and has forced Kulick to desperately rely on increasingly costly borrowings and capital call schemes to fill in the gaps.

34.    A forensic accounting report prepared by American Fiduciary Services (the "AFS Report") reviewed bank activity across Vesta Realty and Vesta Holdings accounts and found

account activity "highly correlated with classic Ponzi-like schemes and highly demonstrative of commingled sources and uses of funds." (**Exhibit A**). Key findings include:

a.      During January and February 2025, Vesta Realty fraudulently paid Kulick's personal American Express bills and various automobile loans totaling $3.1 million—activity characterized as "unusual and inconsistent with the normal business operations";

b.      Cash payments totaling $1.2 million were made from the same account into Kulick's personal bank accounts;

c.      In March 2025, an additional $1.3 million disbursement was made to pay Kulick's personal American Express bill;

d.      The Vesta Realty account incurred 98 separate overdraft fees during the first several months of 2025;

e.      The Vesta Holdings account had an average daily balance of only $82,288, despite having $58.7 million in outflows in January and February 2025 alone—reflecting extraordinary account velocity inconsistent with legitimate operations;

f.      Total sources of funds across both accounts were $62.76 million, including $30.66 million in wires from approximately 43 unknown third parties and $7.96 million in transfers from approximately 53 unknown controlled accounts;

g.      Total uses of funds were $62.10 million, including $32.05 million in bank transfers to unknown controlled accounts and $3.18 million in Vesta Realty American Express charges;

h.      The Vesta Realty account had a zero or negative balance 43% of the days reviewed; the Vesta Holdings account had a zero or negative balance 30% of the days reviewed.

35.      Beyond the AFS Report, additional investigation identified: up to $37,473,988 in credit-card charges with no apparent business purpose; $10,241,940 in net transfers to Kulick-

controlled accounts through 93 transactions; and $4,406,608 in disbursements to Raymond James & Associates, Kulick's barber ($25,000), high-stakes poker player Kane Kalas ($225,000), and unidentified individuals and entities. Kulick failed to provide supporting documentation for any of these transactions despite repeated demands.

36.     During the same period in which Kulick claimed the enterprise lacked sufficient funds to repay investors, he acquired high-value personal real estate, including two residences each costing approximately $1.5 million. Kulick cultivated a public image of philanthropic generosity and professional achievement while simultaneously presiding over a collapsing portfolio, concealing financial distress from investors, and diverting entity funds for personal expenditures.

37.     Kulick is a known high-stakes poker player who appeared on six episodes of High Stakes Poker on PokerGO in 2024 (around the same time that Kulick started taking millions of dollars of merchant cash advances, as otherwise described below). Plaintiffs are informed and believe that Kulick has utilized property funds to subsidize his gambling activities. An employee of Vesta reported that Kulick lost over $1 million gambling in Las Vegas during the Vesta annual office retreat in 2023.

**E.     Fraudulent Capital Calls**

38.     Plaintiffs are aware of at least one fraudulent capital call orchestrated by Kulick, and do not believe this was an isolated event.  On December 12, 2025, Kulick, acting through Vesta Capital's investor relations function, issued a capital call notice to a subset of investors in Woodscape Apartments – a multifamily property located in Oklahoma City, Oklahoma – requesting $1,750,000, representing 7.92% of each notified investor's original investment. The stated purpose was to fund a Fannie Mae-mandated repair escrow with a non-negotiable deadline of December 23, 2025. The capital call was materially fraudulent in at least four respects:

39.     First, the capital call was selectively issued. Andover Partners, which contributed $7,000,000 of equity to the Woodscape transaction, was never sent the December 12, 2025 capital call notice. Had the capital call been applied to Andover's investment at the stated 7.92% rate, Andover's pro-rata share would have been approximately $554,400.[5] A capital call on an equity syndication must be issued to all equity investors on a pro-rata basis; selectively excluding one or more investors distorts each investor's dilution exposure and ownership rights, and potentially allows the sponsor to manipulate the funding outcome. There is no legitimate basis for excluding any equity holder from a pro-rata capital call.

40.     Second, the "lender scope of work" distributed with the capital call notice to justify the $1,750,000 request was not an actual Fannie Mae repair directive but rather an unfilled Newmark-prepared property condition assessment template. The document's header states explicitly: "EXHIBIT A – (Example; Replace with Actual Schedule of Needed Repairs)." The total immediate repair estimate shown in the template was $1,485,305, which broadly aligned with the $1,500,000 escrow figure cited in the capital call, suggesting the template was deliberately used to lend credibility to the repair narrative without disclosure of its placeholder status. No actual lender-issued scope of work or escrow demand letter was provided to investors.

41.     Third, Kulick misrepresented the disposition of capital call proceeds. On January 20, 2026, when Plaintiff Upperman inquired about the approximately $1,000,000 balance in the Accounts Receivable – Other account (GL 1211-0000), Kulick responded in writing: "It is a catch all. But the December financials had a 500k increase from November due to people who had

---

[5] At the time, Andover Partners had already sued Louis Investments and Kulick in the U.S. District Court for the Northern District of Oklahoma (Case No. 25-cv-00599-SH), alleging breaches of the Woodscape Investors operating agreement, and breaches of fiduciary duty, by improperly creating a new class of preferred equity, soliciting an unauthorized investment from 7Acre Investment, and giving 7Acre complete control over the disposition of the Woodscape property.  This may explain why Kulick intentionally avoided issuing the capital call to Andover.

confirmed capital call participation but hadn't funded yet." This explanation is directly contradicted by the December 2025 General Ledger, which shows that the approximately $460,500 increase in that account during December 2025 was driven entirely by seven journal entries totaling $460,500, each explicitly labeled "to Repay Loan VH [Vesta Holdings].". These entries represent capital call proceeds being diverted to repay Vesta Holdings-related loans rather than being directed to the Fannie Mae repair escrow as represented to investors. Capital call proceeds appear in the GL under account 1120-0001 as credits labeled "to record Capital Call," offset by debits in the same account labeled "to Repay Loan VH"—confirming that capital call funds were being simultaneously received and redirected to Vesta Holdings loan repayments.  Meanwhile, Kulick did not disclose to Upperman or the other investors that Kulick had not at that time paid the mortgage for two months.

42.     Fourth, Woodscape was foreclosed upon in approximately March 2026 – fewer than three months after the capital call deadline – with no evidence that any of the repairs itemized in the scope of work document were ever performed. The capital call notice represented that funds were urgently needed to fund a lender-required repair escrow by December 23, 2025, to maintain loan compliance and preserve the asset, and that failure to fund would increase the likelihood of dilution or "less favorable alternatives." The property's swift foreclosure following the capital call, combined with the diversion of proceeds to Vesta Holdings loan repayments, strongly confirms that the repairs were never the actual destination of the funds and that the escrow-repair narrative was pretextual.

43.     The Woodscape capital call constitutes an additional predicate act of wire fraud within the meaning of 18 U.S.C. § 1343. Kulick transmitted the capital call notice by electronic mail across state lines on December 12, 2025, containing materially false representations about the

purpose and necessity of the capital call, inducing investors to wire funds interstate based on the false premise that such funds would be deposited into a Fannie Mae-controlled escrow account for property repairs. The capital call further demonstrates Kulick's ongoing pattern of soliciting investor capital under false pretenses while diverting the proceeds to undisclosed purposes for his personal benefit.

44.    The Woodscape capital call also constitutes an additional predicate act of money laundering within the meaning of 18 U.S.C. § 1956. Kulick transferred money from the capital call to Vesta Holdings, as shown in the general ledger of Woodscape, contrary to the false premise that such funds would be deposited into a Fannie Mae-controlled escrow account for property repairs. The capital call further demonstrates Kulick's ongoing pattern of soliciting investor capital under false pretenses while diverting the proceeds to undisclosed purposes for his personal benefit.

**F.    Unauthorized Borrowings and Collateralizations**

45.    As noted above, Kulick has had to resort to increasingly risky and expensive cash sources in order to maintain his grip on the Vesta Realty portfolio.  Kulick's recent borrowing transactions, none of which have been approved at the corporate level, can only be described as reckless, irresponsible, and highly damaging.

46.    For instance, in 2025, Kulick and his entities borrowed approximately $7.338 million from YSA – a lending entity owned and controlled by Efraim Diveroli, a former arms dealer and convicted felon – at interest rates alleged to have started at 100% per annum, thereafter, increasing to 7,000% per annum, compounded daily. Diveroli was charged in an 84-count indictment charging wire fraud and conspiracy to defraud the U.S. Department of Defense. In January 2011 Diveroli was sentenced to 48 months in federal prison.  While out on bond awaiting

sentencing Diveroli violated the terms of release by contacting a firearms dealer attempting to sell weapons. This led to an additional charge and more time in prison.

