# Exhibit B

EFiled: Mar 10 2026 01:22PM EDT
Transaction ID 78681069
Case No. 2025-1319-KSJM

# IN THE COURT OF CHANCERY OF THE
## STATE OF DELAWARE

MARC KULICK, VESTA HOLDINGS, LLC, and ASSET HOLDER, LLC,

        Plaintiff,

vs.

YSA INVESTMENTS 1, LLC,

        Defendant.

_____/

C.A. No.: 2025-1319-KSJM

## PLAINTIFFS' CORRECTED POST-TRIAL BRIEF IN SUPPORT OF THEIR MOTION FOR PERMANENT INJUNCTION

**Of Counsel**
Benjamin H. Brodsky, Esq.,
(admitted *pro hac vice*)
Michael Fisher, Esq.,
(admitted *pro hac vice*)
BRODSKY FOTIU-WOJTOWICZ, PLLC
*Counsel for Plaintiffs*
44 W Flagler St, Suite 2200
Miami, Florida 33130
Telephone: (305) 503-5054

Dated: March 10, 2026

Sean J. Bellew (#4072)
BELLEW LLC
3801 Kennett Pike
Building D, Suite 300
Wilmington, DE 19807
Telephone: (610) 585-5900
*Counsel for Plaintiffs*

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................1

THE EVIDENCE AT TRIAL ................................... ...............................2

    A. Plaintiffs Enter Into the Six Initial Loan Transactions with YSA .................2

    B. The February 18, 2025 Loan Transaction ...................... ...........................5

    C. The April 2025 Loan Transaction ................................. ...........................8

    D. The July Loan Transactions ............................... ..............................9

    E. Evidence Relevant to the Equities ............................ ..........................10

        1. The Interest Charged .............................. ..........................10

        2. The Shakedown .............................. ..........................11

        3. Refusal to Provide a Payoff ............................. .........................13

    F. The Second Mortgages .............................. ...........................14

STANDARD ON APPLICATION FOR MANDATORY INJUNCTIVE RELIEF.15

    ARGUMENT ................................................ .........................15

    I. Plaintiffs Succeed on the Merits. ........................... .........................15

        A. YSA Has No Right to Record the Second Mortgages. .....................15

            1. YSA's security is limited to the "Interests" in the "Entities. .16

            2. The Powers of Attorney do not Expand YSA's collateral. ...18

            3. The Joinders do not expand YSA's collateral either..............19

B. The Court Cannot Consider Parol Evidence to Rewrite the Unambiguous CPSAs.................................... ........................22

C. The Proffered Parol Evidence Does Not Support YSA's interpretation ..............................................................26

II. Plaintiffs and Nonparties Will Suffer Irreparable Harm Absent a Mandatory Injunction. .................................................................. ........................31

III. Plaintiffs and Nonparties Will Suffer Irreparable Harm Absent a Mandatory Injunction. .................................................................. ........................32

CONCLUSION ................................................................ ........................34

APPENDIX A: Summary of Terms of Four Loans at Issue ........ ........................36

## TABLE OF AUTHORITIES

<u>Case Law</u>

*Appleby v. Batty*,

C.A. No. 2023-1039-LM, 2025 WL 714864 (Del. Ch. March 5, 2025) ................15

*In re COVID-Related Restrictions on Religious Servs.*,

285 A.3d 1205 (Del. Ch. 2022), aff'd, 326 A.3d 626 (Del. 2024) ........................15

*GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*,

36 A.3d 776 (Del. 2012) ....................................................... ..........................16

*Envolve Pharmacy Sols., Inc. v. Rite Aid Hdqtrs. Corp.*,

No. CVN19C12214PRWCCLD, 2021 WL 140919

(Del. Super. Ct. Jan. 15, 2021) ..................................................... ........................17

*Radio Corp. of America v. Philadelphia Storage Battery Co.*,

6 A.2d 329 (Del. 1939) ....................................................... ..........................17

*Council of Unit Owners of Pilot Point Condo. v. Realty Growth Invs.*,

436 A.2d 1268 (Del. Ch. 1981) ..................................................... ........................18

*Thompson v. Barrow*,

No. 2023-0410-LM (MTZ), 2025 WL 2742486 (Del. Ch. Sept. 26, 2025) ...........18

*Cannon v. Romeo Sys., Inc.*,

No. 2021-0171-PAF, 2025 WL 2848069 (Del. Ch. Oct. 7, 2025) .............21, 23, 25

*In re Schmaling*,

783 F.2d 680 (7th Cir. 1986) ................................................ ........................21

*Berkshire Bank v. Kelly*,

217 Vt. 439 (Vt. 2023) ................................................ ........................23

*In re Martin Grinding & Machine Works, Inc.*,

42 B.R. 888 (Bankr. N.D. Ill. 1984) ................................................ ........................23

*Vianix Delaware LLC v. Nuance Commc'ns, Inc.*,

No. CIV.A. 3801-VCP, 2010 WL 3221898 (Del. Ch. Aug. 13, 2010) .................25

*Restanca, LLC v. House of Lithium, Ltd.*,

C.A. No. 2022-0690-PAF, 2023 WL 4306074 (Del. Ch. June, 2023) ...................28

*Osborn ex rel. Osborn v. Kemp*,

991 A.2d 1153 (Del. 2010) ................................................ ........................30

*Kaiser Aluminum Corp. v. Matheson*,

681 A.2d 392 (Del. 1996) ................................................ ........................30

*Hub Grp., Inc. v. Knoll*,

No. 2024-0471-SG, 2024 WL 3453863 (Del. Ch. July 18, 2024) .........................30

*Zimmerman v. Crothall*,

62 A.3d 676 (Del. Ch. 2013) ................................................ ........................30

*DeMarco v. Christiana Care Health Services, Inc.*,

263 A.3d 423 (Del. 2021) ................................................ ........................32

*Sparton Corp. v. O'Neil*,

2018 WL 3025470 (Del. Ch. June 18, 2018) ............................. .........................32

*True N. Commc'ns Inc. v. Publicis S.A.*,

711 A.2d 34 (Del. Ch. 1997) ................................... .........................33

*SLC Beverages, Inc. v. Burnup & Sims, Inc.*,

1987 WL 16035 (Del. Ch. Aug. 20, 1987) ................................ .........................33

**<u>Statutes</u>**

6 Del. C. § 18-701 ........................................... ....................17, 18

6 Del. C. § 9-203 ......................................... .........................21

6 Del. C. § 9-108 ........................................ ....................21, 22

**PLAINTIFFS' POST-TRIAL BRIEF IN SUPPORT OF THEIR
<u>MOTION FOR PERMANENT INJUNCTION</u>**

Plaintiffs Marc Kulick, Vesta Holdings, LLC ("Vesta Holdings"), and Asset Holder, LLC ("Asset Holder"), by and through undersigned counsel, hereby file their Post-Trial Brief in Support of Their Motion for Permanent Injunction.

