## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

JOHN ALEX UPPERMAN, individually; )
ILLINI HOLDINGS, LLC; THRIVE REAL )
ESTATE, LLC; WILDWOOD ASSETS, )
LLC; TU PROPERTIES, LLC; OAK STREET )
CAPITAL, LLC; and 12 OAK LENDING, LLC, )
                                      )
           Plaintiffs,                )
v.                                    )     Case No. 26-cv-00383-SH
                                      )
MARC KULICK, individually; VESTA      )
REALTY, LLC; VESTA HOLDINGS, LLC;     )
LOUIS INVESTMENTS, LLC, and ASSET     )
HOLDER, LLC,                          )
                                      )
           Defendants.                )

## PLAINTIFFS' MOTION FOR APPOINTMENT
## OF A FEDERAL EQUITY RECEIVER

**In our loan documents with Fannie Mae we consent to a receiver being appointed in event of default. We have credible arguments about the defaults but there is less than a 5% chance in any receivership hearing that we will win. The difference between winning and losing is minimal because the borrower has protections in Oklahoma. One such protection is the ability to 'bond over' the appointment.**

**So, in our last hearing the judge appointed a receiver and Vesta posted the bond and offset the appointment. I said above, the difference in winning or losing is minimal and quite frankly for reasons I shouldn't get into on an adversarial thread it may even be better to post the bond than to win outright. But that's litigation strategy.**

E-mail from Marc Kulick to certain Vesta investors dated June 6, 2026.[1] Notwithstanding the

acknowledged *de minimis* odds of success on the merits in defeating receivership motions,

---

[1] *See Exhibit N.*

1

Defendant Kulick has engaged in a widespread strategy of bonding over Court-ordered property-level receiverships, necessitating the instant Motion.

Plaintiffs John Alex Upperman ("Upperman"), individually, and Illini Holdings, LLC, Thrive Real Estate, LLC, Wildwood Assets, LLC, TU Properties, LLC, 12 Oak Lending, LLC, and Oak Street Capital, LLC (collectively, "Plaintiffs"), by and through their undersigned counsel, respectfully move this Court, pursuant to Federal Rule of Civil Procedure 66 and this Court's inherent equitable powers, for entry of an order appointing a neutral federal equity receiver over Defendants Vesta Realty, LLC ("Vesta Realty"), Vesta Holdings, LLC ("Vesta Holdings"), Louis Investments, LLC ("Louis Investments"), Asset Holder, LLC ("Asset Holder") and the property-level entities controlled by Defendant Marc Kulick ("Kulick") (collectively, the "Receivership Entities"). In support of this Motion, Plaintiffs state as follows:

## JURISDICTION AND VENUE

1.      This Court has original federal-question jurisdiction under 28 U.S.C. § 1331 because this action arises under the civil RICO statute, 18 U.S.C. §§ 1961–1968.

2.      Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because many of the Property Entities' (defined below) assets are situated in this District, and because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred and continue to occur within this District.

3.      This Court has the inherent equitable power to appoint a federal equity receiver under Federal Rule of Civil Procedure 66 and 28 U.S.C. §§ 754, 959, and 1692.

## INTRODUCTION

4.      This emergency motion seeks the appointment of a federal equity receiver to halt ongoing fraud, prevent the further dissipation of assets, and preserve what remains of a real estate

portfolio that is being systematically looted and driven into collapse by Defendant Marc Kulick and entities under his control.

5.      Kulick controls Vesta Realty, Vesta Holdings, Louis Investments, and a network of property-level entities. Vesta Realty functions as the operational hub for cash management, property management, accounting, books and records, and investor communications across the entire enterprise.  Vesta Holdings acts as a de facto holding company for the enterprise, through which Kulick has solicited loans and other financial accommodations, has purportedly made loans to many of the property-level entities (many of which were then sold at deep discounts), and has misappropriated property-level rents. Through this structure, Kulick (through Defendant Louis Investments, which is the Manager of each property-owning entity in the Vesta Realty portfolio) exercises pervasive, unchecked control over an enterprise comprising more than 30 projects and over 9,600 residential units representing a combined value historically exceeding $925 million, but which upon information and belief is rapidly declining.

6.      Through his unchecked control, Kulick has caused untold damage to the portfolio, causing most of the property-owning entities to, among other things:  (i) default on their senior secured debt obligations; (ii) default on their trade debts, including key utility services such as water and heat (with aggregate accounts payable across the portfolio believed to have ballooned to a number in excess of $15 million); (iii) fail to maintain property insurance coverage; (iv) suffer substantial occupancy declines; (v) fail to keep up with necessary maintenance obligations; and (vi) otherwise allow their properties to fall into disrepair – at times to a level where the municipalities in which those properties are located have declared them uninhabitable.

7.      A summary of each of the properties in the Vesta Realty portfolio, along with a status (based on information in Plaintiffs' possession) of the myriad loan defaults and foreclosures

caused by Kulick's misconduct, is attached to and incorporated in this Motion as *Exhibit A*. This summary reveals the profound distress that nearly every portfolio property is facing, including nearly across-the-board failures by Kulick to meet debt service obligations, the filing of fifteen (15) foreclosure actions by senior lenders, formal declarations of default by all but a small handful of the properties, and the appointment of receivers over eight (8) of the properties (with all such appointments having been suspended either as a result of appeals or bankruptcy filings).

8.  This distress, however, is not the result of macroeconomic or market-based factors, but rather, can be almost entirely attributed to Kulick's gross mismanagement and fraudulent conduct. This continuing mismanagement of the portfolio has caused untold damage to its value, and the damage will become irreparable – if it is not already beyond repair – unless swift and decisive action is taken by this Court to stop it. The Oklahoma State courts have issued orders appointing receivers, only to have the efforts thwarted by Kulick filing appeal bonds, as admitted in his quote above.