47. The loans taken by Kulick demonstrate how desperate he was, and continues to be, to keep the house of cards and misapplication of funds ongoing, as is common in a Ponzi scheme. The following description comes directly from a brief filed by Kulick in the Court of Chancery of the State of Delaware, CA No. 2025-1319-KSJM, in a retaliatory suit he filed against YSA after YSA sued him for breach of contract:

> The first loan was made on October 8, 2024, for a principal sum of $775,000 at an annual interest rate of **85%**. The collateral for this loan, set forth in a Collateral Pledge and Security Agreement (the "October 2024 CPSA"), consisted of (1) Vesta Holdings' already-encumbered membership interests in thirteen Delaware LLCs, (2) Asset Holder's unencumbered membership interests in four other Delaware LLCs, and (3) the rights inhering in those interests, such as distribution and other membership rights. None of the Title Owners (the entities that actually own the underlying real property) were borrowers, pledgors, or guarantors under this loan.
>
> Five additional short-term loans followed over the next several months—on January 22, January 24, January 30, February 4, and February 10, 2025—using the same form of documents and the same listed collateral, for similar amounts and at similar interest rates. All six of these initial loans were repaid by the Plaintiffs and are not in dispute.
>
> On February 18, 2025, the parties entered into a seventh loan, using documents essentially identical to the prior six, with one key difference: the addition of a "Joinder of Borrower-Affiliated Entities" annexed to the last page of the CPSA. The February CPSA listed the same two categories of membership interests in seventeen Delaware LLCs—unencumbered interests owned by Asset Holder in four companies and encumbered interests owned by Vesta Holdings in thirteen companies. "Collateral" was defined in Section 1.1(a) as those membership interests and any other interests in the defined entities now owned or later acquired by the Borrower or Pledgor; the collateral was limited to membership interests and never included any real estate.

The February Promissory Note was for a principal sum of $1,500,000, with a maturity date of May 19, 2025, and a stated annual interest rate of **133.333%**. The note contained a full integration clause superseding any prior agreements and barring oral modifications. The CPSA also contained a Power of Attorney clause (Section 4.6) granting the lender broad authority to act in the borrower's and pledgor's name, though only upon an event of default.

In April 2025, Plaintiffs received an additional loan from YSA to finance the acquisition of Parc 1010, an apartment complex in Tulsa, Oklahoma.  YSA loaned $300,000 to three entities owned by Kulick Manager, LLC—Parc 1010 Holdco., LLC; Parc 1010 GP, LLC; and Parc 1010 Investors, LLC—with a maturity date of April 9, 2025, and an annual interest rate of **1,500%.**

The April CPSA listed two categories of pledged interests: encumbered limited partnership interests in Wellsford Oaks LP (an Oklahoma LP) and unencumbered membership interests owned by Kulick Manager, LLC in the three Parc 1010 entities.  The definition of collateral, Power of Attorney clause, and Joinder language were all identical to the February CPSA.  This transaction also included an additional document—a Membership Interest Pledge and Assignment Agreement (the "MIPAA")—under which Mr. Kulick pledged all his membership interests in Kulick Manager, LLC to secure the obligations of the three Parc 1010 borrower entities, representing those interests were free and clear of liens.

Two additional working capital loans were made on July 16 and July 31, 2025, to Vesta Holdings, using the same form of documents as the February transaction.

July 16, 2025 loan: $365,000 principal, maturity date of July 30, 2025, with an annual interest rate of **960%, compounding daily on a 360-day year**.

July 31, 2025 loan: $317,000 principal, maturity date of August 5, 2025, with an annual interest rate of **7,000%, also compounding daily on a 360-day year**.

(Plaintiffs' Corrected Post-Trial Brief in Support of Their Motion for Permanent Injunction, pp. 2-

10.)(**Exhibit B**.)

48. Kulick was so desperate for liquidity to support the Vesta Realty Ponzi scheme that he signed paperwork mandating astronomical interest rates that would be criminal, except that Kulick agreed to application of Delaware law. Kulick lives in Oklahoma, and most of the Vesta Realty properties are located in Oklahoma, which has a commercial interest rate cap of 45% per annum under its usury laws. Delaware, on the other hand, does not prohibit usurious loans. Plaintiffs were not aware of Kulick's transactions with Diveroli or the fact that Diveroli was claiming ownership interests in the various real estate projects, nor were other investors warned of Kulick's use of funds from a convicted felon.  Kulick's agreement to the astronomical interest rates proposed by YSA have been disastrous to the Vesta enterprise, as the amounts alleged to be due by YSA – on outstanding loans in the aggregate principal amount of approximately $2.7 million – has ballooned to over *$930 million*.

49. Kulick was fully aware that what he was doing violated his commitments, obligations, and promises to Fannie Mae.  In an exchange of text messages admitted in evidence in the YSA litigation, Kulick made the following admissions regarding the loan and his desperation:



50.    This notwithstanding, Kulick agreed to collateralizations of most of the Vesta portfolio to secure repayment of the YSA loans, despite express prohibitions against doing so in all of the subject loan documents with the properties' lenders, and despite not even seeking – let alone obtaining – the appropriate corporate consents.  In February 2025, Kulick executed Collateral Pledge and Security Agreements ("CPSAs") collateralizing LLC interests in seventeen property-level entities. The seventeen entities whose interests were pledged are: Capitol on 28th Investors, LLC; Remington Ranch Investors, LLC; Copperfield Investors, LLC; Putnam Investors, LLC; Woodscape Investors, LLC; Barcelona Best Living, LLC; Riverpark Best Living Investors,

LLC; Montgomery Vesta Investors, LLC; Fairfax Holding Company, LLC; OKC3 Investors, LLC; Eton Investor, LLC; Eaton Place Investors, LLC; W.O. Holding Co., LLC; Regency Holdings, LLC; Woodland Manor Holdings, LLC; 727-Classen Best Living Investors, LLC; and Muntage Vesta Investors, LLC.

51.    YSA relied upon the CPSAs and powers of attorney granted by Kulick to file second mortgages on substantially all portfolio properties for payment of the loans and the usurious interest. These borrowings and collateralizations violated: (a) each property-level loan agreement prohibiting incurrence of secured indebtedness without lender consent; (b) the Vesta Realty Operating Agreement requiring supermajority Member consent for borrowings outside the ordinary course; and (c) each property-level operating agreement requiring Member consent for encumbrances.

52.    The YSA loans violated the terms of every property-level loan and security agreement, which prohibited additional loans or liens against the properties without prior approval. Neither the subject lenders, Plaintiff Upperman, nor any of the various investors were told of Kulick's agreement for extortionate loans from Diveroli, nor were they asked to approve the broad collateral grants Kulick agreed to with YSA.

53.    In a March 26, 2026 report emailed to investors explaining the Fannie Mae foreclosure filings Kulick falsely represented that all interest on the short-term loans "was, and remains, my responsibility." **(Exhibit C)**  The agreements Kulick executed with Diveroli state the opposite. Kulick knew on March 26, 2026 that his assurance that only he was responsible for the interest was false and misleading to the investors, constituting wire fraud under 18 U.S.C. §1343.

54.    A trial was conducted in the Delaware Chancery Court on Kulick's motion for injunction, in which he sought an order requiring YSA remove the second mortgages it filed on

many of the Vesta properties.  During this trial, "*Kulick acknowledged comingling his personal funds with Vesta's to create a 'lending pool' to move cash around to pay the debts of one property with proceeds from another . . . In summary, from November 2024-July 2025 $33.2 million was deposited from the associated real estate portfolio of Vesta and from the next operational flows of the Vesta accounts, and these $33.2 million were comingled and sent to unidentified entities controlled by the controller.*"  (6/9/2026 Court ruling, p. 17, fn. 107, quoting trial testimony, **Exhibit D**)  The irony in the dealings between Diveroli, a convicted fraudster, and Kulick is the testimony by Diveroli that "it was only because YSA 'discovered the fraud and deceit' coupled with the poor conditions of the Properties that YSA decided to record the second mortgages." (Id.)

55.    Ultimately, on June 9, 2026, the Delaware Chancery Court denied Kulick's request for an injunction, holding that the broad grant of authority in favor of YSA under the CPSAs authorized YSA to file the second mortgages on the Properties, and further holding that under Delaware law, Kulick was foreclosed from raising a usury defense to the YSA loans.

56.    In addition to the YSA loans, Kulick caused the enterprise to incur additional unauthorized merchant cash advances and other loans, in many cases at usurious effective interest rates.  Defendants have defaulted in nearly every one of these loans and advances, inviting litigation in multiple states, including:

> (a) On December 2, 2025, Lend Bug LLC sued Vesta Realty, Kulick (as guarantor) and numerous Property Entities in the Vesta Realty portfolio in the Supreme Court of New York, Kings County (Index No. 542083/2025) on account of a so-called "future receivables sale and purchase agreement" pursuant to which Kulick caused to be sold $412,225 of the properties' rent receivables to Lend Bug for an upfront purchase price of $275,000.  The

defendants were thereafter required to repay $13,741.00 per day for 44 days, for a total of $704,604 (representing an effective interest rate of approximately 1,800%).