Plaintiffs' entitlement to a mandatory permanent injunction, as informed by the evidence at trial, is clear. Under the plain language of the loan documents and pursuant to black letter Delaware law on secured transactions, the second mortgages recorded by YSA against real property owned by non-parties are unlawful and must be lifted.[1]

The operative Collateral Pledge and Security Agreements (the "CPSAs") define "Collateral" exclusively as "membership interests" owned by Plaintiffs in enumerated LLCs. No reading of the CPSAs could expand YSA's security interest beyond the Collateral. Not the Joinders: on their face and as admitted by YSA at trial, the Joinders neither list nor describe any additional collateral whatsoever. Nor the powers of attorney clauses: YSA's argument that it had unfettered rights through the powers of attorney to expand its collateral to whatever it deems appropriate is an affront to Delaware law.

---

[1]    As noted in their pre-trial briefing and stated in open court at trial, Plaintiffs are not proceeding on their argument that Mr. Kulick lacked authority to give the second mortgages.

Based on the unambiguous contractual limitation on YSA's security, which YSA blew through in recording the second mortgages, the Court need not reach the equities.  Even if it did, trial laid bare where the equities lie.  YSA, through unconscionable threats and pressure tactics, has attempted to collect an unlawful, usurious debt.  The second mortgages, which are harming countless innocent investors, are of a piece of this.  A mandatory injunction must be issued to lift them.

### THE EVIDENCE AT TRIAL

This is a case about the application of unambiguous terms of written contracts, and the relevant facts were largely undisputed at trial.

**A.      Plaintiffs Enter Into the Six Initial Loan Transactions with YSA**

Mr. Kulick, through entities he owns, is the manager of a portfolio of multi-family real estate assets.  (Trial Transcript ("Trial Tr."), attached hereto as Exhibit 1, at 6:18-7:4.)  Those assets are owned by individual title owners (the "Title Owners").[2] (*Id.* at 7:5-8:1.)  In addition to being the manager, Mr. Kulick owns

---

[2]      The Title Owners that have had the second mortgages recorded against their real property are A-V 23 East Owner, LLC; 727 Lofts Best Living LLC; Barcelona Best Living LLC; Bryan Hill's Best Living LLC; TRDWind Capitol LLC; A-V Classen Owner LLC; Copperfield Apartments LP; Fairfax Best Living LLC; Lakeside Best Living LLC; Bartlesville Best Living LLC; Lofts at North Penn Best Living LLC; Montgomery Best Living LLC; Muntage Best Living LLC; One Eton Square LLC; Ridge Best Living LLC; Riverpark Best Living LLC; Shoreline's Best Living LLC; Springdale Village's Best Living, LLC; Summer Oaks Best Living, LLC; Ridge Best Living LLC; Jenk's Best Living LLC; A-V Village Creek Owner LLC; Villas at Midtown Best Living LLC; Woodland Manor's Best Living LLC;

fractional interests in holding companies that in turn own interests in the Title Owners. (*Id.* at 8:7-9:10.) Mr. Kulick holds some of those fractional interests through the two other Plaintiffs, Vesta Holdings and Asset Holder. (*Id.*) Neither Mr. Kulick nor the other Plaintiffs own the mortgaged assets—they are owned by the Title Owners. (*Id.* at 9:6-14.)

Mr. Kulick was introduced to Efraim Diveroli in April 2024 as part of Mr. Kulick's efforts to obtain short-term financing. (Trial Tr. at 9:19-10:3.) In October 2024, after several months of intermittent negotiations, the parties entered into their first transaction, a short-term loan of $775,000 at 85% annual interest. (*Id.* at 10:4-13, 10:19-24.) The loan documents for this first loan, made on October 8, 2024, are in the record as JX10. None of the Title Owners were borrowers, pledgors, or guarantors under this loan.

The collateral for this first loan—set forth in a Collateral Pledge and Security Agreement (the "October 2024 CPSA")—was (i) Vesta Holdings' already-encumbered membership interests in thirteen Delaware LLCs; (2) Asset Holder's unencumbered membership interests in four other Delaware LLCs; and (3) the rights inhering in those two sets of interests, such as the rights to distributions as a member and other rights given to a member under the various LLCs' organizational

---

Woodland Oaks Best Living LLC; B & J Woodscape/Oklahoma City LLC; and Easton Best Living, LLC

documents. (JX 10 at 9-10.) This collateral was used for and identically described in all subsequent loan transactions between the parties save one (the April 2025 loan transaction described below).   Plaintiffs repaid the October 2024 loan. (Trial Tr. at 13:17-18.)

Over the next several months (January 22, 2025; January 24, 2025; January 30, 2025; February 4, 2025; and February 10, 2025), Plaintiffs and YSA entered into five more short-term loan transactions, using the same form of documents as the October 2024 loan, including the listed collateral, for similar amounts and at similar interest rates.   (*Id.* at 13:19-14:15.) Plaintiffs paid off each of these loans (*id.* at 14:16-18), and they are not in dispute here.

**B.    The February 18, 2025 Loan Transaction**

On February 18, 2025, the parties entered into a seventh loan transaction, using loan documents essentially identical to those used in the prior six loans. (*Id.* at 15:8-13.)  The one difference was the addition of a "Joinder of Borrower-Affiliated Entities" which is annexed to the last page of the CPSA.  The February 18, 2025 loan documents are in the record at JX16 and the Joinder is at page 22 of that exhibit. YSA and its counsel drafted the one-paragraph Joinder (Trial Tr. 202:21-203:5; JX 14; JX 15), which reflects Mr. Kulick's assumption of Vesta Holding's obligations under the CPA.

Like the October 2024 CPSA, the February 18, 2025 CPSA (the "February CPSA," JX0016 at 9-22) lists in its recitals the same two categories of membership interests in seventeen Delaware limited liability companies: unencumbered membership interests (defined as the "Unencumbered Interests") owned by Asset Holder (as "Borrower" under the February CPSA) in four of the companies (each defined as a "Borrower Entity"); and encumbered membership interests (defined as the "Encumbered Interests") owned by Vesta Holdings (as "Pledgor" under the February CPSA) in the remaining thirteen companies (each defined as a "Pledgor Entity"). The Unencumbered Interests and Encumbered Interests are defined in the recitals as the "Interests." And the Borrower Entities and Pledgor Entities are defined in the recitals as the "Entities." Notably, the descriptor "Pledgor Entities" refers to entities in which the Pledgor owned a membership interest; it does not mean that those entities themselves were pledgors. The seventeen Entities each hold a direct or beneficial interest in a different property-owning Delaware LLC, which are among some of the Title Owners. (Trial Tr. at 9:2-14,16:12-19:22)

In relevant part, "Collateral" is defined in Section 1.1(a) of the February CPSA as "the Interest and any and all other interests in any Entity that are now owned or hereafter acquired by Borrower or Pledgor, as applicable, in or to any Entity." "Collateral" also includes the rights as members or interest holders for the

5

defined Interests. The Collateral was limited to membership interests and never included any real estate. (Trial Tr. at 19:23-20:1.)