9.  Among other things, Kulick has engaged in the following misconduct compelling the immediate appointment of a receiver:

- Diversion of rent receipts from where they are required to go (debt service, utilities, maintenance, taxes) to Kulick's pocket or on account of his personal obligations (through unauthorized transfers, including on account of personal expenses);

- Taking out millions of dollars of unauthorized loans, as well as merchant cash advances, at usurious interest rates that expose the property owners to enormous debts that are beyond the value of the properties;

- Causing dozens of lawsuits to be filed against the Defendants, as well as the property-level entities, by lenders, merchant cash advance companies, tenants, contractors, and

service providers;

- Causing millions of dollars of unauthorized transfers among properties;

- Causing nearly every property-level LLC to go into default with its lenders, with over one dozen foreclosure actions filed, and more threatened;

- Dodging the appointment of receivers at the property level through taking advantage of favorable state law allowing for such appointments to be held up indefinitely through appeals; and

- Refusing to respond to reasonable requests for financial information concerning the properties, taking the position that the properties' investors are not entitled to such information.

10.     Kulick's brazen conduct and his utter refusal to be accountable to his constituents is inexcusable, has caused substantial harm to Upperman's equity interests in the portfolio, and may result in hundreds of millions of dollars of guaranty liability if left unchecked.  Plaintiffs urge this Court to appoint a receiver to take over the operations of the Vesta portfolio, stabilize and address urgent health and safety concerns of the properties, and position the portfolio for sale transactions that will maximize recoveries by secured and unsecured creditors and investors and protect the rights of the properties' residents to habitable homes.

## FACTUAL BACKGROUND

**A.    The Parties and Enterprise Structure**

11.     Upperman is a sophisticated real estate investor who invested approximately $1,369,488 across multiple Vesta deals and has current loans outstanding to Vesta Holdings in the principal amount of $2,525,000. Upperman holds interests through his controlled entities – Illini Holdings, LLC; Thrive Real Estate, LLC; Wildwood Assets, LLC; TU Properties, LLC; and Oak

5

Street Capital, LLC – in approximately 29 property-level entities across the Vesta portfolio. Additionally, Upperman serves as a personal guarantor of almost every property loan in the portfolio, exposing him to substantial potential liability. These guaranties are predominantly in the nature of "nonrecourse carveout" or "bad boy" guaranties, in which Upperman's obligations are triggered upon certain actions of the borrower or guarantors (including Kulick, who also personally guaranteed each of the property loans) that interfere with the lenders' rights and remedies against the borrowers or their properties.

12.    Defendant Kulick is an individual residing in Oklahoma who serves as the sole Manager of Vesta Realty and controls Louis Investments, LLC – the entity that serves as Manager of each of the property-level LLCs. Through this structure, Kulick exercises complete operational control over day-to-day management, banking, books and records, accounting, dispositions, investor communications, financial statements, and property operations.   The operating agreements for the property-level LLCs create nearly insurmountable hurdles to removing Louis Investments as Manager, or otherwise restricting Kulick's conduct.

13.    Defendant Vesta Realty, LLC is a Kansas limited liability company that functions as the operational hub of the enterprise. Vesta Realty is the sole employer of all employees within the enterprise and maintains custody and control of the enterprise's books and records.  Upperman holds a 5% economic interest and 5% voting percentage in Vesta Realty.

14.    Defendant Vesta Holdings, LLC is an Oklahoma limited liability company of which, upon information and belief, Kulick is the sole Member and Manager.  It is believed that Vesta Holdings was formed as an alternative to a previously-formed entity, Vesta Capital, LLC (of which both Upperman and Josef Loeffler are members) in order for Kulick to execute on his schemes outside of the direct scrutiny of Upperman and Loeffler.

15.    Defendant Louis Investments, LLC is a Kansas limited liability company of which Kulick is the sole Member and Manager. Louis Investments serves as the direct or indirect Manager of each of the limited liability companies that hold the underlying portfolio properties (collectively, the "Property Entities").

16.    Defendant Asset Holder, LLC is an Oklahoma limited liability company of which Kulick is the sole Member and Manager.  Asset Holder is the borrower on each of the YSA loans and purportedly granted YSA collateral pledges and powers of attorney as to each of the Property Entities' membership interests.

**B.    Kulick's Fraudulent Conduct and Mismanagement of the Vesta Portfolio**

17.    Kulick has operated the Vesta enterprise as a personal slush fund while concealing the true financial condition of the entities from investors and lenders.  His known misconduct is so voluminous as to be unsusceptible to easily being summarized, but includes the following:

18.    **Misappropriation of Funds and the Forensic Report.**  YSA Investments 1, LLC ("YSA"), an unauthorized lender to the Vesta entities, commissioned American Fiduciary Services to prepare a forensic report (the "AFS Report"), a copy of which is attached to a complaint recently filed by a co-investor, Josef Loeffler, against the Defendants, in Johnson County, Kansas (the "Loeffler Action"), and which provides damning evidence of Kulick's misconduct.[2] *See Exhibit B*.  The AFS Report reviewed bank activity for January and February 2025 across several Vesta Realty and Vesta Holdings bank accounts.

---

[2] In the Loeffler Action, Loeffler outlines much of Kulick's known fraudulent activity, and seeks, among other things, removal of Kulick as the sole manager of Vesta Realty and of Louis Investments.  It is Plaintiffs' understanding that Loeffler has experienced difficulty serving Kulick (which comes as little surprise), and the action has not progressed beyond the complaint stage.

19. The AFS Report found account activity "highly correlated with classic Ponzi-like schemes and highly demonstrative of commingled sources and uses of funds." Key findings include:

- Vesta Realty paid Kulick's personal American Express bills and various automobile loans totaling $3.1 million—activity the report characterized as "unusual and inconsistent with the normal business operations."