(b) On March 18, 2026, another MCA, Apollo Funding Co., filed suit against Vesta Holdings, LLC, Vesta Realty, Kulick, and what appears to be each of the Property Entities in the Supreme Court of New York, Clinton County (Index No. 2026-00026129), for confirmation of an arbitration award in the amount of $289,064.20 (obtained by default due to Kulick's failure to participate) based on a receivables purchase agreement in which the defendants "sold" to Apollo $449,700 of receivables for $300,000.

(c) On March 18, 2026, another MCA, American Funding Services Inc. filed suit against Vesta Capital, Vesta Realty, Kulick, and numerous Property Entities in the Supreme Court of New York, Erie County (Index No. 805312/2026), seeking judgment in the amount of $1,295,931.25 based on two future receivables sale agreements whereby defendants "sold," in the aggregate, $2,086,600 of future rents, and a subsequent settlement agreement in the amount of $1,490,431.25, which defendants defaulted on. Kulick has filed a motion to compel arbitration of this dispute.

(d) On March 20, 2026, another MCA, Dover Capital LLC, filed suit against Vesta Realty LLC, Kulick, and what appears to be each of the property-level LLCs in the Supreme Court of New York, Monroe County (Index No. E2026006970), on account of two future receivables sale and purchase agreements pursuant to which Kulick caused to be sold $1,061,504.50 of

the properties' rent receivables to Dover for an upfront purchase price of $725,500. Even after remitting $323,358.40 to Dover, Dover seeks a judgment in the amount of $981,734.31. The effective interest rate of the first agreement was 360.26% and the effective interest rate of the second agreement was 459.33%.

(e) On December 16, 2025, Seaview 525, LLC commenced an action against Vesta Capital, Vesta Holdings, and Kulick in the District Court of Tulsa County, Oklahoma (CJ-2025-05836), asserting a claim for breach of a promissory note and seeking an award of damages in the principal amount of $2,500,000, plus $500,000 in contractual fees, plus accrued and unpaid interest based on the contract rate of 40% per annum.

(f) On August 22, 2025, Austin Business Finance, LLC commenced an action against Vesta Realty, Vesta Holdings, Louis Investments, Kulick, and several property-holding entities in the 395th Judicial District Court, Williamson County, Texas (Cause No. 25-2371-C395), asserting breach of a future receivables sale agreement, and seeking damages of not less than $571,790.25, plus court costs.

(g) On December 12, 2025, General Holding, LLC commenced an action against Vesta Holdings and Kulick in the District Court of Tulsa County, Oklahoma (Case No. CJ-2025-05786), alleging that Vesta Holdings and Kulick executed a promissory note in the principal amount of $500,000, and that Vesta Holdings gave General Holding a collateral pledge of membership interests in approximately thirteen (13) property-holding

entities.  General Holding sought and obtained a money judgment in the amount of $789,941.09, plus accrued interest, costs, and fees.

(h) Based on a review of certain Vesta Capital and Vesta Realty account statements, substantial payments were made to several other merchant cash advance lenders, including Harper Advance LLC, Modo, LLC, and Logiq Advance LLC.  Plaintiffs are not in possession of the underlying merchant cash advance agreements, but believe that payments to these MCAs aggregated to approximately $2,780,500, with those payments being made through 2025.

(i) On May 18, 2026, Ronald Marks, Tibor L. Nagy, and Anna Nagy commenced an action against Kulick and Vesta Holdings in the District Court of Tulsa County, Oklahoma (Case No. CJ-2026-2190), seeking judgment by confession on account of Kulick's breach of a settlement agreement related to loans made by the plaintiffs having a balance of $4,000,000 as of March 17, 2026.  On May 21, 2026, an agreed judgment was entered in the full amount sought, plus interest, fees, and court costs.

(j) An entity called LOTOR LLC filed a second lien on the Lexington Commons property in September 2025 based on a $1,250,000 obligation. To Upperman's knowledge, Defendants did not obtain the necessary consents – including from the lender – to have this lien placed.  This lien was released in March 2026.

57.     Similarly, Kulick took a $3 million loan in April 2023 from David Levine and Presidio Mortgage Holdings LP to make up Kulick's share of the purchase of the Woodscape

property. The borrowers were Woodscape Investors, LLC, Louis Investments, and Marc Kulick. Kulick did not have authority to bind Woodscape Investors, LLC for the loan.  Kulick never disclosed the Presidio loan to Plaintiffs.

58.    The original maturity date for the Presidio loan was seven months after the execution of the loan documents. Kulick defaulted on the loan which created exposure for Woodscape Investors, LLC and all of its investors, including Plaintiff Upperman. On September 11, 2025, Kulick sent Presidio a check for $120,000 and asked that Presidio treat the payment as monthly interest despite the loan's maturity.  When Presidio attempted to cash the check, it was rejected due to insufficient funds.  The knowing submittal of a check on an account with insufficient funds was act of mail fraud, in violation of 18 U.S.C. § 1341. Presidio sued Woodscape LLC, Kulick and Louis Investments on November 3, 2025 in the Tulsa County, Oklahoma District Court (Case No. CJ-2025-05089).

59.    The Woodscape project is now in foreclosure proceedings brought by Fannie Mae, Case No. CJ-2026-1969, in the Oklahoma County, Oklahoma District Court, on various grounds, not the least of which is that Kulick has ceased making mortgage payments.

**G.    Unauthorized Debt Sales at Fire-Sale Prices**

60.    Kulick also engaged in a pattern of unauthorized dilution of investors' equity interests across the enterprise. The Vesta Capital Operating Agreement requires written consent from existing Members for the admission of new Members. Notwithstanding this requirement, Kulick unilaterally admitted new Members and caused Property Entities to issue additional equity without obtaining the required consents. For example, Josef Loeffler's economic interest in Vesta Capital was improperly reduced from 44.55% to approximately 1.79%—a dilution that Kulick never sought nor obtained consent to effectuate. When investors questioned the changes, Kulick

confirmed he brought in new investors but refused to provide details about why the entities required additional cash, refused to identify the new investors, refused to state the consideration paid for the equity, and refused to disclose the uses of the new capital. On information and belief, the equity sales were not justified by the business needs of the issuing entities but were used to cover Kulick's defalcations and mismanagement, and in Loeffler's case, to divest him of what little authority he had to limit Kulick's activities and prevent his removal as manager. At least one investor has challenged such dilution in Andover Woodscape LLC v. Louis Investments, LLC, pending in the United States District Court for the Northern District of Oklahoma (Case No. 25-cv-00599-SH).

61.    With the properties desperate for cash due to Kulick's looting of rental income, Kulick, through Vesta Holdings, allegedly loaned approximately $22 million to numerous property-level entities using funds sourced from: Upperman ($2.525 million); YSA; the MCA lenders; Worcester Lending ($2.5 million); Marks and Nagy ($4 million); Presidio Mortgage Holdings ($3 million); Austin Business Finance ($1.3 million); and cash flow from profitable properties. Kulick did not seek consent from the members of any lending or borrowing entity before making these loans.

62.    In late 2025, Kulick then sold approximately $13.4 million of these loans for a deeply discounted aggregate price of approximately $3.4 million, including: (a) $1.5 million in Ridge Best Living loans for $700,000; (b) $1.4 million in Lofts at North Penn loans for $700,000; (c) $4.6 million in Lofts at North Penn loans for $1,415,385; and (d) $5,999,902.49 in Lofts at North Penn and Woodland Oaks loans for $600,000. None of these sales were disclosed to investors or lenders, nor were required consents obtained. The purchasers, and whether the

transactions were at arm's-length, remain unknown.  While this (temporarily) put more cash in Kulick's hands, it was grossly inequitable for all of the investors.

63.    The only reasonable explanation is that the loans and the sales of the loans were a device used by Kulick to move cash from entity to entity to conceal his thefts and the consequences of his mismanagement. Kulick has never disclosed – despite being repeatedly asked – why the loans (or their sale) were needed in the first place, what uses were made of the proceeds, the identity of the loan purchasers, and the uses made of the cash generated by the loan sales.

**H.    Deterioration of Properties and Nonpayment of Operating Expenses**

64.    Kulick's diversion of funds has caused widespread deterioration of portfolio properties and nonpayment of critical operating expenses, including:

a.    Failure to make debt service payments on nearly every property-level secured loan, including each of the nine (9) loans held by Federal National Mortgage Association (Fannie Mae);

b.    Failure to timely pay water and utility bills at multiple properties, resulting in frequent shutoff notices at Barcelona, One Eton Square, Remington Ranch, Villas at Midtown, Woodscape, Village Creek, Drexel Flats, Riverpark, and other properties;

c.    Failure to maintain hot water and heating service at Remington Ranch (declared unfit for human occupancy by the Stillwater City Council and subject of a public nuisance petition by the City of Stillwater alleging approximately $200,000 in unpaid utility bills), One Eton Square (declared a public nuisance by the City of Tulsa), and other properties;

d.    At the Tuscany Village property, the City of Oklahoma City, Oklahoma determined that one of the structures is "Dilapidated" due to fire damage, danger of collapse, and other issues;

e.    Failure to address work orders, resulting in insect infestations, mold, mildew, and standing water at multiple properties;

f.      Failure to collect trash at Tuscany Village, Wedgewood Village, Village Creek, Drexel Flats, and Riverpark, among other properties;

g.      Failure to maintain property insurance coverage at multiple properties, which constitutes an event of default under applicable loan agreements and places properties at risk of catastrophic loss from, for instance, weather events (which is an acute possibility in the region in which the properties are located, which are prone to considerable tornado activity);

h.      Non-functioning tenant amenities, including pools and fitness centers, which have been left unusable for months;

i.      Allowing mechanics' and materialmen's liens to be filed on substantially all portfolio properties; and

j.      Life-safety failures including missing smoke and carbon monoxide detectors, broken stair railings, and broken security cameras.