The Joinder annexed to the last page of the February CPSA (the "February Joinder"), signed by Mr. Kulick signed and attested to him personally, provides:

> The undersigned, as a manager, member or other authorized person of any and all Guarantor Entities and any other entities in which the undersigned does now own or control or may herein after own or control during the term of that certain [February CPSA] hereby agrees to jointly and severally assume all obligations of [Vesta Holdings] under the [February CPSA] for all purposes thereof on the terms set forth therein and to be bound by the terms as fully as if the undersigned had personally and individually executed and delivered the [February CPSA] as of the date thereof.

(JX16 at 22.)

The February CPSA also contains a Power of Attorney clause at Section 4.6 that provides as follows:

> Borrower and Pledgor each appoint Lender as its/his/her/their attorney-in-fact with full power in Borrower's and Pledgor's name and behalf to do every act that Borrower and Pledgor are obligated to do or may be required to do hereunder or to do all other things which Lender is permitted to do under this Agreement or any other Loan Documents or are necessary to carry out this Agreement or the other Loan Documents; however, nothing in this section shall be construed to obligate Lender to take any action hereunder. Through exercise of this irrevocable power of attorney, Lender may take whatever steps that it deems necessary in its sole discretion to secure and protect its interests, including but not limited to filing any action and doing whatever else is necessary to protect its interests, enforce its rights, and collect all amounts due to Lender. This shall include but not be limited to taking any action against any of the Collateral or any real or personal property owned by the Collateral. The power of attorney hereby created is a power coupled with an interest, and shall be irrevocable. Neither Lender nor any of its officers, managers, employees or agents of Lender will be liable for any acts of commission or omission nor for any error in judgment or mistake of fact or law unless the

6

same shall have resulted from gross negligence or willful misconduct. Notwithstanding anything to the contrary above, Lender shall not exercise the foregoing power of attorney unless an Event of Default exists and only as long as an Event of Default exist.

(JX16 at 13, §4.6.)

The February 18, 2025 Promissory Note (the "February Note," JX16 at 1-8) is for a principal sum of $1,500,000.00, has a maturity date of May 19, 2025, and a stated annual interest rate of 133.333%. Section 11.9 of the February Note provides that the Loan Documents (including the February CPSA and February Joinder) are fully integrated—that is, they supersede any prior agreements or discussions regarding their subject matter and cannot be modified by prior, contemporaneous, or subsequent oral agreements or discussions. (JX0016 at 7, at §11.9.) The same section provides that Loan Documents may not be orally modified. (*Id.*)

**C.    The April 2025 Loan Transaction**

In April 2025, Plaintiff received an additional loan from YSA to finance its acquisition of Parc 1010, an apartment complex in Tulsa, Oklahoma. Copies of the loan documents from the April 2025 loan transaction are in the record at JX17.

In this transaction, YSA loaned $300,000 to three entities owned by Kulick Manager, LLC—Parc 1010 Holdco., LLC, Parc 1010 GP, LLC, and Parc 1010 Investors, LLC—with a maturity date of April 9, 2025, and an annual interest rate of 1,500.00%. (JX17 at 1.)

The April Note contains the identical integration clause as the February Note. (JX 17 at 8, §11.9.)

The April CPSA (JX17 at 11-25) lists in its recital two categories of membership interests being pledged: encumbered limited partnership interests in an Oklahoma limited partnership, Wellsford Oaks LP; and unencumbered membership interests owned by Kulick Manager, LLC (as "Pledgor" under the April CPSA) in Parc 1010 Holdco., LLC, Parc 1010 GP, LLC, and Parc 1010 Investors, LLC.  The definition of Collateral under the April CPSA is identical to the definition of that term as set out in the February CPSA. (JX17 at 11-12, §1.1(a).)  The April CPSA contains a Power of Attorney clause that is identical to the one in the February CPSA (JX17 at 15, §4.6), and the language of the Joinder of Borrower-Affiliated Entities annexed to the April CPSA (the "April Joinder") is identical to the February Joinder (JX 17 at 25).  Mr. Kulick is the signatory to the April Joinder.  (*Id.*)

The April loan transaction differs from the others at issue in this case in that it contains an additional loan document, a Membership Interest Pledge and Assignment Agreement (the "MIPAA," JX17 at 34-42). Under the MIPAA, which was prepared and required by YSA (Trial Tr. at 25:14-20; JX18), Mr. Kulick pledged all his membership interests in Kulick Manager, LLC to secure the obligations of Parc 1010 Holdco., LLC, Parc 1010 GP, LLC, and Parc 1010 Investors, LLC. Mr. Kulick represented in the MIPAA that the interests in Kulick Manager, LLC were

"free and clear of any material liens, claims, encumbrances or security interests of any kind whatsoever."  (JX17 at 35, § 3.2.)

**D.    The July Loan Transactions**

On July 16, 2025 and July 31, 2025, Vesta Holdings took additional working capital loans from YSA. (Trial Tr. at 28:7-18.) The loan documents for the July transactions were in the same form as the loan documents for the February transaction.  (*Id.* at 28:19-22.)  The loan documents for the July 18, 2025 and July 31, 2025 transactions are in record as JX20 and JX21, respectively.

The loan on July 16, 2025 was for $365,000, had a maturity date of July 30, 2025, and an annual interest rate of 960%.  (JX20 at 1.)  Interest under the July 16, 2025 Note compounds daily based on a 360-day year. (*Id.*)

The loan on July 31, 2025 was for $317,000, had a maturity date of August 5, 2025, and an annual interest rate of 7,000%. (JX21 at 1.)  Interest under the July 31, 2025 Note also compounds daily based on a 360-day year. (*Id.*)

The July CPSAs (JX20, JX 21) are identical to one another other than the dates listed within.  Under both, the recitals list the same two categories of membership interests in seventeen Delaware limited liability companies as listed in the February CPSA.  The only difference between the recitals in the July CPSAs and the recitals in the February CPSA is that Vesta Holdings is named as both Borrower and Pledgor and is recited to own all seventeen of the membership interests.  In all

9

other respects, including the definition of Collateral and the language of the Joinder and Power of Attorney clause, the three CPSAs (Feb. 18, July 16, and July 31) are identical.

**E.    Evidence Relevant to the Equities**

**1.    The Interest Charged**

In the record as JX28 are YSA's calculations of the interest owed under the four loans in question. According to YSA, it purported to "stop[] the loans from accruing interest/charges/penalties as of September 12, 2025." (JX28 at 1.)  YSA stopped the interest from accruing on that date because, by then, its interest exceeded the estimated value of the real estate it wrongfully encumbered, and therefore there was no need to let it accrue further.  (Trial Tr. at 46:10-18.)