- Cash payments totaling $1.2 million were made from the same account into Kulick's personal bank accounts.

- The Vesta Realty account incurred 98 separate overdraft fees, frequently had a zero or negative balance, and had an average daily balance of only $82,288, despite having $58.7 million in outflows in January and February 2025 alone—reflecting extraordinary account velocity inconsistent with legitimate operations.

- Total sources of funds across both accounts were $62.76 million, including $30.66 million in wires from approximately 43 unknown third parties and $7.96 million in transfers from approximately 53 unknown controlled accounts.

- Total uses of funds were $62.10 million, including $32.05 million in bank transfers to unknown controlled accounts and $3.18 million in Vesta Realty American Express charges.

*Exhibit B*.

20. Beyond the AFS Report, Loeffler's March 26, 2026 breach notice to Kulick, attached as an exhibit to the Loeffler complaint, identified additional misappropriations totaling tens of millions of dollars, including $37,473,988 in credit card charges that appear to have no business purpose, paid from Vesta Realty account and Waterford accounts, with the Waterford

8

payments "primarily directed to a Chase account held by Leslie Kulick [believed to be Marc's mother, who to Plaintiffs' knowledge has no role or interest in the Vesta portfolio].". *Exhibit C*. The notice further identified $10,241,940 in net transfers to Kulick-controlled accounts through 93 transactions with no apparent business purpose, and $4,406,608 in disbursements to Raymond James & Associates, Kulick's barber Kandice Dawn Kochell (approximately $25,000), the "infamous high-stakes poker player Kane Kalas" ($225,000), and unidentified individuals and entities. The breach notice concludes: "We have asked you to explain and/or substantiate these disbursements, each of which appears to relate to personal activities. To date, you have failed to do so, which, again, leads to the conclusion that you stole these funds." In total, $52,122,536 in transfers were identified that appear to have been made for Kulick's personal benefit.

21.    Kulick is a known high-stakes poker player who appeared on six episodes of High Stakes Poker on PokerGO in 2024 (around the same time that Kulick started taking millions of dollars of unauthorized high-interest loans and merchant cash advances). While there have been allegations that Kulick lost $1 million gambling in a single night during a company retreat in Las Vegas, the full extent of Kulick's gambling losses is unknown, and Plaintiffs are concerned that Kulick has been utilizing property funds and loan proceeds to subsidize his gambling activities. The receiver proposed by Plaintiffs will possess the authority to investigate Kulick's gambling activities and whether the Vesta portfolio has been used to subsidize those activities.

22.    **Unauthorized Borrowing and Collateralization.** With Kulick repeatedly raiding portfolio rents to subsidize his lifestyle and to prop up underperforming properties, and with conventional capital unavailable to him in light of the defaults he caused on the senior property loans, Kulick resorted to high-risk, high-cost loans and cash advances to keep the crumbling Vesta empire afloat.

23.    Most notably, Kulick and his entities borrowed approximately $7.338 million from YSA at interest rates alleged to have started at 100% annually and increased to 7,000% per annum, compounded daily.  YSA is a lending entity owned and controlled by Efraim Diveroli, a former arms dealer and convicted felon.  In February 2025, Kulick executed Collateral Pledge and Security Agreements ("CPSAs") collateralizing LLC interests in most of the Property Entities, without consent of the relevant members or the lenders.  YSA relied upon these agreements to file second mortgages on the Vesta properties.  These transactions directly violated each of the Property Entities' loan and security agreements, which prohibit additional secured indebtedness without lender consent – and both Kulick and YSA were well-aware that this was the case, but went ahead regardless.[3]  These second mortgages have been front and center in most of the foreclosure complaints that have been filed.  Kulick's taking of the YSA loans was extraordinarily reckless, and could have been avoided had he been managing the portfolio properly.

24.    The YSA relationship has sparked contentious litigation.  In November 2025, YSA filed suit against Kulick and most of the Property Entities in the Delaware Superior Court, alleging breaches of contract and unjust enrichment, and seeking to pierce the corporate veil of the Property Entities (C.A. No. N25C-10-309-KSJM).  Kulick retaliated with his own suit against YSA in the Delaware Chancery Court (C.A. No. 2025-1319-KSJM), alleging the YSA second mortgages were unlawful and unauthorized, and further alleging extortionate conduct on the part of Mr. Diveroli.

25.    This litigation has gone disastrously for Kulick, and the risks to the entire portfolio resulting from the YSA loans have only multiplied based on a June 9, 2026 ruling from Chancery Court, which denied Kulick's motion for an injunction, held that YSA was authorized to file the second mortgages based on the broad grant of authority agreed to by Kulick under the CPSAs, and

---

[3] *See Exhibit M* (text exchange between Kulick and Diveroli dated March 29, 2025, attached as an exhibit in support of YSA's opposition to Kulick's motion for permanent injunction in the Delaware Chancery Court litigation).

10

that Kulick's usury claims were improper based on the fact that Delaware expressly prohibits usury defenses. *See* Post-Trial Memorandum Opinion, attached hereto as *Exhibit D*. Kulick's reckless decision to do business with YSA has substantially impeded his ability to engage in property dispositions and has hastened the exercise of lender remedies against the Vesta portfolio. Moreover, YSA has taken the position that *it* now controls Vesta Holdings and can direct all cash transfers and borrowings for the entity. *Exhibit E*. It has also begun to serve each of the Property Entities in the Chancery Court litigation on account of its Chancery Court counterclaims for declaratory judgment that it now has lawful ownership and control over the Property Entities. Absent a receivership, Kulick will control the defense of the Property Entities in the Chancery Court litigation – despite the obvious conflict of interest.