**I.      Misappropriation of Proceeds from Property Sales**

65.      Kulick also misappropriated distributions to which investors were entitled when portfolio properties were sold. When a property is sold, the Manager is required to distribute the net proceeds to investors. In numerous instances, Kulick failed to distribute the proceeds, often with unfulfilled promises that the withheld funds were being invested in new property through IRC section 1031 like-kind exchanges (which allow investors to defer capital gains on the sale of an investment property by reinvesting the proceeds into a qualifying new property). The IRS's rules concerning 1031 exchanges include strict deadlines for (i) the identification of a replacement property and (ii) the closing of the new purchase. Despite representations that proceeds would be returned if a replacement property was not pursued, distributions were made only after certain investors individually inquired, resulting in preferential treatment of some investors over others.

In multiple instances, Kulick failed to follow the procedures required to perfect valid section 1031 exchanges, including failing to direct sale proceeds to a Qualified Intermediary upon closing – establishing that proceeds had already passed through Kulick's control before any exchange mechanics were initiated. This sequence disqualified the purported exchanges and demonstrates that Kulick's invocation of section 1031 was knowingly improper and used as a pretext to retain control of investor funds.

**J.    Proliferation of Defaults, Foreclosures, and Receiverships**

66.    The consequences of Kulick's misconduct are manifest in the cascade of defaults, foreclosure actions, and receivership proceedings engulfing the enterprise, on top of the numerous litigations filed against the Defendants and the property-holding entities described above. As of the filing of this Complaint:

a.    Federal National Mortgage Association ("Fannie Mae") initiated foreclosure proceedings against nine apartment complex properties operated by Kulick and/or entities under his control, including Barcelona (CJ-2026-1187, Tulsa County, Oklahoma District Court), Villas at Midtown (CJ-2026-1188, Tulsa County, Oklahoma District Court), One Eton Square (CJ-2026-1215, Tulsa County, Oklahoma District Court), Lexington Commons (CJ-2026-00088, Washington County, Oklahoma District Court), Remington Ranch (CJ-2026-77, Payne County, Oklahoma District Court), Copperfield (CJ-2026-1970, Oklahoma County, Oklahoma District Court), Woodscape (CJ-2026-1969, Oklahoma County, Oklahoma District Court), The Canopy Apartments (60CV-26-3320, Pulaski County, Arkansas District Court), and The Capitol on 28th (CJ-2026-1968, Oklahoma County, Oklahoma District Court), located across Tulsa, Bartlesville, Stillwater, and Oklahoma City, Oklahoma. The principal balance of the loans subject to these foreclosure actions totals approximately $174,352,000. Fannie Mae initiated these foreclosure

proceedings based on Kulick's failure to make required loan payments for an extended period of time, and the improper recording of the YSA second mortgages, both of which constitute a material default under the applicable loan agreements, as well as failure to disclose other pending litigation affecting the subject properties as required under applicable loan covenants;

b.    Additional foreclosure actions have been filed by several other property-level lenders;[6]

c.    State courts have appointed receivers over Lofts at North Penn, Village Creek, Drexel Flats, Woodland Oaks, Fairfax, Lexington Commons, Remington Ranch, and One Eton Square, though most of these receiverships have been suspended by Kulick's systematic exploitation of the state-law bonding mechanism which stays the receiverships while the court's orders are appealed[7]; and

d.    Non-judicial foreclosure sales have been noticed up, and have or will be conducted imminently, by several lenders, including Saperean Capital (related to the Woodland Oaks and Fairfax properties) and Acre (related to the 727 Lofts property).[8]

---

[6] *See, e.g.*, Acre Q018 Retention Holder LLC v. 727 Lofts Best Living, LLC, Case No. CJ-2026-02188 (Tulsa County, Oklahoma District Court) (related to the 727 Lofts property); CREO QRS NP LLC v. Lofts at North Penn Best Living, LLC, Case No. CJ-2025-7426 (Oklahoma County, Oklahoma District Court) (related to the Lofts at North Penn property); CREO QRS VC LLC v. A-V Village Creek Owner LLC, Case No. CJ-2025-4684 (Tulsa County, Oklahoma District Court) (related to the Village Creek property); Ready Capital Mortgage Financing 2023-FL12, LLC v. Drexel Flats Acquisition LLC, Case No. CJ-2026-1275 (Oklahoma County, Oklahoma District Court) (related to the Drexel Flats property); Saperean Capital IV TB Note Lender KD4, LLC v. Woodland Oaks Best Living, LLC, Case No. CJ-2025-8499 (Oklahoma County, Oklahoma District Court) (related to the Woodland Oaks property); Saperean Capital IV TV Note Lender KD4, LLC v. Fairfax Best Living, LLC, Case No. CJ-2025-8499 (Oklahoma County, Oklahoma District Court) (related to the Fairfax property); and Term Fund III MRA Seller LLC v. A-V Classen Owner LLC, *et al.*, Case No. CJ-2026-4901 (Oklahoma County, Oklahoma District Court) (related to The Classen property).

[7] "If a receiver shall be or has been appointed, upon the appellant filing an appeal bond . . . the authority of the receiver shall be suspended until the final determination of the appeal . . . . 12 O.S. § 993(C)" (*Truett v Freedom Leaf* (2021) 495 P.3d 153, 162.)

[8] On the eve of a scheduled June 12, 2026 foreclosure sale of the Woodland Oaks and Fairfax properties, the respective borrowers each filed chapter 11 petitions for relief in the U.S. Bankruptcy Court for the Western District of Oklahoma, thereby staying such sales. *See In re Fairfax Best Living, LLC*, Case No. 26-11985 (Bankr. W.D. Okla.) and *In re Woodland Oaks Best Living, LLC*, Case No. 26-11986 (Bankr. W.D. Okla.)

67.     The bonding over of Oklahoma receivers is of particular concern, given Kulick's express acknowledgement that he is highly unlikely to prevail on the appeal of the state court receivership orders:

> In our loan documents with Fannie Mae we consent to a receiver being appointed in event of default. We have credible arguments about the defaults but there is less than a 5% chance in any receivership hearing that we will win.  The difference between winning and losing is minimal because the borrower has protections in Oklahoma.  One such protection is the ability to 'bond over' the appointment.
>
> So, in our last hearing the judge appointed a receiver and Vesta posted the bond and offset the appointment.  I said above, the difference in winning or losing is minimal and quite frankly for reasons I shouldn't get into on an adversarial thread it may even be better to post the bond than to win outright.  But that's litigation strategy.

E-mail from Marc Kulick to certain Vesta investors dated June 6, 2026, attached hereto as **Exhibit E**. Continuing to bond over receiver appointments notwithstanding the *de minimis* likelihood of success suggests that the strategy is not being guided by protecting investors such as Plaintiffs, but rather, by Kulick's desire to maintain control of property rents for personal purposes.

**K.     Obstruction of Books and Records Requests from Investors**

68.     Kulick has engaged in a systematic pattern of obstruction designed to prevent investors from discovering the scope of his misconduct, including:

a.      Responding to a formal August 2025 demand for inspection of 23 categories of Vesta Realty documents by stating that "a member is not entitled to reporting from a company" and that reporting requirements are "minimal to non-existent";

b.      Characterizing legitimate information requests as a "smear campaign" and "unfounded accusations of criminal activity";

c.      Refusing to provide bank account statements for Vesta Holdings or access to affiliated accounts;

d.      Closing a bank account on which Loeffler was a signatory and refusing to disclose where funds were moved;

e.      Causing UMB Bank to close accounts due to alleged abuse of the ACH payment network—a serious and relatively rare sanction that banks impose only after documented patterns of problematic activity, which may include excessive payment failures, returned transactions, suspected fraud, or violations of banking compliance requirements;

f.      Firing the enterprise's independent accountant and controller—whose employment was required under the Manager's Memorandum;

g.      Meeting Upperman's parallel requests with incomplete, hostile, or evasive responses; and

h.      Deploying multiple law firms at entity expense to oppose legitimate investor inquiries.