According to YSA's calculations:

- Over 166 days, it had accrued $2.65 million interest on the $300,000 loan made on April 9, 2025;

- Over 58 days, it had accrued $3.47 million in interest on the $365,000 loan made on July 18, 2025; and

- Over 43 days, it had accrued $919,740,361.28 in interest on the $317,000 loan made on July 31, 2025.   (JX28 at 2.)

YSA also charged $1,000,000 in "Associated Note Penalties" for each of the July 2025 loans.  (*Id.*)

10

In total, YSA claims to be owed $929,667,606.85 in interest and fees on four loans with an outstanding principal balance of $2,482,000, the earliest of which was outstanding for less than six months at the time YSA stopped calculating interest.

YSA's expert testified at trial that the interest charged by YSA is reasonable. (Trial Tr. at 214:22-215:9.)

### 2. The Shakedown

Between June and October of 2025, Mr. Kulick and YSA discussed a larger financing of between $25 to $50 million. (Trial Tr. 30-31:19-31:5.) As part of YSA's due diligence into this potential transaction, it received "almost every document in existence in Vesta," and had "full, unadulterated access to [Vesta's] third-party property management system." (*Id.* at 31:2-5.)

Armed with information demonstrating the nearly $1 billion of real estate managed by Mr. Kulick, YSA began its "heavy-handed dragnet approach" to shake down Plaintiffs. (*Id.* at 172:19-20.) In October of 2025, under the guise of a due diligence trip, Mr. Diveroli along with two associates traveled to Oklahoma to meet with Mr. Kulick and see the properties. (*Id.* at 32:3-24.)

At a meeting called by Mr. Diveroli at the end of his trip to Oklahoma, Mr. Diveroli told Mr. Kulick for the first time that he owed YSA over a billion dollars, that no Delaware court would ever overturn the interest being charged, and that YSA now essentially owned the entire real estate portfolio Mr. Kulick managed. (*Id.* at

11

33:1-18.)  Mr. Diveroli then presented Mr. Kulick with two options: "the easy way or the hard way." (*Id.* at 33:18-19.)

The "easy way" would be to pay off Mr. Kulick and have him sign over deeds-in-lieu of foreclosure to YSA for all the properties. (*Id.* at 34:9-18.)

The "hard way" would be an "intense" lawsuit filed in Delaware. (*Id.* at 34:19-35:4.)  Mr. Diveroli came armed to the meeting with a complaint filled with salacious allegations against Mr. Kulick that named his wife as a co-defendant and co-conspirator in various alleged frauds. (*Id.* at 34:19-35:4.)

After Mr. Kulick failed to yield, YSA pressed the "hard way" approach, this time through its counsel.  In an email dated Friday, November 7, 2025, Joel Tasca sent an email to Plaintiffs' counsel, presenting Mr. Kulick with a binary choice. (JX23.) Mr. Kulick could give the deeds-in-lieu of foreclosure within three days, by Monday, November 10, 2025. (*Id.*)  But if he did not, Mr. Tasca advised that YSA would take certain steps.  It would file the complaint shown to Mr. Kulick at his earlier meeting with Mr. Diveroli. (*Id.*)  The draft complaint, attached to the email, named Mr. Kulick's wife as a co-defendant and made a variety of scandalous allegations against Mr. Kulick. (*Id.* at 35:19-36:21.)  It also contained allegations that Plaintiffs' counsel, counsel of record here, had participated in fraudulent conduct with Mr. Kulick. (*Id.*)  Mr. Tasca also advised that YSA would send "preservation notices" outlining the allegations against Mr. Kulick to a list of

12

approximately 70 people.  (JX23.)  The list of people included Mr. Kulick's investors, mortgage lenders, and his rabbi.  (Tr. Tr. at 36:22-37:6.)  These were merely threats, as YSA did not file the draft complaint or send the preservation notices.  (*Id.* at 37:12-38:3.)

### 3.    Refusal to Provide a Payoff

The day after Mr. Tasca sent this email, Mr. Kulick called Mr. Miley to request a pay-off, which Mr. Miley refused to give. (Trial Tr. at 141:20-142:11.)  As outlined in Plaintiffs' Motion to Compel Discovery Regarding the Claimed Outstanding Balance of the Debt (DIN No. 74), Plaintiffs made numerous additional but fruitless attempts to receive a payoff from YSA.  Plaintiffs did not receive a pay-off until February 6, 2026—which was the demand for nearly $1 billion. (JX0023, Trial Tr. 45:12-20.)

### F.    The Second Mortgages

On October 31, 2025, YSA recorded second mortgages against at least twenty-five multifamily apartment complexes located in Oklahoma and Kansas and owned by the Title Owners. (JX0027.) YSA purported to record the second mortgages as the attorney-in-fact of Mr. Kulick pursuant to the power of attorney clauses in the CPSAs. (*See generally id.*) Mr. Kulick did not see any of these mortgages before they were filed and did not agree to any of their terms. (*Id.* 38:23-39:1.)

The effects of the second mortgages have been devastating in various ways. Transactions related to the Muntage, Lofts, and Village Creek properties have been unable to close. (Trial Tr. 42:13-44:2, 45:4-6.)  The financial strain faced by the portfolio of properties managed by Mr. Kulick over the last several years is undisputed.  The second mortgages have prevented Mr. Kulick from pursuing his restructuring plan of "sell[ing] properties, liquidat[ing] some of the negative cash flow properties, pay[ing] off vendors, and get[tting] money" recirculating into the portfolio. (Trial Tr. 134:1-10.) Investors have sued, or threatened, to sue—indicative of the cascade of lawsuits arising out of the second mortgages. (Trial Tr. 134:11-135:11.) The second mortgages have also created hundreds of millions of dollars in recourse liability against Mr. Kulick personally. (Trial Tr. 39:5-20.)

### STANDARD ON APPLICATION FOR MANDATORY INJUNCTIVE RELIEF

"To obtain a permanent injunction, a plaintiff must show by a preponderance of the evidence: (1) actual success on the merits of the claims; (2) that the plaintiff will suffer irreparable harm if injunctive relief is not granted; and (3) that the harm to the plaintiff outweighs the harm to the defendant if an injunction is granted." *Appleby v. Batty*, C.A. No. 2023-1039-LM, 2025 WL 714864, at *7 (Del. Ch. March 5, 2025) (citations omitted).  The need to stop a threat of imminent irreparable harm is one way to show that a legal remedy would be inadequate. *In re COVID-Related*

14

*Restrictions on Religious Servs.*, 285 A.3d 1205, 1232-33 (Del. Ch. 2022), aff'd, 326 A.3d 626 (Del. 2024).