26.    But in addition to the YSA loans, Plaintiffs are aware of other unauthorized borrowings caused by Kulick, predominantly in the form of usurious merchant cash advances ("MCAs"). The advances and other borrowings currently known to Plaintiffs include: (a) Lend Bug LLC, which filed suit in the Supreme Court of New York, Kings County (Index No. 542083/2025) and obtained a $191,943.65 judgment on a MCA with an effective interest rate of approximately 1,800%; (b) Apollo Funding Co., which filed suit in the Supreme Court of New York, Clinton County (Index No. 2026-00026129), for confirmation of an arbitration award in the amount of $289,064.20 (obtained by default) based on a $450,000 MCA; (c) American Funding Services Inc., which filed suit in the Supreme Court of New York, Erie County (Index No. 805312/2026) to enforce a $1,490,431.25 settlement agreement stemming from a defaulted MCA; (d) Dover Capital LLC, which filed suit in the Supreme Court of New York, Monroe County (Index No. E2026006970) seeking a judgment of $981,734.31 on account of two MCAs carrying effective interest rates of 360.26% and 459.33%; (e) Seaview 525, LLC, which commenced an action in the

11

District Court of Tulsa County, Oklahoma (CJ-2025-05836), asserting a claim for breach of a promissory note and seeking a $3,000,000 judgment, plus accrued and unpaid interest based on the contract rate of 40% per annum; (f) Austin Business Finance, LLC, which commenced an action in the 395th Judicial District Court, Williamson County, Texas (Cause No. 25-2371-C395), asserting breach of a MCA agreement and seeking damages of $571,790.25; (g) General Holding, LLC, which commenced an action in the District Court of Tulsa County, Oklahoma (Case No. CJ-2025-05786) for breach of promissory note, alleging that Vesta Holdings gave it a collateral pledge of membership interests in approximately thirteen (13) property-holding entities, and obtaining judgment in the amount of $789,941.09; (h) substantial payments were made to several other MCAs, including Harper Advance LLC, Modo, LLC, and Logiq Advance LLC, believed to exceed $2,780,500; (i) Ronald Marks, Tibor L. Nagy, and Anna Nagy commenced an action in the District Court of Tulsa County, Oklahoma (Case No. CJ-2026-2190), pursuant to which a $4 million judgment was obtained on account of a defaulted promissory note; and (j) LOTOR LLC filed a second lien on the Lexington Commons property in September 2025 based on a $1,250,000 obligation, which was released in March 2026.

27.   **Unauthorized Debt Sales.**  Kulick (through Vesta Holdings) allegedly loaned approximately $22 million to numerous Vesta Realty property-level entities, with the source of these loans believed to be:  (i) Upperman himself ($2.525 million); (ii) Loeffler ($2-3 million); (iii) YSA; (iv) the MCA lenders; (v) Worcester Lending (approximately $2.5 million); (vi) Marks and Nagy ($4 million); (vii) Presidio Mortgage Holdings, LP ($3 million)[4]; (viii) Austin Business Finance, LLC ($1.3 million); and (ix) cash flow from those properties that at the time were

---

[4] Presidio has sued Woodscape Investors, LLC; Louis Investments; and Kulick for breach of loan and unjust enrichment in Tulsa County, Oklahoma (Case No. CJ-2025-05089).

operating profitably.  Kulick did not seek consent of the members of any of the relevant lending or borrowing entities despite being required to do so under the applicable agreements.

28.    In late 2025, Kulick then "sold" approximately $13.4 million of these loans for a deeply discounted aggregate price of $3.4 million.  None of these sales were disclosed to Plaintiffs or any other investor or lender, nor were the appropriate consents under relevant operating agreements obtained.  Plaintiffs are currently unaware as to who the buyer(s) of these loans were and whether these fire sale transactions were even at arms'-length.

29.    **Fraudulent Capital Calls.**  On December 12, 2025, Kulick, acting through Vesta Capital, issued a capital call notice requesting $1,750,000 from a subset of Woodscape Apartments investors, purportedly to fund a Fannie Mae-mandated repair escrow by December 23, 2025. The capital call was not issued *pro rata* to all equity investors; Andover Partners, a $7,000,000 equity contributor, was excluded entirely.[5]  Further, the "lender scope of work" provided to investors was not an actual Fannie Mae directive but an unfilled Newmark template, and the Woodscape mortgage has not been paid since October 2025.   The foregoing constitutes material misrepresentations of the basis for the capital raise.

30.    The capital call proceeds were not used for their stated purpose, but rather, appear to have been used to repay Vesta Holdings loans.  The repair escrow was never funded, and the property was foreclosed in March 2026, fewer than three months after the capital call, with no evidence that any repairs were performed.

---

[5] At the time, Andover Partners had already sued Louis Investments and Kulick in the U.S. District Court for the Northern District of Oklahoma (Case No. 25-cv-00599-SH), alleging breaches of the Woodscape Investors operating agreement, and breaches of fiduciary duty, by improperly creating a new class of preferred equity, soliciting an unauthorized investment from 7Acre Investment, and giving 7Acre complete control over the disposition of the Woodscape property.  This may explain why Kulick intentionally avoided issuing the capital call to Andover.

31. **Misappropriation of Property Sale Proceeds.** The Loeffler Action further reveals that Kulick systematically misappropriated the proceeds of property sales rather than distributing them to investors as required. When the Waterford property was sold, over $11 million in sale proceeds were deposited into the Waterford operating account, but within days of closing, all or substantially all of those proceeds were removed through a series of preferential transfers, including transfers to Kulick himself. Only thereafter did Kulick advise investors that the proceeds would not be distributed, claiming they were being retained for a tax-related initiative.