69.     Kulick's communications, both through counsel and directly, exhibit a pattern commonly associated with financial fraud and embezzlement: deflection, intimidation, reversal of victimhood, and escalating hostility, all designed to deter inquiry into conduct warranting investigation. Rather than engaging with legitimate investor concerns, Kulick's counsel dismissed them as a "smear campaign" and claimed that investor information requests were a "pretext for personal issues." Kulick also closed bank accounts to which investors had signatory access, terminated accounting personnel, and used company funds to retain multiple law firms to oppose investor inquiries—forcing investors to bear their own litigation costs while Kulick funded his obstruction with other people's money.

**L.    Kulick's Exploitation of Oklahoma Law to Block Lender-Initiated Receiver Appointments**

70.    The Defendants, as well as all or substantially all of the property-holding entities, are defendants in civil actions in Delaware, Oklahoma, Kansas, and Arkansas, all related to the conduct alleged herein.  Based on evidence provided and after full briefing, the following courts have seen fit to appoint receiver to take control of the following properties:

a.    One Eton Square, Tulsa, Oklahoma – on motion of the lender, Federal National Mortgage Association (Fannie Mae), a receiver was appointed on May 20, 2026 by the Tulsa County, Oklahoma District Court; however, such appointment has been suspended due to the borrower's appeal (at Kulick's direction) of the receivership order and the payment of a $100,000 cash bond.

b.    Lexington Commons, Bartlesville, Oklahoma – on motion of the lender, Fannie Mae, a receiver was appointed on June 10, 2026 by the Washington County, Oklahoma District Court.  That same day, Kulick posted a $100,000 cash bond which suspended the receiver's appointment.

c.    Remington Ranch Apartments, Stillwater, Oklahoma – on motion of the lender, Fannie Mae, a receiver was appointed on May 20, 2026 by the Payne County, Oklahoma District Court; however, the receivership has not yet taken effect due to a pending dispute concerning the amount of the receiver's bond.

d.    The Lofts at North Penn, Edmond, Oklahoma – on motion of the lender, CREO QRS NP LLC, a receiver was appointed on November 25, 2025 by the Oklahoma County, Oklahoma District Court; however, after the borrower appealed and suspended the appointment by paying a cash bond, the lender dismissed the foreclosure action and is pursuing a non-judicial foreclosure.

e.      Village Creek, Tulsa, Oklahoma – on motion of the lender, CREO QRS VC LLC, a receiver was appointed on January 22, 2026 by the Tulsa County, Oklahoma District Court; however, after the borrower appealed and suspended the appointment by paying a cash bond, the lender dismissed the foreclosure action and is pursuing a non-judicial foreclosure.

f.      Drexel Flats, Oklahoma City, Oklahoma – on motion of the lender, Ready Capital Mortgage Financing 2023-FL12, LLC, a receiver was appointed on May 28, 2026 by the Oklahoma County, Oklahoma District Court; however, such appointment has been suspended due to the borrower's appeal (at Kulick's direction) of the receivership order and the payment of a $200,000 cash bond.

g.      Woodland Oaks, Tulsa, Oklahoma – on motion of the lender, Saperean Capital IV TB Note Lender KD4, LLC, a receiver (Scott Shefman of Friedman Real Estate Management) was appointed over the property.  Kulick – likely as a result of the lender's assertion that challenging the receiver's appointment would constitute a recourse trigger resulting in full liability by both him (and incidentally, Upperman) under his guaranty – has refrained from appealing the appointment.  However, in order to prevent a foreclosure sale by the lender originally scheduled for June 12, 2026, Kulick caused to be filed in the U.S. Bankruptcy Court for the Western District of Oklahoma a chapter 11 bankruptcy case on behalf of the borrower, Woodland Oaks Best Living, LLC.

h.      Fairfax, Midwest City, Oklahoma - on motion of the lender, Saperean Capital IV TB Note Lender KD4, LLC, a receiver (Scott Shefman of Friedman Real Estate Management) was appointed over the property.  Kulick – likely as a result of the lender's assertion that challenging the receiver's appointment would constitute a recourse trigger resulting in full liability by both him (and incidentally, Upperman) under his guaranty – has refrained from appealing the

appointment. However, in order to prevent a foreclosure sale by the lender originally scheduled for June 12, 2026, Kulick caused to be filed in the U.S. Bankruptcy Court for the Western District of Oklahoma a chapter 11 bankruptcy case on behalf of the borrower, Fairfax Best Living, LLC.

71.    Kulick has systematically exploited state-law procedural mechanisms in Oklahoma, pursuant to 12 Okl. St. § 993(C), to bond over and suspend court-ordered property-level receiverships, maintaining control of rental income during appeals while continuing to divert funds. A federal receivership, governed by Federal Rule 66, would not be subject to these state-law circumvention mechanisms and would provide immediate, enterprise-wide relief.

72.    The Defendants, through the Property Entities, are receiving over $4 million a month in rental income across the entire portfolio while failing to make debt service payments, as well as necessary operating expenses such as utilities, insurance, payroll, and maintenance expenses. Upon information and belief, the Defendants have ceased making debt service payments on most of the Vesta properties for months, with the only properties paying debt service being those for which the lender has lockbox arrangements in place. A federal receivership will halt any further misappropriation of funds, provide for maintenance of the properties in the interest of the rent-paying residents and establish a status quo that will terminate Kulick's ability to further siphon money for his own personal interest.

**M.    Upperman's Injuries and Guaranty Exposure**

73.    Upperman invested approximately $1,369,488 of personal capital across multiple Vesta deals through his controlled entities. All or substantially all of these investments have been impaired or rendered worthless by Kulick's misconduct.

74.    Upperman has current loans outstanding to Vesta Holdings of approximately $2,525,000, which remain unpaid despite having matured on January 1, 2026.

75.     Upperman's experience parallels that of other investors. Josef Loeffler, who brought this enterprise's misconduct to light in a related state-court action (Case No. JO-2026-CV-000792, Johnson County, Kansas), advanced $2.47 million to Vesta Holdings from May 2024 through January 2025 after Kulick periodically called to ask for short-term loans purportedly to cover expenses such as closing costs, fees to lock in interest rates, and earnest money. Kulick assured Loeffler the loans would be repaid in a matter of days. When Loeffler asked for repayment, Kulick claimed the business lacked sufficient funds—while simultaneously using company funds to pay personal obligations and acquiring two residences each costing approximately $1.5 million. Kulick's pattern of soliciting emergency capital from investors under false pretenses while diverting the proceeds to personal use constitutes a core component of the racketeering scheme that has injured Plaintiffs.

76.     Upperman serves as a personal guarantor on 28 property-level loans. Due to Kulick's misconduct – including unauthorized second mortgages, diversion of rents, failure to make debt service payments, and actively interfering with the lenders' contractual remedies (including appealing or threatening to appeal receiver appointments at the property level) – multiple lenders have already called or threatened to call Upperman's guaranties, including: Eaton Place (Legacy Bank, $12,161,000 – full recourse triggered); 727 Lofts (Acre, $19,719,864 – guaranty called); Lofts at North Penn (CREO, $27,273,758 – sued personally); Village Creek (CREO, $12,223,041 – sued personally); OKC3 Bryan Hill (Oceanview, $11,798,946 – recourse notice); OKC3 Summer Oaks (Oceanview, $10,321,740 – recourse notice); OKC3 Springdale Village (Oceanview, $5,925,000 – recourse notice); Tuscany Village (Silver Hill Capital, LLC, $16,000,000 – recourse notice); Woodland Oaks and Fairfax (Saperean Capital, $60,800,000 – sued personally); and The Classen (Term Fund III MRA Seller, $15,409,883.23 – sued personally);

Barcelona (Fannie Mae, $13,132,000 – sued personally); Remington Ranch (Fannie Mae, $13,470,000 – sued personally); Woodscape (Fannie Mae, $33,800,000 – sued personally); Villas at Midtown (Fannie Mae, $24,868,000 – sued personally); Capitol on 28th (Fannie Mae, $21,408,000 – sued personally); Canopy (Fannie Mae, $13,565,000 – sued personally); One Eton Square (Fannie Mae, $35,027,000 – sued personally); and Copperfield (Fannie Mae, $17,641,000 – sued personally).

77.    Upperman's current aggregate guaranty exposure across the portfolio, based on those guaranties that have already been called, exceeds $352 million, and could exceed $490 million if his other guaranties are triggered. Each triggering of guaranty liability constitutes a separate, direct injury to Upperman's business and property proximately caused by Kulick's racketeering activity.

**COUNT I**

**(Violation of RICO by Defendant Marc Kulick)**

**THE RICO ENTERPRISE**

78.    The RICO "enterprise" within the meaning of 18 U.S.C. § 1961(4) consists of two alternative theories, either of which independently satisfies the enterprise element.

**A.    Legal Entity Enterprises**

79.    Vesta Realty constitutes an enterprise – a legal entity – engaged in, and the activities of which affect, interstate commerce. Vesta Realty manages a portfolio of residential properties across Oklahoma, Kansas, Arkansas, and other states; collects rents through interstate bank wires and ACH transfers; communicates with investors across state lines by electronic mail and wire; and engages in interstate financial transactions involving lenders, investors, and vendors in multiple states.