### **ARGUMENT**

### I.    **Plaintiffs Succeed on the Merits.**

#### A.    **YSA Has No Right to Record the Second Mortgages.**

The CPSAs limit the collateral to certain enumerated LLC membership interests and there is nary a mention in them of anything coming close to a right to mortgage real property owned by non-party entities.  Neither the power of attorney clauses contained within the CPSAs nor the Joinders appended to them provide any support for YSA's position that it was entitled to record the second mortgages. Because, as a matter of law and policy, collateral cannot be expanded beyond what a security agreement describes with reasonable specificity, and because the CPSAs fail to mention real property collateral at all—of the Title Owners or otherwise— Plaintiffs prevail on the plain language of the loan documents.

#### 1.    **YSA's security is limited to the "Interests" in the "Entities."**

The canons of contractual construction are well-known:

> The Court will interpret clear and unambiguous terms according to their ordinary meaning. Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language.  A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction.  Rather, an ambiguity exists when the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings.

*GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 780 (Del. 2012).  Under the plain language of the loan documents at issue, YSA has no right to record second mortgages against the Title Owners' real property.

The recitals of each of the CPSAs lists LLC membership interests, both unencumbered and encumbered.  Specifically, the recitals of the February and July CPSAs list membership interests in the same seventeen Delaware LLCs, and the recitals of the April CPSA lists membership interests in three Delaware LLCs and an Oklahoma limited partnership.  Across the four CPSAs, these interests are defined as the "Interests" and the entities in which the interests are held are defined as the "Entities."

"Collateral" is defined in the CPSAs as the "Interest and any and all other interests in any Entity that are now owned or hereafter acquired . . . in or to any Entity" along with all the various rights inhering in those Interests.  That is, the Collateral is limited to the *capital E* "Entities" listed in the recitals and *capital I* "Interests" in those Entities.  There is no reasonable reading of these documents that would expand the Collateral beyond Interests in Entities. *See Envolve Pharmacy Sols., Inc. v. Rite Aid Hdqtrs. Corp.*, No. CVN19C12214PRWCCLD, 2021 WL 140919, at *6 (Del. Super. Ct. Jan. 15, 2021) (citing *Radio Corp. of America v. Philadelphia Storage Battery Co.*, 6 A.2d 329, 334 (Del. 1939)) ("When a term is defined in a contract, and that definition is unambiguous, that definition controls.").

16

Membership interests—i.e., the Collateral—do not own any real or personal property. There is no bridge that can take YSA from the circumscribed definition of the Collateral in the CPSA to the boundless security it has arrogated to itself.

Furthermore, as a matter of law, and as noted by the Court at the preliminary injunction hearing, ownership of (or a security interest in) a limited liability company interest provides no ownership of (or a security interest in) the assets of the company. That is because "[a] limited liability company interest is personal property. A member has no interest in specific limited liability company property." 6 Del. C. § 18-701. Just as a creditor of a corporate shareholder has no right to seize property belonging to the corporation, YSA has no right to put mortgages on any real property—let alone real property owned by companies other than the Entities—through its security interest in the Collateral.

### 2.    The Powers of Attorney do not Expand YSA's collateral.

The Power of Attorney clauses in the CPSAs have been misused to record the second mortgages. The clauses did not create new collateral in the form of real estate assets owned by nonparty Title Holders. The clauses provide no cover for YSA's improper recording of the second mortgages.

"[I]n accepted legal parlance, a power of attorney means an instrument in writing by which one person, as principal, appoints another as his agent, or attorney in fact, and confers upon him the authority to act in the place and stead of the

17

principal for the purpose or purposes set forth in the instrument." *Council of Unit Owners of Pilot Point Condo. v. Realty Growth Invs.*, 436 A.2d 1268, 1275 (Del. Ch. 1981).[3]  While the Power of Attorney clauses gave YSA the right to act as Plaintiffs' agent under certain circumstances and might authorize acting against the Collateral (i.e., the Interests), they do nothing more than that.

Nor do the clauses give YSA any recourse to or a security interest in real property owned by the Entities let alone real property owned by the Title Owners in which the Entities own an interest.  *See* 6 Del. C. § 18-701.  The Powers of Attorney give YSA rights to proceed against "any real or personal property owned by the Collateral."  Yet membership interests do not own any real property.  YSA's rights are, at most, security interests in equity interests in various holding companies that own interests in the Title Owners.

In its pre-trial briefing, YSA has argued that it was allowed to record the second mortgages because it was granted unlimited power through the powers of attorney to "take whatever steps that it deems necessary in its sole discretion to secure and protect its interests."  This "interpretation" is glaringly unreasonable. According to YSA, anything it does is permissible if it serves its interests in collecting its debt.  Perhaps more fundamentally, it is directly contrary to the law of

---

[3]     Powers of attorney are construed more strictly than other contracts.  *See Thompson v. Barrow*, No. 2023-0410-LM (MTZ), 2025 WL 2742486, at *8 (Del. Ch. Sept. 26, 2025).

18

secured transactions in Delaware and across the country.  A secured lender has collateral in what is reasonably described in a security agreement, nothing less but nothing more.

### 3.    The Joinders do not expand YSA's collateral either.

YSA also relies upon a remarkable misreading of the Joinders as if to construe them as an agreement made by unidentified nonparties to encumber their real estate. But the Joinders do not even create a security interest in any membership interests of the Title Owners, and, even if they did, that would not give YSA any right to a security interest in the Title Owners' assets.

That the Joinders do not create any additional security interests in favor of YSA is apparent from their clear and unambiguous terms.  According to the Joinders, Mr. Kulick, on behalf of himself and purportedly any entity he owns or controls, jointly and severally agreed to assume all obligations of the Pledgors under the CPSA and agreed to be bound by the terms of these agreements.  The obligations of the Pledgors are to pledge the Collateral—i.e., their Interests in the Pledgor Entities.  Pledgors undertook no payment obligations in the CPSAs and did not agree to pledge any other assets than their portion of the defined Collateral.

Common sense dictates that a change of this magnitude—the granting of a supposed right to mortgage dozens of apartment complexes, especially when the prior loan documents granted no such right—would be stated clearly and repeatedly

19

in the loan documents.  It is not. As YSA's witness, Robert Miley, acknowledged at trial, the Joinders do not list (1) the Title Owners, (2) the Properties; or (3) their addresses. (Trial Tr. 205:24-206:6.) Indeed, they identify no collateral all.  (*Id.* at 205:9-23.)  In sum, there is no indication whatsoever from the documents that YSA's security was going to radically increase to encompass hundreds of millions of dollars of real estate.  The signature block reflects individual action by Mr. Kulick, not action as a representative as stated in the signature block on the CPSA itself.[4] And the Collateral for the transactions, the Interests pledged by Borrowers and Pledgors, was always and everywhere membership interests, not real estate.

The UCC requires far, far more than the reed-thin justification YSA has offered for recording the second mortgages. A security interest is enforceable against the debtor and third parties with respect to collateral only if, among other things, "the debtor has signed a security agreement that provides a description of the collateral[.]" 6 Del. C. § 9-203(b).  Section 9-108 provides the standard to determine the sufficiency of the description of collateral in a security agreement.  Section 9-108 does not "require the most exact and detailed description possible" of collateral, *Cannon v. Romeo Sys., Inc.*, No. 2021-0171-PAF, 2025 WL 2848069, at *21 (Del.