32. **Deterioration of Properties.** There have been widespread reports of the rapidly deteriorating condition of many of the Vesta properties, owing to Kulick's failure to fulfill his most basic responsibility as a property manager: to maintain the properties and to provide a safe living environment for tenants. As of the date of this Motion, Plaintiffs are aware of unfulfilled maintenance and life safety issues at nearly every property, including: (i) chronic failures to timely pay water bills at the property, with shutoff notices being issued to tenants frequently; (ii) hot water interruptions; (iii) declarations of properties as a "public nuisance" and "unfit for human occupancy" by government authorities; (iv) failures to timely fulfill work orders; (v) overflowing trash; (vi) mold, broken security cameras, heating outages, and elevator malfunctions; and (vii) non-operating amenities, such as fitness centers and pools. These issues have been extensively covered by local media, with a schedule of known media reports attached hereto as *Exhibit F*. Given Vesta Realty's well-documented liquidity challenges, there is no reason to believe that conditions will improve, and are only likely to get worse.

33. **Obstruction of Information Rights and Kulick's Hostility Toward Legitimate Inquiries.** Kulick has engaged in a pattern of obstruction designed to prevent investors from discovering the true scope of his misconduct. This pattern includes incomplete financial reporting,

14

refusal to provide books and records, hostility toward information requests, closing of accounts to which co-owners had access, and refusal to identify where funds were moved.

34.    When Loeffler submitted a formal demand in August 2025 for inspection of Vesta Realty documents, Kulick responded with defensiveness and deflection. In a September 2, 2025 letter, Vesta Realty dismissed the demand, stating that "a member[] is not entitled to reporting from a company" and that the Property Entities' "reporting requirements to members are minimal to non-existent." It characterized the demand as "[b]laming Vesta for Macroeconomic problems" and offered to produce only some of the requested documents. *See Exhibit G*.

35.    In a November 4, 2025 letter, Vesta Realty's counsel continued to dismiss investor concerns as a "smear campaign," accused Loeffler of making "unfounded accusations of criminal activity," and declined to provide bank account statements or access. *Exhibit H*. The letter explicitly stated that Kulick would not provide access because it might allow Loeffler to discover information about "dozens of entities in which he has no economic interest whatsoever" – an admission that Kulick was prioritizing secrecy over the transparency to which members were contractually entitled.

36.    Upperman's parallel requests for information have been met with similarly incomplete, false, or evasive responses.

**C.    Kulick's Exploitation of State-Law Procedural Mechanisms to Delay Property-Level Receiverships.**

37.    Even where courts have appointed receivers at the property level, Kulick has exploited borrower-friendly procedural mechanisms under Oklahoma law to delay or frustrate receivership relief, leaving properties without effective oversight during critical periods of financial distress. All the while, Kulick is representing to investors that this conduct is appropriate

and necessary given the good condition of the properties (in most cases, untrue) and that he has a meritorious case to defeat receivership appointments (also, untrue). *See, e.g., Exhibit I.*

38.    Kulick has been able to suspend receiver appointments in Oklahoma through a borrower-friendly statutory mechanism.  Specifically, Okla. Stat. tit. 12, § 993(C) provides:

> If a receiver shall be or has been appointed, upon the appellant filing an appeal bond, with sufficient sureties, in such sum as may have been required of the receiver by the court or a judge thereof, conditioned for the due prosecution of the appeal and the payment of all costs or damages that may accrue to the state or any officer or person by reason thereof, the authority of the receiver shall be suspended until the final determination of the appeal, and if the receiver has taken possession of any property, real or personal, it shall be returned and surrendered to the appellant upon the filing and approval of the bonds.

39.    Customarily, receiver bonds in Oklahoma are set at a nominal amount (between $1,000 and $5,000). These nominal bonds provided Kulick with an easy opportunity to block receivers at minimal cost; all he needed to do is pay the nominal bond amount in cash and buy a substantial delay in the receiver appointment, giving him free rein over the rents to do as he wishes (which apparently does not include paying debt service or utilities, or maintaining the property). While the lenders have recently caught on to Kulick's scheme and have demanded increasingly large receiver bonds, this strategy has not deterred Kulick.  For example, at Drexel Flats, the lender obtained approval of a $200,000 receiver bond given Kulick's past practices. Kulick simply waited until June rents arrived in order to raise the cash necessary to bond over the appeal.

40.    This pattern of procedural gamesmanship illustrates precisely why a federal equity receivership is necessary.  A federal receivership order, governed by procedural law under Federal Rule 66, would not be subject to these state-law circumvention mechanisms, with Federal Rule 62 expressly making stays pending appeal discretionary rather than automatic, and would provide

immediate, enterprise-wide relief rather than the piecemeal, property-by-property approach that Kulick has successfully delayed.

**D.      Upperman's Injuries and Guaranty Exposure**

41.     Upperman faces a dual emergency: loss of equity value and formidable personal guaranty exposure.

42.     **Investment Losses.** Upperman invested approximately $1,369,488 of personal capital across numerous Vesta deals through his controlled entities.  Upperman is justifiably concerned that his investments are at serious risk of complete loss, given Kulick's malfeasance and the proliferation of loan defaults, foreclosure actions, and non-judicial foreclosures.

43.     In addition, millions of dollars of additional investments have been made by dozens of innocent investors – many of whom were brought into Vesta deals by Upperman, who trusted and relied upon Kulick's representations concerning the quality of the portfolio and his acumen as a real estate manager.  These investors' funds are also at serious risk of complete loss.  The relief sought by this Motion is intended to protect and preserve any remaining possibility of these investors obtaining a recovery from the Vesta portfolio.