80. Louis Investments constitutes a separate enterprise – a legal entity – engaged in, and the activities of which affect, interstate commerce. Louis Investments serves as the Manager of each property-level LLC and directs the receipt and disbursement of funds through interstate banking channels.

81. Vesta Holdings constitutes another separate enterprise – a legal entity – engaged in, and the activities of which affect, interstate commerce. On information and belief, Vesta Holdings was created by Kulick to replace Vesta Capital as the entity to raise capital, thereby denying Plaintiffs, and other investors, visibility into the enterprise's finances that would reveal fraudulent transactions and his use of Vesta Holdings as an instrumentality of his schemes. As noted above, Vesta Holdings was the enterprise Kulick used to take a $4 million loan from Marks and Nagy for which Judgement has been entered against Vesta Holdings and Marc Kulick.

82. Asset Holder is also a stand-alone enterprise corrupted by Kulick.

**B.      Association-in-Fact Enterprise**

83. In the alternative, Vesta Realty, Vesta Holdings, Louis Investments, Asset Holder, and the Property Entities constitute an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4). This association-in-fact enterprise has: (a) a common purpose—to acquire, finance, manage, and operate multifamily residential properties for profit; (b) an ongoing organization—a vertically integrated management structure with Kulick at its apex, Vesta Realty as the operational hub, Louis Investments as the property-level manager, and the Property Entities as the asset-holding entities; and (c) relationships among the participants sufficient to permit them to function as a continuing unit.

84. The association-in-fact enterprise functioned as a continuing unit through which Kulick: raised investor capital through interstate solicitations; acquired properties using pooled

investor funds wired across state lines; managed properties through a centralized platform; collected rents through interstate banking networks; disbursed funds among dozens of accounts through interstate wire transfers; communicated with investors, lenders, and vendors through interstate wires and mails; and concealed the true financial condition of the enterprise from investors and lenders.

85.    Kulick is a "person" distinct from the enterprise. Although Kulick controls Vesta Realty, Vesta Holdings, Louis Investments and Asset Holder, he is legally distinct from those entities and conducted their affairs through his pattern of racketeering activity. Kulick used the enterprise as a vehicle for his racketeering—the enterprise did not exist solely to commit the predicate acts but had a legitimate business purpose (property acquisition and management) that Kulick corrupted through his fraudulent conduct.

**PATTERN OF RACKETEERING ACTIVITY—PREDICATE ACTS**

86.    Kulick committed at least two acts of racketeering activity within a ten-year period, as defined in 18 U.S.C. § 1961(1) and (5), constituting a pattern of racketeering activity. The predicate acts are related to one another through the common participants, common victims, common methods, and common purpose of the scheme, and posed a threat of continued criminal activity.

87.    The predicate acts are not actionable as fraud in the purchase or sale of securities. Rather, the predicate acts involve the operational diversion of rents and entity funds, lender fraud, vendor-payment fraud, falsification of operating-entity books and records, unauthorized loan transactions, and misappropriation of property-level operating revenues—none of which arises in connection with the purchase or sale of a security within the meaning of the Private Securities Litigation Reform Act, 18 U.S.C. § 1964(c).

**A.        Wire Fraud (18 U.S.C. § 1343)**

88.        Kulick devised and participated in a scheme to defraud investors, lenders, and co-owners of money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing that scheme, transmitted and caused to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, and pictures. Specific instances of wire fraud include, but are not limited to:

a.        Causing interstate wire transfers of investor capital contributions based on false representations that funds would be used for property operations, debt service, and capital improvements, when in fact funds were diverted to Kulick's personal expenses;

b.        Causing interstate wire transfers from Vesta Realty and Vesta Holdings accounts to Kulick's personal bank accounts totaling at least $1.2 million in January-February 2025 alone;

c.        Causing interstate wire transfers totaling $3.1 million to pay Kulick's personal American Express bills and automobile loans in January-February 2025;

d.        Causing an interstate wire transfer of $1.3 million to pay Kulick's personal American Express bill in March 2025;

e.        Causing interstate wire transfers in connection with the YSA borrowings of $7.338 million without authorization or disclosure;

f.        Causing interstate wire transfers in connection with the fire-sale loan transfers of $13.4 million in loans for $3.4 million;

g.        Transmitting false financial reports, investor communications, and account information by electronic mail across state lines to induce investors to refrain from exercising contractual remedies;

h.    Causing interstate ACH transfers of rent revenues to accounts from which funds were diverted rather than applied to debt service and property operations;

i.    Causing interstate wire transfers in connection with merchant cash advances at usurious rates, pledging future rent receivables without authorization;

j.    Transmitting by interstate wire false assurances to lenders concerning the financial condition of borrower entities, including false representations regarding compliance with loan covenants.

k.    Transmitting by email the false representation to investors with respect to the short term loans Kulick took with Diveroli loans that "all interest on those loans was, and remains my responsibility."

**B.    Mail Fraud (18 U.S.C. § 1341)**

89.    Kulick devised and participated in a scheme to defraud investors, lenders, and co-owners of money and property, and for the purpose of executing that scheme, placed and caused to be placed in authorized depositories for mail matter, and caused to be delivered by the United States Postal Service or private interstate carriers, letters, documents, and communications. Specific instances of mail fraud include, but are not limited to:

a.    Mailing or causing to be mailed Private Placement Memoranda and investor solicitation materials containing materially false representations about the enterprise's financial controls, operational discipline, and use of investor funds;

b.    Mailing or causing to be mailed K-1 tax forms, investor communications, and financial reports that concealed the true financial condition of the enterprise;

c.    Mailing or causing to be mailed loan documents, including the CPSAs and second mortgages, in furtherance of the unauthorized borrowing scheme;

d.      Mailing or causing to be mailed responses to books-and-records demands that were knowingly false, incomplete, or designed to obstruct discovery of the fraud.

**C.      Money Laundering (18 U.S.C. § 1956)**

90.      Kulick devised and participated in a scheme to defraud investors, lenders, and co-owners of money and property, and for the purpose of executing that scheme, conducted financial transactions with the proceeds of such specified unlawful activity, as defined in 18 U.S.C. §1956(c)(7)(B)(iii). Specific instances of money laundering include, but are not limited to:

a.      Causing interstate wire transfers of investor capital contributions based on false representations that funds would be used for property operations, debt service, and capital improvements, when in fact funds were diverted to Kulick's personal expenses;

b.      Causing interstate wire transfers from Vesta Realty and Vesta Holdings accounts to Kulick's personal bank accounts totaling at least $1.2 million in January-February 2025 alone;

c.      Causing interstate wire transfers totaling $3.1 million to pay Kulick's personal American Express bills and automobile loans in January-February 2025;

d.      Causing an interstate wire transfer of $1.3 million to pay Kulick's personal American Express bill in March 2025.

e.      Causing seven transfers of funds from Woodscape's bank account to Vesta Holdings; from December 1, 2025 to December 31, 2025; funds that were obtained from a capital call falsely promised to for required repairs to the Woodscape project.

**D.      Pattern: Relatedness and Continuity**

91.      The predicate acts are related because they share a common scheme: Kulick's exploitation of his managerial control over the enterprise to divert funds for personal use while concealing the diversions from investors and lenders. The acts are connected by common

participants (Kulick, Vesta Realty, Louis Investments), common victims (Upperman, other investors, lenders), common methods (interstate wire transfers, false representations, obstruction of access to books and records), and a common purpose (Kulick's personal enrichment at the expense of the enterprise and its stakeholders).

92.     The pattern has both open-ended and closed-ended continuity. Closed-ended continuity exists because the predicate acts span a period from at least 2018 through the present – more than eight years – and involve a multitude of separate fraudulent transactions. Open-ended continuity exists because the scheme is ongoing: Kulick continues to control the enterprise's funds, continues to divert rents, continues to obstruct access to books and records, and continues to exploit state-law procedural mechanisms to avoid accountability.

**Violation of 18 U.S.C. § 1962(c) — Conduct of Enterprise Affairs Through a Pattern of Racketeering Activity**

93.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

94.     At all relevant times, Kulick was a "person" within the meaning of 18 U.S.C. § 1961(3) who was employed by or associated with an enterprise engaged in, and the activities of which affect, interstate commerce.

95.     Kulick conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

96.     The enterprise – whether defined as Vesta Realty, Vesta Holdings, Louis Investments, Asset Holder, or the association-in-fact described above – is an entity or group of entities engaged in, and the activities of which affect, interstate commerce. The enterprise collects

rents, receives investor capital, services debt, communicates with investors and lenders, and transfers funds through interstate wire and mail.

97.    Kulick's pattern of racketeering activity, as described in detail above, includes multiple acts of wire fraud (18 U.S.C. § 1343) and mail fraud (18 U.S.C. § 1341) committed over a period of more than eight years and involving hundreds of millions of dollars in mismanaged and diverted funds.

98.    As a direct and proximate result of Kulick's violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property, including: (a) loss of approximately $1.369 million in equity investments; (b) non-repayment of $2.525 million in loans; (c) triggering of personal guaranty liability exceeding $490 million in aggregate; (d) loss of distributions and promote fees; and (e) litigation costs imposed by Kulick's misconduct.