---

[4]    Indeed, there would be significant issues under the Statute of Frauds if the signature by an individual conveyed an interest in real property by an unnamed owner or committed an unnamed third party to be the guarantor of someone else's obligations.

Ch. Oct. 7, 2025), but must "reasonably identif[y] what is described." 6 *Del. C.* § 9-108(a). *See also In re Schmaling,* 783 F.2d 680, 682 (7th Cir. 1986) (citations omitted) ("a security interest granted by a debtor to a creditor is limited strictly to the property or collateral described in the security agreement").

"A description is reasonable if it enables third persons to identify the property." *Cannon*, 2025 WL 2848069, at *21; *see also id.* at *22-25 (analyzing cases and holding that an objective third-party standard to evaluate the sufficiency of the collateral's description in a security agreement). Here, the concept of a mortgage on real property owned by nonparties to the loan documents is nowhere even hinted at. A third party reviewing the CPSAs would be completely clueless that YSA was claiming a security interest in the Title Owners' property. Instead, a third party would reasonably conclude that the security interest is limited to the Pledgors' Interests in the Entities, as that is what is expressly stated in the security agreements.

If this was not enough, "[a] description of collateral as 'all the debtor's assets' or 'all of the debtor's personal property" or using words of similar import does not reasonably identify the collateral." 6 *Del. C.* § 9-108(c). YSA's position is also squarely at odds with this plain language of the UCC. (Trial Tr. at 205:11-13 (Mr. Miley: the Joinders do not "name collateral, but they do say that the undersigned is signing on behalf of all entities that he owns and controls, I believe.").)

21

**B.    The Court Cannot Consider Parol Evidence to Rewrite the Unambiguous CPSAs.**

Penned in by the clear language of the loan documents, which provide YSA no right to record these second mortgages, YSA has fallen back on an alternative argument: that the loan documents are ambiguous such that the Court should consider parol evidence in determining the scope of YSA's security interest. Although the description of the Collateral is not ambiguous, nor are any other portions of the loan documents, YSA's argument nonetheless misses the mark. Under Delaware law, extrinsic evidence may not be considered "to save an objectively insufficient description of collateral." *Cannon*, 2025 WL 2848069, at *29.

As a general rule, parol evidence may not vary an unambiguous contract, this principle has special force when the Court is assessing the clear and unambiguous description of collateral in security agreements such as the CPSAs. *Cannon*, 2025 WL 2848069, at *29 and at *21 (citing *Berkshire Bank v. Kelly*, 217 Vt. 439 (Vt. 2023), and summarizing its holding as follows: "considering a dispute between original contracting parties and finding the description of the security interest was not sufficient between the original contracting parties notwithstanding the parties' intent because the agreement was not, itself, ambiguous"). *See also In re Martin Grinding & Machine Works, Inc.,* 42 B.R. 888, 891 (Bankr. N.D. Ill. 1984) (citing cases) ("Where a security agreement clearly grants a specific, unambiguous security

22

interest, parol evidence cannot enlarge the security interest beyond that stated in the security agreement.").

This is a function of the unique role security agreements play in commercial transactions and in regulating third-party and debtor expectations of collateralization of assets. *Id.* at 892. Thus, YSA's contentions that the Collateral was expanded to something beyond the Pledgors' Interests in the Entities through oral discussions or extrinsic communications between the parties is ineffective to modify the scope of its clearly stated security interests.

The documents before the Court do not support the conclusion that the Title Owners contributed anything towards the Collateral, much less title to their real estate. The Title Owners are not identified as Borrowers, Pledgors, Borrower Entities, Pledgor Entities, Entities, Interests, or Guarantors. They are nowhere present in the loan documents, their signatures are absent, and there is not a word about the assets they own that have been improperly encumbered. YSA is not arguing for the interpretation of ambiguous language. It is arguing for creation of a wholly different transaction. The documents cannot support such an interpretation.

*Cannon* is instructive. One of the primary questions before Vice Chancellor Fioravanti in that case was whether the lender had a security interest in a common stock warrant held by the borrower. The borrower had signed a pledge agreement that granted the lender a first priority security interest in the "Pledged Assets," which

23

were defined as "(a) a warrant to purchase Common Stock in the Issuer [Romeo Systems] for one million shares"; and "(b) all proceeds of any of the foregoing." However, the borrower's warrant that was supposedly pledged was for a fixed percentage of shares rather than a fixed number of shares. In addressing whether a security interest was created, Vice Chancellor Fioravanti first found that courts must use an "objective-third-party standard" to determine whether the collateral is sufficiently described in the security agreement. Because a fixed-share warrant does not sufficiently describe a fixed-percentage warrant, Vice Chancellor Fioravanti found that—over the arguments of the lender that any misdescriptions of the collateral were immaterial, technical, and would put a third-party on notice of his security interest—no security interest was created. Vice Chancellor Fioravanti also rejected the lender's attempt to use parol evidence to vary the language of the security agreement, finding that extrinsic evidence could not be considered "to save an objectively insufficient description of collateral." 2025 WL 2848069, at *29.

Here, consistent with *Cannon* and the cases cited therein, the Joinders, which YSA contends gives it hundreds of millions of dollars in additional security, are objectively insufficient to describe any collateral whatsoever, to an order of magnitude many times greater than the security agreement in *Cannon*. That is because they describe no collateral whatsoever.

The use of parol evidence to vary the terms of the CPSAs and Joinders is also barred by the integration clause imported into the CPSAs and Joinders via the Notes. *See_Vianix Delaware LLC v. Nuance Commc'ns, Inc.*, No. CIV.A. 3801-VCP, 2010 WL 3221898, at *15 (Del. Ch. Aug. 13, 2010) ("[B]ecause the TLA contains a merger clause, the parol evidence rule applies. Under that rule, the unambiguous terms of a written contract may not be varied or contradicted by extrinsic evidence.").

**C.    The Proffered Parol Evidence Does Not Support YSA's interpretation.**

Even if the Court were to consider parol evidence in interpreting the Joinder, the extrinsic evidence is that Mr. Kulick did not intend to pledge more collateral through the Joinders.

As a starting point, in their many emails and text messages, which are in evidence, the parties never once discussed using any real property as security for any of the loan transactions until the April loan transaction, and, even then, it was limited to a single potential mortgage on the Parc 1010 property. (JX0003 at 46-47, 53.)  Yet YSA ultimately did not get a mortgage on the Parc 1010 property.  Instead, it received the MIPAA.

At trial, YSA pointed to an email sent prior to execution of the February 2025 loan documents that it contends supports its view that the parties intended to vastly expand YSA's security, including to the property owned by the Title Owners.