44.     In January 2026, Kulick orchestrated a sale of the Thrive Argenta property in North Little Rock, Arkansas.  At the time the deal went under contract, Kulick represented to Upperman that investors would receive a positive return.  Then, when the sale closed, Kulick represented that investors would take a 36% loss.  But in fact, even those projections proved unreliable. After five months of demands from Upperman and other investors, Kulick effectuated a distribution resulting in a 56% loss on the investment, despite (i) the property having been held for eight years; and (ii) Kulick's representations at the time the deal went under contract that investors would receive a positive return.  These losses were completely avoidable, had Kulick not stopped making debt

17

service payments in 2025, prompting foreclosure proceedings and substantial accrued default interest. Further contributing to investor losses was Kulick's $1 million payment at closing on account of an unknown "account payable" (representing approximately 50% of the total original equity), which Plaintiffs suspect was an insider transfer. When Upperman pressed Kulick for an explanation, Kulick was dismissive and evasive, stating "[t]he truth is no matter what we show you it won't change how Alex sees me/us." *Exhibit J*.

45.     **Outstanding Loans.** Upperman, through Plaintiff 12 Oak Lending, LLC, has current loans outstanding to Vesta Holdings in the principal amount of $2,525,000. *See* Promissory Note, attached hereto as *Exhibit K*. These loans matured on January 1, 2026, and have not been paid.

46.     **Guaranty Exposure.** Plaintiffs' most profound area of exposure is in Upperman's personal guaranties on 28 of the Vesta projects. Kulick's actions have already put Plaintiffs at tremendous financial risk, which will only compound the longer Kulick remains in control of Vesta.

47.     As of the date of this Motion, lenders have already sued or formally notified Upperman of recourse carveout trigger events resulting in full recourse liability on account of his guaranties, all caused by Kulick's conduct: Eaton Place Apartments ($12,161,000, full recourse); 727 Lofts ($19,719,863.52, lawsuit filed); The Lofts at North Penn, ($27,273,758.16, lawsuit filed); Village Creek ($12,223,041.06, lawsuit filed); OKC3 – Bryan Hill ($11,798,946, formal notice); OKC3 – Summer Oaks ($10,321,740, formal notice); OKC3 – Springdale Village, ($5,925,000, formal notice); Woodland Oaks and Fairfax ($60,800,000, lawsuit filed); Tuscany Village ($16,000,000, formal notice); The Classen ($15,409,883.23, lawsuit filed); Barcelona ($13,132,000, lawsuit filed); Remington Ranch ($13,470,000, lawsuit filed); Woodscape

($33,800,000, lawsuit filed); Villas at Midtown ($24,868,000, lawsuit filed); Capitol on 28th ($21,408,000, lawsuit filed); Canopy ($13,565,000, lawsuit filed); One Eton Square ($35,027,000, lawsuit filed); and Copperfield ($17,641,000, lawsuit filed). Worcester Lending has also called a $500,000 guaranty from Upperman on a loan it made to Vesta Holdings.

48.    In the aggregate, there are approximately $490.3 million in loan balances across those Vesta properties in which Upperman has signed a personal guaranty. Upperman's guaranty exposure is not theoretical – lenders have already begun pursuing him personally, in each case explicitly referencing Kulick's conduct as the triggering event for full recourse. Upperman's current exposure based on already triggered guaranties is in excess of **$352,386,392.97**, exclusive of continuing default interest, lender attorneys' fees, protective advances, and costs.

49.    Making this situation even more dire is that Upperman has no direct control or influence in the management of the Vesta Realty properties or litigation strategy in the numerous pending and threatened foreclosure actions, and his "bad boy" guaranties are inextricably intertwined with Kulick's conduct. Therefore, actions taken by Kulick constituting recourse carveout triggers under the guaranty documents will be imputed to Upperman and will only add to Upperman's extraordinary potential exposure, unless Kulick's vice grip over the Vesta enterprise is put to an end.

## LEGAL STANDARD

50.    The appointment of a receiver in federal court is governed by Federal Rule of Civil Procedure 66 and the Court's inherent equitable powers. Federal law applies to the appointment of a receiver, even in diversity jurisdiction cases. *See Britton v. Green*, 325 F.2d 377, 382 (10th Cir. 1963); *Inland Empire Ins. Co. v. Freed*, 239 F.2d 289, 292 (10th Cir. 1956).

51. This Court has jurisdiction to appoint a receiver as part of its equitable powers. The Tenth Circuit recognizes that "[a] district court may appoint a receiver 'to take control, custody, or management of property . . . involved in litigation, preserve the property, and receive rents, issues[,] and profits thereof pending the ultimate determination of such litigation." *United States v. Solco I, LLC*, 962 F.3d 1244, 1246 (10th Cir. 2020) (quoting *Comm'r v. Owens*, 78 F.2d 768, 773 (10th Cir. 1935)); *S.E.C. v. Wing*, 599 F.3d 1189, 1194 (10th Cir. 2010). The appointment or refusal to appoint a receiver rests in the sound discretion of the trial court, but the power is "delicate," "jealously safeguarded," and should be exercised "sparingly," with courts acting "cautious[ly] and circumspect[ly]." *Skirvin v. Mesta*, 141 F.2d 668, 673 (10th Cir. 1944).

52. In this District, courts typically consider the following non-exclusive factors when determining whether appointment of a receiver is appropriate:  (a) the inadequacy of the security to satisfy the debt; (b) the financial position of the debtor; (c) fraudulent conduct on the defendant's part; (d) the inadequacy of legal remedies; (e) imminent danger of the property being lost, concealed, injured, diminished in value, or squandered; (f) the probability that harm to the moving party by denial of appointment would outweigh injury to parties opposing appointment; (g) the probability of the moving party's success in the action and the possibility of irreparable injury to its interest in the property; and (h) whether the moving party's interests sought to be protected will in fact be well-served by receivership.  *Fleet Bus. Credit, L.L.C. v. Wings Rests., Inc.*, 291 B.R. 550, 556 (N.D. Okla. 2003) (citing *Brill & Harrington Investments v. Vernon Savings & Loan Ass'n*, 787 F.Supp. 250, 253-54 (D.D.C. 1992)).  These factors are consistent with Tenth Circuit authority permitting appointment of a receiver where fraud, mismanagement, intermingling or diversion of funds, and danger that property will be lost or diminished in value require preservation of the property pending determination of the case on the merits. *See Skirvin*, 141 F.2d at 673.