99.    Plaintiffs' injuries were directly and proximately caused by the predicate acts of racketeering. But for Kulick's wire fraud, mail fraud and money laundering, including his diversion of entity funds, unauthorized borrowings, fire-sale loan transfers, and fraudulent concealment of the enterprise's true financial condition, Plaintiffs would not have suffered the losses described herein.

100.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover threefold the damages they have sustained, together with costs of suit and reasonable attorneys' fees.

## COUNT II

### (State Law Conversion Against All Defendants)

101.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

102.    Plaintiffs and the Property Entities had ownership of or the right to possess specific, identifiable funds—including investor capital contributions, rent revenues, loan proceeds, and distribution proceeds—that were held in designated entity accounts for the specific purposes of debt service, property operations, investor distributions, and capital improvements.

103.    The Defendants wrongfully exercised dominion and control over those funds by diverting them to his personal American Express accounts, personal bank accounts, automobile loans, payments to personal associates (including Kane Kalas and Kandice Dawn Kochell), and other non-business purposes, without authorization and in derogation of Plaintiffs' and the entities' property rights.

104.    As a direct and proximate result of the Defendants' conversion, Plaintiffs have suffered damages including loss of invested capital, non-payment of loans, loss of distributions, and triggering of guaranty liability, in an amount to be proven at trial.

## COUNT III

### (State Law Breach of Fiduciary Duty Against All Defendants)

105.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

106.    The Defendants owed fiduciary duties to Plaintiffs and the Property Entities. The Vesta Realty Operating Agreement confirms that the Manager is liable for acts constituting bad faith, fraud, gross negligence, willful misconduct, or breach of fiduciary duty.

107.    The Defendants breached their fiduciary duties by, inter alia: (a) self-dealing through diversion of entity funds to personal expenses; (b) commingling entity funds; (c) unauthorized borrowings at usurious rates; (d) unauthorized grants of liens on entity assets; (e) unauthorized fire-sale transfers of entity loans; (f) unauthorized equity dilutions; (g) failure to

maintain books and records; (h) failure to provide financial statements; (i) failure to pay vendors and maintain properties; (j) waste of enterprise assets; and (k) obstruction of investor information rights.

108.    As a direct and proximate result of the Defendants' breaches of fiduciary duty, Plaintiffs have suffered damages in an amount to be proven at trial, but not less than the aggregate of their lost investments, unpaid loans, lost distributions, and guaranty exposure.

## COUNT IV

### (State Law Accounting Against All Defendants)

109.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

110.    A fiduciary and confidential relationship exists between Defendants and Plaintiffs by virtue of Kulick's role as Manager and his control over all entity finances. The financial dealings among the parties are so complex—involving dozens of entities, property-level accounts, intercompany transfers, investor capital accounts, unauthorized debt, and "Ponzi-like" commingling—that Plaintiffs cannot determine their losses without a full accounting.

111.    Kulick and the entity Defendants control the relevant books, accounts, and cash flows, and have obstructed Plaintiffs' access to the information necessary to calculate their damages.

112.    Plaintiffs are entitled to a judicially supervised accounting of: all Vesta Realty, Vesta Holdings, Louis Investments, and property-level accounts; all investor capital accounts; all distributions; all property sales and refinancings; all intercompany transfers; all debt issuances and loan sales; all payments to or for Kulick; all payments to insiders; and all funds retained for 1031 exchanges or reinvestment.

## COUNT V

### (State Law Constructive Trust Against All Defendants)

113.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

114.    Kulick obtained identifiable property and proceeds – including personal credit-card payments, cash transfers to personal accounts, automobile-loan payments, fire-sale loan proceeds, and withheld distributions – through fraud, breach of fiduciary duty, and conversion.

115.    Equity requires that Kulick and the other Defendants be declared a constructive trustee of all funds and property traceable to misappropriated entity assets, investor distributions, loan proceeds, unauthorized debt proceeds, equity-sale proceeds, and property-sale proceeds, for the benefit of Plaintiffs and the Property Entities.

116.    The funds and assets can be traced or should be traced through the accounting and receiver investigation sought herein.

## COUNT VI

### (State Law Fraud Against All Defendants)

117.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

118.    At all relevant times, Kulick and the other Defendants owed contractual and fiduciary duties to Plaintiffs to implement and comply with adequate financial controls, to maintain segregated accounts for each entity, and to report financial information fully and accurately. Given those explicit obligations, which included the retention of an independent accountant/controller to prepare the enterprise's financial records and report its results, Plaintiffs reasonably relied on the

integrity and accuracy of the enterprise's financial reporting and Defendants' representations concerning the use of investor funds.

119. Kulick, on behalf of the entity Defendants, made materially false and misleading statements and omissions to Plaintiffs, including but not limited to: (a) false representations that investor capital contributions would be used for property operations, debt service, and capital improvements, when in fact funds were being diverted to Kulick's personal expenses, including personal American Express bills, automobile loans, cash transfers to personal accounts, and payments to personal associates; (b) false assurances that adequate financial controls were in place and that entity funds were properly segregated, when in fact Kulick was commingling funds across dozens of entities in a manner the forensic report characterized as exhibiting "Ponzi-like indicia"; (c) false representations that refinancings or short-term capital needs were for legitimate business purposes, when in fact Kulick was using the proceeds to conceal prior diversions and fund his personal lifestyle; (d) concealment of unauthorized borrowings at usurious rates from YSA and other lenders; (e) concealment of unauthorized grants of liens and second mortgages on portfolio properties; (f) concealment of fire-sale transfers of approximately $13.4 million in enterprise loans for approximately $3.4 million; (g) transmission of false or misleading investor communications, financial reports, and K-1 forms that concealed the true financial condition of the enterprise; and (h) false assurances of compliance with the Manager's Memorandum and operating agreement requirements.

120. Kulick knew that his representations were false and misleading when made, or made them with reckless disregard for their truth or falsity. Kulick had actual knowledge that he was diverting entity funds to personal expenses, that financial controls had not been implemented as represented, that entity accounts were not properly segregated, and that the enterprise's financial

condition was materially worse than disclosed to investors. The forensic evidence, including $3.1 million in payments of Kulick's personal American Express bills and automobile loans in a single two-month period, $1.2 million in cash transfers to personal bank accounts, and account activity "highly correlated with classic Ponzi-like schemes," demonstrates that Kulick's simultaneous assurances to investors were knowingly false.

121.    Kulick made the foregoing false representations and omissions with the intent to deceive Plaintiffs and to induce them to: (a) continue investing capital in the enterprise; (b) refrain from exercising contractual remedies, including removal of Kulick as Manager; (c) remain exposed on personal guaranties; (d) extend additional loans to enterprise entities; and (e) permit Kulick to continue managing the properties and controlling the enterprise's funds without interference.

122.    Plaintiffs reasonably relied to their detriment on Kulick's materially false and misleading statements and omissions. Specifically, in reliance on Kulick's representations, Plaintiffs continued to invest approximately $1,369,488 in capital across multiple Vesta deals, extended approximately $2,525,000 in loans to Vesta-affiliated entities, remained exposed as personal guarantors on 28 property-level loans exceeding $490 million in the aggregate, refrained from exercising contractual remedies during the period of concealment, and permitted Kulick to continue managing the properties. Plaintiffs' reliance was reasonable given Kulick's fiduciary position, his control over all books and records, and the presence of an independent controller whose oversight was designed to prevent the very misconduct now alleged.

123.    As a direct and proximate result of Kulick's fraud, Plaintiffs have suffered damages including, but not limited to: (a) loss of approximately $1,369,488 in equity investments; (b) non-repayment of approximately $2,525,000 in outstanding loans; (c) triggering of personal guaranty

liability on loans exceeding $490 million in aggregate; (d) loss of distributions and promote fees; and (e) litigation costs imposed by Kulick's misconduct, in an amount to be proven at trial. Kulick, Vesta Realty, and Louis Investments are jointly and severally liable for all such damages, together with punitive damages warranted by Kulick's intentional, malicious, and egregious conduct.

## COUNT VII

### (State Law Fraudulent Inducement Against All Defendants)

124.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

125.    Prior to and at the time Plaintiffs made their equity investments, extended loans, and executed personal guaranties in connection with the Vesta enterprise, Kulick, on behalf of the entity Defendants, made material misrepresentations and failed to disclose material facts for the purpose of inducing Plaintiffs to enter into those transactions. Specifically, Kulick represented to Plaintiffs that: (a) investor capital would be used exclusively for property acquisitions, operations, debt service, and capital improvements; (b) each property-level entity maintained separate, segregated bank accounts and financial controls; (c) Vesta Realty employed an independent controller to ensure compliance with the Manager's Memorandum and fiduciary obligations; (d) the enterprise maintained strong operational discipline, in-house property management, and a strong lending network; and (e) the enterprise was generating adequate cash flow to service its debt and provide returns to investors.