25

(JX0013 ("Robert the entity list would remain exactly the same. No change to this document at all except to add a joinder that joins any asset controlled by any affiliate of mine.").)  Put into context, the email says no such thing.

In the days prior to the execution of the February 2025 loan documents, Plaintiffs and YSA had several discussions about ensuring that, for this new loan, the Collateral could not be transferred to other entities owned or controlled by Mr. Kulick or otherwise dissipated.  (Trial Tr. 21:12-23.)

On February 18, 2025, the day the February 2025 loan documents were executed, Mr. Miley inquired of Mr. Kulick and Mr. Diveroli via text message whether Plaintiffs were collateralizing the loan with additional membership interests.  Mr. Kulick responded, "**The answer is yes and no. I suggest we keep that the same but maybe add a joinder to the portfolio as a whole**."  (JX0012 at 2 (emphasis added).)  Several minutes later, Mr. Miley asked for language to insert into the security agreement that would address the issue of the collateral. Mr. Kulick responded: "Yes **the collateral needs to remain the same** but does my idea for a joinder with any asset controlled by any affiliate of mine work?" (JX0012 at 3. (emphasis added).)  Mr. Miley responded in turn: "It may, I would think so which makes life easier if so. Sounds viable to me." (*Id.*)  Mr. Kulick then reiterated this idea in an email to YSA.  (JX0013)  Following these exchanges, Mr. Miley and his counsel drafted the language of the Joinders that made it into the subsequent security

26

agreements.  (JX0014 and JX0015.)    The language of the Joinders reflects the "solution" to the problem—ensuring that the Collateral could not be transferred to other entities owned or controlled by Mr. Kulick or otherwise dissipated—that the parties were seeking to address.  ((Trial Tr. 21:12-23.))

YSA's alternative explanation is both hard to believe and unsupported by the record. Mr. Diveroli and Mr. Miley testified at trial that YSA sought this significant increase in collateral because the February loan amount was for $1.5 million, rather than the past loans of between $700-800,000. (Trial Tr. 151:203; 192:19-23.) This explanation is not only absent from contemporaneous communications between the parties but also defies common sense. The previous loans of $700-800,000 were collateralized by approximately $4.5 million worth of security interests. (*See* JX0010 (capital contributions).) Yet YSA's position is that a $750,000 increase in the loan amount required an additional $900 million of collateral. (Trial Tr. 201:21-202:7.)

Perhaps acknowledging that the Joinders do not describe any collateral whatsoever, YSA's next excuse is that Mr. Kulick rushed YSA into drafting the February 18, 2025 loan and Joinder to accommodate him. But as the Lender, YSA was under no obligation to lend money to Mr. Kulick. Nothing would happen to YSA if it decided not to lend to Mr. Kulick on that day as opposed to the next. (Trial Tr. 205:1-8.) Instead, YSA made a business decision in drafting a broad Joinder.

27

(Trial. Tr. 206:7-15.)  YSA's claimed "customer service" defense for the language of the Joinder is particularly rich given the steps they have taken in this case.

It also bears noting that YSA opted against having its attorney Christopher Rogers—who drafted the Joinder—despite having adequate trial time to do so. *See Restanca, LLC v. House of Lithium, Ltd.*, C.A. No. 2022-0690-PAF, 2023 WL 4306074, at *16 (Del. Ch. June, 2023) ("The federal courts follow the 'uncalled witness' rule, which states that 'if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable.'").  YSA obviously realized that Mr. Rodgers would have to acknowledge that if the purpose of the Joinder was to expand YSA's collateral, it failed miserably under Delaware law.

Thus, although there is no need for—or legal ability of—the Court to rewrite the clear and unambiguous words of the loan documents by resort to parol evidence, the preponderance of the evidence demonstrates that the language of the Joinders nonetheless reflects what Mr. Kulick stated he would agree to in the contemporaneous communications between the parties—that he and entities he controlled would honor the obligations of the Pledgor under the security agreements. Had YSA intended that its collateral would extend to real property owned by entities in which Mr. Kulick and his entities owned an interest or controlled, it should have

28

drafted the CPSAs and Joinders accordingly.  But they did not because that was not the deal.

In all events, the trial evidence shows that even YSA did not intend through the Joinders to extend its collateral to other interests held by Mr. Kulick, other than the Collateral.  The MIPAA, prepared by YSA, proves that.  If the intended effect of the February CPSA was to collateralize all assets that Mr. Kulick owned or controlled, then and in the future, there would be no need for a new agreement to collateralize specific membership interests in Parc 1010 Holdco., LLC, Parc 1010 GP, LLC, or Parc 1010 Investors, LLC.  Nor would the MIPA have stated the interests in Kulick Manager, LLC were "free and clear of any material liens, claims, encumbrances or security interests of any kind whatsoever," as these interests would already have been collateralized through the February CPSA.

In addition, YSA's offered interpretation of the loan documents is patently unreasonable.  If YSA's interpretation were correct, the loan documents for a principal balance of a little over two million dollars would silently authorize the encumbrance of hundreds of millions of dollars in real estate without a single property description, legal description, or recording reference—an implausible result under Delaware law.  *See Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010) (a proffered interpretation of an ambiguous contract is

unreasonable and should not be adopted if it "produces an absurd result" or a result "that no reasonable person would have accepted when entering the contract.").

Critically, to the extent there are differing, competing interpretations of the Joinders proffered by the parties, any such ambiguity must be construed against YSA as the drafter. *Kaiser Aluminum Corp. v. Matheson*, 681 A.2d 392, 398 (Del. 1996) ("It is a well-accepted principle that ambiguities in a contract should be construed against the drafter."). *See also Hub Grp., Inc. v. Knoll*, No. 2024-0471-SG, 2024 WL 3453863, at *12, n.125 (Del. Ch. July 18, 2024) (quoting *Zimmerman v. Crothall*, 62 A.3d 676, 698 (Del. Ch. 2013)) ("The rule of *contra proferentum* [sic] is ... appropriate in cases of standardized contracts and in cases where the drafting party has the stronger bargaining position")).

Finally, even if the Court were to credit YSA's urged interpretation of the Joinders, under any reading of the CPSAs, Mr. Kulick pledged only his membership interests and capital contributions in other entities within the holding company structure of the Title Owners. And a security interest in equity of a company—even all the equity of a company—is not a security interest in the assets of the company.

## II.   Plaintiffs and Nonparties Will Suffer Irreparable Harm Absent a Mandatory Injunction.

The Court has already found on Plaintiffs' request for preliminary injunctive relief that YSA's recording of the second mortgages threatens irreparable harm to Plaintiffs. (Transcript, Hearing, 11/25/25, at 40:14-17 ("The first is imminent

30

irreparable harm. I think that is present here. I take the view that an encumbrance on land or a cloud on title that is improperly imposed or shouldn't be there is irreparable harm.").)