53.     Here, given the vast record of Kulick's misconduct in his management and control of the Vesta portfolio, Plaintiffs can establish justification for the appointment of a receiver under the strictest standard.  Plaintiffs respectfully request the immediate appointment of a receiver over each of the Defendants (excluding Kulick individually) as well as the Property Entities.

## ARGUMENT

### A.     Plaintiffs Have a Valid Claim and Strong Probability of Success on the Merits

54.     In their Complaint, Plaintiffs assert claims for civil RICO, fraud, breach of fiduciary duty, conversion, breach of contract, unjust enrichment, and other causes of action against Defendants.  The forensic evidence of misappropriation, the proliferation of defaults, the existing foreclosure actions and receivership orders, and the pattern of unauthorized transactions all demonstrate a strong probability of success on the merits. The evidence of Ponzi-like indicia in the Vesta accounts, Kulick's reckless borrowing at exorbitant interest rates, and diversion of investor proceeds from property sales establish a consistent track record of fraud, racketeering, and waste.  That many of these transactions were self-interested at the expense of legitimate investors constitutes a clear-cut breach of Kulick's fiduciary duties of care and loyalty under applicable state law, including the laws of the states of Delaware and Kansas.  *See, e.g.*, *Emprise Bank v. Rumisek*, 215 P.3d 621, 634 (Kan. App. 2009) (in Kansas, LLC managers owe fiduciary duties to the other members); *Burcham v. Unison Bancorp, Inc.*, 276 Kan. 393, 416, 77 P.3d 130 (Kan. 2003) (Kansas "imposes a very strict fiduciary duty on officers and directors of a corporation to act in the best interests of the corporation and its stockholders"); *William Penn P'Ship v. Saliba*, 13 A.3d 749, 756 (Del. 2011) ("managers of a Delaware limited liability company owe traditional fiduciary duties of loyalty and care to the members of the LLC, unless the parties expressly modify or eliminate those duties in the operating agreement"); *see also* Vesta Realty Operating Agreement

21

(does not eliminate or modify Kulick's fiduciary duties; further provides that limitation of liability and indemnification provisions except bad faith, fraud, gross negligence, willful misconduct, intentional torts, and breaches of fiduciary duty from their ambit).

55.     Further, the overwhelming evidence of pervasive property-level mismanagement and neglect, and diversion and misappropriation of rents, as cited to repeatedly in many of the foreclosure actions filed to date, serves as further validation of the strength of Plaintiffs' claims and underscore the high likelihood that they will prevail at trial.

**B.      Fraudulent Conduct and Imminent Danger of Loss**

56.     Kulick has engaged in pervasive fraud and mismanagement, as evidenced by the AFS Report's findings of commingling and account velocity consistent with Ponzi-like schemes. Kulick continues to exercise exclusive control over the enterprise's assets and use entity money for personal purposes, and has caused unauthorized borrowings, collateral pledges, second mortgages, and equity and loan sales. Multiple lenders, creditors, and residents have alleged diversions of rents, misappropriation of revenues, unpaid vendors, serious life safety issues, and failure to maintain properties. The portfolio is hemorrhaging value daily as properties deteriorate, defaults compound, and foreclosure actions proliferate.

57.     The risk that this has placed on Plaintiffs is acute and growing by the day. Upperman's potential "nonrecourse carveout" guaranty exposure exceeds $400 million, and coupled with the fact that he has no existing ability to control the management or strategy of the underlying properties, his very financial existence is in the hands of Kulick, who simply cannot be trusted at this point in time. Removing Kulick immediately from control over the Vesta enterprise is essential to stem the tide of recourse trigger events and the accumulation of Upperman's exposure.

58.     And as for the guaranties that have already triggered, removing Kulick from the chain of command is just as critical.  A receiver that can stabilize the properties, promptly address life safety and deferred maintenance issues, secure insurance for properties that are currently lacking coverage, and ensure timely and full payment of utility bills, will have a positive impact on the properties' values, thereby reducing Upperman's guaranty exposure on the related loans.

**C.      Legal Remedies Are Inadequate, Especially Given the Precarious Financial Position of the Properties.**

59.     A damages judgment alone cannot address the ongoing emergency.  Kulick controls the entire enterprise, and Plaintiffs have no access to accounts and cannot determine the full extent of their losses, distributions owed, dilution, guaranty exposure, or entity-level damages without judicial intervention.  The transactions are too complex and voluminous for ordinary discovery alone, given dozens of entities, property-level accounts, intercompany transfers, investor capital accounts, unauthorized debt, alleged commingling, and Ponzi-like activity.

60.     Compounding the peril is Kulick's tactical use of Oklahoma law to indefinitely delay property-level receiver appointments, thereby giving him continued access to rents to defend litigation (rather than use them to pay debt service and property-level obligations).  And because Plaintiffs do not have membership lists for each property, the ability to remove Kulick as manager through non-judicial means is non-existent.  A receiver with credibility must be appointed to ensure that continued diminution of value and continued ill-advised borrowings are halted.

61.     The precariousness of the properties' financial condition is underscored by the Delaware Chancery Court's recent ruling in the YSA litigation, which affirmed the validity of the recording of second mortgages securing asserted claims exceeding $930 million.  These claims, if ultimately allowed, would swallow up every penny of the diminishing equity in the portfolio,

completely wiping out Plaintiffs and other investors.  A receiver is essential to investigating and taking appropriate actions to reconcile these massive claims.