126.    Each of the foregoing representations was materially false when made. At the time Kulick induced Plaintiffs to invest capital, extend loans, and execute guaranties, Kulick was already diverting entity funds for personal use, commingling funds across entities, failing to maintain segregated accounts, failing to implement the financial controls required by the

Page 52

Manager's Memorandum, and concealing the enterprise's deteriorating financial condition. The independent controller either failed to recognize or was prevented from reporting Kulick's ongoing misconduct, and Kulick subsequently fired the controller: the very person whose oversight was supposed to prevent the fraud.

127.    Kulick knew that his representations were false and intended them to induce Plaintiffs to invest additional capital, extend loans, execute guaranties, and refrain from exercising contractual remedies. Kulick concealed from Plaintiffs that the enterprise's cash flow shortages were the result of his own diversions and mismanagement, and affirmatively misrepresented that funds were needed to cover legitimate short-term needs such as closing costs, fees to lock in interest rates, and earnest money. Kulick promised that loans would be repaid within a matter of days. These representations were false when made and were intended to prevent Plaintiffs from discovering the full scope of Kulick's misconduct and from exercising contractual remedies, including removal.

128.    In reliance on Kulick's false representations and material omissions, Plaintiffs were induced to: (a) make equity investments totaling approximately $1,369,488 across multiple Vesta deals through their controlled entities; (b) extend loans totaling approximately $2,525,000 to Vesta-affiliated entities; (c) execute personal guaranties on 28 property-level loans with aggregate exposure exceeding $490 million; and (d) refrain from exercising contractual removal and termination rights that would have stopped Kulick's scheme at an earlier stage, when losses could have been mitigated. But for Kulick's fraudulent inducement, Plaintiffs would not have entered into these transactions or remained exposed to the resulting liabilities.

129.    Plaintiffs' reliance was reasonable. Kulick occupied a position of trust and confidence as the sole Manager of the enterprise, with exclusive control over all books, records,

bank accounts, financial reporting, and investor communications. Plaintiffs had no independent means of verifying Kulick's representations, particularly after Kulick restricted access to financial records, terminated accounting personnel, and met information requests with hostility, deflection, and obstruction. The presence of an independent controller further reinforced Plaintiffs' reasonable belief that appropriate oversight was being exercised.

130.    As a direct and proximate result of Kulick's fraudulent inducement, Plaintiffs have suffered damages including, but not limited to: (a) loss of approximately $1,369,488 in equity investments that Plaintiffs would not have made but for the fraud; (b) non-repayment of approximately $2,525,000 in loans that Plaintiffs would not have extended but for the fraud; (c) triggering of personal guaranty liability on loans exceeding $490 million in the aggregate that Plaintiffs would not have guaranteed but for the fraud; (d) loss of distributions and promote fees; and (e) litigation costs imposed by Kulick's misconduct, in an amount to be proven at trial. Kulick, Vesta Realty, and Louis Investments are jointly and severally liable for all such damages, together with punitive damages warranted by Kulick's intentional and egregious conduct.

**COUNT VIII**

**Appointment of Federal Equity Receiver**

131.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

132.    Plaintiffs are entitled to the appointment of a federal equity receiver over Vesta Realty, Vesta Holdings, Louis Investments, Asset Holder and the Property Entities (collectively, the "Receivership Entities") pursuant to Federal Rule of Civil Procedure 66 and this Court's inherent equitable powers.

133. The appointment of a receiver is warranted because: (a) Plaintiffs have demonstrated a valid claim and a probability of success on the merits; (b) Kulick has engaged in ongoing fraud and mismanagement; (c) the portfolio assets are in imminent danger of further loss, waste, dissipation, and diminution in value; (d) legal remedies are inadequate because Kulick controls all books, accounts, and management platforms; (e) the balance of harms overwhelmingly favors receivership; and (f) less drastic remedies, including the Manager's Memorandum, independent controller, and state-court receivership proceedings, have all proven inadequate.

134. Kulick has systematically exploited state-law procedural mechanisms in Oklahoma (12 Okl. St. § 993(C)) to bond over and suspend court-ordered property-level receiverships, maintaining control of rental income during appeals while continuing to divert funds. A federal receivership, governed by Federal Rule 66, would not be subject to these state-law circumvention mechanisms and would provide immediate, enterprise-wide relief.

135. Kulick and the Property Entities are receiving over $4 million a month in rent across the entire portfolio while failing in almost every case (with the exception of the handful of properties for which the lenders have taken control of inbound rents through a lockbox arrangement) to make debt service payments. Many of the lenders, including Fannie Mae, have complained that they have not received debt service payments in months. A receiver is needed to ensure that inbound rents are being appropriately utilized for necessary property-level expenses (including utilities, maintenance, and insurance) and debt service.

136. The receiver should be empowered to: (a) take control of all books, records, bank accounts, accounting systems, and property-management operations; (b) collect rents and revenues; (c) pay necessary operating expenses including debt service and utilities; (d) preserve, maintain, and where appropriate improve properties; (e) investigate intercompany transfers and

trace diverted funds; (f) employ professionals; (g) communicate with lenders, vendors, investors, and regulators; (h) market and sell portfolio properties in value-maximizing transactions; (i) defend or resolve pending foreclosure actions; (j) report to this Court; and (k) seek further authority as needed.

137.    Concurrently with this Complaint, a motion has been filed with this Court seeking appointment of a federal equity receiver on an expedited basis, consistent with this Count.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court enter judgment in their favor and against Defendants, and grant the following relief:

A.    On Count I (RICO), award Plaintiffs treble damages pursuant to 18 U.S.C. § 1964(c), together with costs of suit and reasonable attorneys' fees;

B.    On Count II (Conversion), award Plaintiffs compensatory damages in an amount to be proven at trial;

C.    On Count III (Breach of Fiduciary Duty), award Plaintiffs compensatory and, where applicable, punitive damages in an amount to be proven at trial;

D.    On Count IV (Accounting), order a full and complete accounting of all funds received, held, transferred, or disbursed by Defendants and all entities within the enterprise;

E.    On Count V (Constructive Trust), impose a constructive trust on all funds and property traceable to Defendants' wrongful conduct for the benefit of Plaintiffs and the Property Entities;

F.    On Count VI (Fraud), award Plaintiffs compensatory and punitive damages in an amount to be proven at trial;

G.     On Count VII (Fraudulent Inducement), award Plaintiffs compensatory and punitive damages, including rescissory damages, in an amount to be proven at trial;

H.     On Count VIII, and pursuant to the Motion for Appointment of Receiver being filed concurrently herewith, immediately appoint a neutral federal equity receiver over Vesta Realty, Vesta Holdings, Louis Investments, Asset Holder, and the Property Entities, with full powers to take control of operations, preserve assets, investigate transactions, employ professionals, and pursue value-maximizing dispositions;

I.     Enter an injunction prohibiting Kulick from: (i) transferring, encumbering, or dissipating any assets of the enterprise; (ii) destroying, altering, or concealing books and records; (iii) acting in any managerial capacity with respect to any entity within the enterprise; or (iv) communicating with investors, lenders, or vendors on behalf of the enterprise;

J.     Award Plaintiffs prejudgment and post judgment interest at the maximum rate allowed by law;

K.     Award Plaintiffs their reasonable costs of suit and attorneys' fees to the extent permitted by statute, contract, or equity; and

L.     Grant such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims and issues so triable.


DATED:  June 25, 2026


Page 57

Respectfully submitted,

/s/Stephen Q. Peters
Stephen Q. Peters, OBA #11469
Jason A. McVicker, OBA #31150
Thomas M. Askew, OBA #13568
Sharon K. Parker, OBA #19010
**JPM Law** | Jayne Peters McVicker
Burke Askew & Parker
401 S. Boston Avenue, Suite 2000
Tulsa, Oklahoma 74103
Telephone:  918/938.7944
Facsimile:   918/938.7966
speters@jpmlawgroup.com
jmcvicker@jpmlawgroup.com
taskew@jpmlawgroup.com

sparker@jpmlawgroup.com

and

Marc R. Greenberg (*pro hac vice* pending)
TUCKER ELLIS LLP
515 South Flower Street, 42nd Floor
Los Angeles, CA  90071-2223
Phone:  213-430-3400
Fax:  213-430-3409
E-mail:  marc.greenberg@tuckerellis.com

and

Thomas R. Fawkes (*pro hac vice* pending)
TUCKER ELLIS LLP
233 S. Wacker Dr., Suite 6950
Chicago, IL  60606
Phone:  312-624-6300
Fax:  312-624-6309
E-mail:  thomas.fawkes@tuckerellis.com

**ATTORNEYS FOR JOHN ALEX UPPERMAN, ILLINI HOLDINGS, LLC; THRIVE REALESTATE, LLC; WILDWOOD ASSETS, LLC; TU PROPERTIES, LLC;OAK STREET CAPITAL, LLC; and 12 OAK LENDING, LLC**

Page 58

## VERIFICATION

I, John Alex Upperman, the above-named Plaintiff, hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on June 24, 2026.

John Alex Upperman