That harm is ongoing, as the second mortgages are blocking four transactions to sell or refinance property owned by certain of the Title Owners—Lofts at North Penn, Village Creek on 67th (Eaton Place), Villas at Midtown, and Muntage—and impeding others.  (Trial Tr. 42:13-44:2, 45:4-6.) The financial strain faced by the portfolio of properties managed by Mr. Kulick over the last several years is undisputed.  But the second mortgages have prevented Mr. Kulick from pursuing its planned business plan of "sell[ing] properties, liquidat[ing] some of the negative cash flow properties, pay[ing] off vendors, and get[tting] money" recirculating into the portfolio. (Trial Tr. 134:1-10.) Investors have sued, or threatened, to sue— indicative of the cascade of lawsuits arising out of the second mortgages. (Trial Tr. 134:11-135:11.)

Because the second mortgages also cloud the title of nonparties, those entities are suffering harm for which only equity can provide a remedy. Real property is unique and someone who wrongly clouds title imposes a significant injury for which money is not an adequate remedy.

31

The second mortgages have also placed Mr. Kulick and Vesta potentially liable for hundreds of millions of dollars in recourse liability. (Trial Tr. 39:5-20.) This, too, calls for equity to relieve him.

### III.    The Balance of Hardships Weighs in Plaintiff's Favor.

In order to obtain injunctive relief, Plaintiffs must prove that denying the injunction would cause them greater harm than granting the injunction will cause YSA. *DeMarco v. Christiana Care Health Services, Inc.*, 263 A.3d 423, 438 (Del. 2021). When the movant is seeking to prevent the non-movant's breaches of or overreaching under the parties' contract, the breaching or overreaching non-movant has no resort to equity. *See Sparton Corp. v. O'Neil*, 2018 WL 3025470, at *4 (Del. Ch. June 18, 2018) ("The equities are in Defendant's favor because Sparton never had the right to withhold the escrow funds under the parties' agreements. Allowing Sparton to withhold assets that rightfully belong to YSAs will harm YSAs more than taking those assets that were not Sparton's away from Sparton."); *True N. Commc'ns Inc. v. Publicis S.A.*, 711 A.2d 34, 45 (Del. Ch. 1997) ("I find that because Publicis has no right to breach its contract with True North, Publicis cannot invoke general equity principles to save it from an injunction. Under the terms of the Pooling Agreement, Publicis contracted away its right to launch a hostile takeover of True North and also to solicit proxies in opposition to the Bozell merger."). *See also SLC Beverages, Inc. v. Burnup & Sims, Inc.*, 1987 WL 16035, at *3 (Del. Ch. Aug. 20,

32

1987) (finding that equities favored issuance of a mandatory injunction where "plaintiff is suffering injury by being prevented from obtaining the consideration which it bargained for").  As YSA never had the right to put the second mortgages on the properties, there is no equitable consideration that can overcome their lack of contractual rights to maintain them.

In all events, the equities do not favor YSA.  On the one hand, Plaintiffs are suffering immense harm through YSA's clouding of title.  On the other, YSA will suffer no such harm. YSA is seeking to enforce grotesque, facially unreasonable interest rates. YSA is demanding $1 billion in interest—a patently unequitable and unreasonable course of conduct. YSA opted to take these tactics as part of its self-admitted "strong arm and dragnet" approach to recouping approximately $2.5 million in unpaid principal.  Its various threats against Mr. Kulick and his family are unconscionable. As a predatory lender seeking to enforce a usurious contract, YSA has no resort to equity to save its position.

In their brief, YSA will likely seek to paint its second mortgages as necessary in order to protect its "collateral" that it wants this Court to think is in disrepair. Ignoring for the moment that the Properties themselves are not YSA's collateral, YSA adduced no credible evidence at trial to that effect. Mr. Diveroli claimed that in October, various real estate was unlivable. (Trial Tr. 165:15-23.) But Mr. Diveroli notes that he is not a real-estate expert. (*Id.* 166:6-8.) And that is why he brought

33

Mr. Detweiler and Mr. Berney to Oklahoma with him to value the real estate. (*Id.* 166:6-13.) But while Mr. Detweiler and Mr. Berney were present in the gallery during the trial, neither testified despite being those who "knew this stuff." (*Id.* 166:8-9.) YSA opted to use its time at trial to proffer an expert who claimed that the $900,000,000 in accrued interest in 42 days was reasonable. The equities of an injunction weigh heavily in Plaintiffs' favor.

#### CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant Plaintiffs' Motion and require YSA to immediately execute and record withdrawals, cancellations, and/or releases of the invalid second mortgages and preventing future second mortgages from being recorded based on the Loan Documents between the parties.

Dated: March 10, 2026

Respectfully submitted,

/s/ *Sean J. Bellew*
Sean J. Bellew (#4072)
BELLEW LLC
3801 Kennett Pike
Building D, Suite 300
Wilmington, DE 19807
Telephone: (610) 585-5900

*Attorney for Plaintiffs*

Of Counsel
Benjamin H. Brodsky, Esq.,

34

(admitted *pro hac vice*)
Michael Fisher, Esq.,
BRODSKY FOTIU-WOJTOWICZ, PLLC
(admitted *pro hac vice*)
*Counsel for Plaintiffs*
44 West Flagler Street, Suite 2200
Miami, Florida 33130
Telephone: (305) 503-5054

Words: 8,867
Word Limit: 14,000

## Appendix A
## Summary of Terms of Four Loans at Issue

| | Borrower | Pledgor | Collateral | Principal | Effective Annual Interest Rate / Stated Annual Interest Rate | Maturity Date |
|---|---|---|---|---|---|---|
| Feb. 18, 2025 | Asset Holder | Vesta Holdings | Asset Holder's membership interests in four DE LLCs; Vesta Holding's membership interests in thirteen DE LLCs | $1,500,000 less a $30,000 fee | **Effective**: 253.00%<br><br>**Stated**: 133.33% (compounded monthly) | May 19, 2025 |
| Apr. 9, 2025 | Parc 1010 Holdco., LLC; Parc 1010 GP, LLC; Parc 1010 Investors, LLC | Kulick Manager, LLC | Kulick Manager's membership interests in the Parc 1010 entities; Parc 1010 entities' interest in an OK LP | $300,000 less a $50,000 fee | **Effective**: 1,683,311%<br><br>**Stated**: 1,500% (comp. monthly) | Apr. 19. 2025 |
| July 16, 2025 | Vesta Holdings | Vesta Holdings | Vesta Holding's membership interests in seventeen DE LLCs | $365,000 less a $15,000 fee | **Effective**: 1,301,886%<br><br>**Stated**: 960% (comp. daily) | July 30, 2025 |
| July 31, 2025 | Vesta Holdings | Vesta Holdings | Vesta Holding's membership interests in seventeen DE LLCs | $317,000.00 less a $10,000 fee | **Effective**: $1.4641093 \times 10^{28}$% (14 octillion percent)<br><br>**Stated**: 7000% (comp. daily) | Aug. 5, 2025 |