**D.    Milder Measures Are Inadequate**

62.    Plaintiffs recognize that appointment of a federal equity receiver is an extraordinary remedy to be exercised with caution. *See Skirvin*, 141 F.2d at 673.  But if there was ever an "extreme case" justifying appointment of an equity receiver, this is it, especially given that efforts of other investors, lenders, and creditors to rein in Kulick have been largely unsuccessful to date. There is no reason to believe that lender-driven litigation will bring about meaningful change across the portfolio – especially given Kulick's appeal strategy in Oklahoma – and effecting change through corporate governance is nearly impossible given the concentration of power in Kulick's hands under the entity operating agreements.

63.    A centralized, portfolio-wide federal receivership is the only measure that can prevent Kulick from continuing to exploit state-court procedural mechanisms and ineffectual corporate controls to maintain control over deteriorating assets.

**E.    The Balance of Harms Favors Receivership**

64.    The harm to Plaintiffs that will result from a denial of this Motion will be catastrophic and irreparable: continued dissipation of assets, further deterioration of properties, compounding defaults, and personal guaranty exposure on hundreds of millions of dollars in loans. By contrast, Kulick has no legitimate interest in continuing to control entities whose assets he is misappropriating.  A neutral receiver will stabilize operations, preserve assets, prevent further dissipation, and protect all stakeholders—investors, lenders, tenants, and vendors alike.  The balancing of the equities unquestionably favors the Plaintiffs.

**F.    A Federal Receiver Is Necessary to Protect Assets Across Multiple Jurisdictions**

65.    Because the Vesta enterprise operates across multiple states, with properties in Oklahoma, Kansas, and Arkansas, a federal receiver, properly domesticated under 28 U.S.C. § 754, is necessary to ensure effective jurisdiction over the entire portfolio. Federal law permits an appointed equity receiver to assert control over even those properties located outside the jurisdiction of the receivership proceeding. *See S.E.C. v. American Capital Investments, Inc.*, 98 F.3d 1133, 1144 (9th Cir. 1996) (federal receiver possesses "complete control" of receivership assets under 28 U.S.C. § 754). Moreover, judicial efficiency is served by a single receivership proceeding rather than a patchwork of state court receiverships in which those receivers are not under any obligation to communicate or work with each other.

**G.    Scope of Requested Receivership**

66.    Plaintiffs respectfully request that the Court appoint a neutral federal equity receiver possessing the broadest possible powers permitted by law, as set forth in the Plaintiffs' proposed receivership order, attached to this Motion and incorporated herein. These powers include but are not limited to: exercising control over the entire Vesta portfolio, directing a full turnover of all books, records, and bank accounts, managing and stabilizing operations at the properties (including collecting revenues and paying operating expenses), collaborating with the lenders on value-maximizing transactions and dispositions, acting on behalf of the Receivership Entities in any pending or threatened litigation, possessing sole authority to commence bankruptcy cases on behalf of any Receivership Entity, and initiating and conducting investigations concerning the Defendants' conduct, including through subpoena powers. In all respects, these powers will be subject to a "Lender Carveout" that will preserve senior property-level lenders' rights and remedies under their loan and security documents and applicable law.

67.    Plaintiffs further request that the Court enter an "automatic stay"-style provision enjoining the commencement or continuation of litigation against the Receivership Entities or their property, subject to appropriate exceptions for lender remedies.

## PROPOSED RECEIVER

68.    Plaintiffs propose that Matthew D. Mason, Executive Director – Head of Real Estate Fiduciary Services at Hilco Global be appointed as the receiver over each of the Receivership Entities.  Mr. Mason is qualified to serve as receiver given his 24 years of experience in real estate and fiduciary services, having served as a court-appointed receiver for more than 200 retail, office, multifamily, industrial, hotel, and mixed-use projects.  Mr. Mason's curriculum vitae, setting forth his experience in complex real estate receiverships, is attached to this Motion as *Exhibit L.*

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant their Motion and enter an Order appointing a neutral federal equity receiver over the Receivership Entities on the terms set forth herein, and granting such other and further relief as the Court deems just and equitable.

DATED:  June 25, 2026

Respectfully submitted,

/s/Stephen Q. Peters
Stephen Q. Peters, OBA #11469
Jason A. McVicker, OBA #31150
Thomas M. Askew, OBA #13568
Sharon K. Parker, OBA #19010
**JPM LAW | JAYNE PETERS MCVICKER
BURKE ASKEW & PARKER**
401 S. Boston Avenue, Suite 2000
Tulsa, Oklahoma 74103
Telephone:  918/938.7944
Facsimile:   918/938.7966
speters@jpmlawgroup.com
jmcvicker@jpmlawgroup.com
taskew@jpmlawgroup.com
sparker@jpmlawgroup.com

and

Marc R. Greenberg (*pro hac vice* pending)
TUCKER ELLIS LLP
515 South Flower Street, 42nd Floor
Los Angeles, CA  90071-2223
Phone:  213-430-3400
Fax:  213-430-3409
E-mail:  marc.greenberg@tuckerellis.com

and

Thomas R. Fawkes (*pro hac vice* pending)
TUCKER ELLIS LLP
233 S. Wacker Dr., Suite 6950
Chicago, IL  60606
Phone:  312-624-6300
Fax:  312-624-6309
E-mail:  thomas.fawkes@tuckerellis.com

**ATTORNEYS FOR JOHN ALEX
UPPERMAN, ILLINI HOLDINGS, LLC;
THRIVE REAL ESTATE, LLC;
WILDWOOD ASSETS,  LLC; TU
PROPERTIES, LLC; OAK STREET
CAPITAL, LLC; and 12 OAK
LENDING, LLC**

27