# Exhibit B



**MEMO re: Forensic Accounting Observations in Support of Ponzi-like Indicia Vesta Holdings and Vesta Realty Accounts**

**Vesta Realty and Vest Holdings Jan-Feb 2025 Review**

A table summarizing the 01/2025-02/2025 transfers between the Vesta accounts, the sources and uses of these accounts, and analysis of the volume, balances and flows of these funds may be found at the end of this report in the table titled "Preliminary Account Analysis".

**Overview of Account Activity**

The following analysis summarizes key findings identified during the review of bank activity for January and February 2025 across accounts ending 2390 and 5657. The review focused on identifying unusual patterns, inconsistencies, or transactions that may indicate irregular fund movement, cash flow strain, or potential misuse of company assets.

Each topic discussed in the sections below highlights a specific area of concern noted during the analysis. The goal of this review is to provide a clear and factual summary of activity observed, supported by transaction data, and to flag items requiring further verification or investigation.

**Analysis of Controlled Accounts**

Analysis was conducted on statements for Vesta Realty a/e 2390 and Vesta Holdings a/e 5657 Bank of Blue Valley accounts. A running daily account balance is not available on these statements, so this was calculated to assist in analysis and cash-tracing. Critically, Bank of Blue Valley business accounts show memos that allow the user to ascertain those transfers among the controlled Bank of Blue Valley Accounts (i.e. memo descriptions that start with "IB TFR FR" indicate that this is a credit and an "inbound transfer from" a certain controlled account, and those that start with "IB TFR TO" indicate that this is a debit and an "outbound transfer to" a certain controlled account).

The controller appeared to exert transfer control among 88 accounts at Bank of Blue Valley. These accounts had $19.8 million in deposits into the two subject accounts and $40.7 million in withdrawals from the subject accounts. 35 accounts were identified as belonging to an associate rental property owned by the subject, and these accounts had $11.7 million in deposits and $8.6 million in withdrawals (meaning these known entities deposited a net $3.1 million into the enterprise during this period). 53 accounts were not able to be identified as belonging to an associated rental property, and these accounts had $8.0 million in deposits and $32.1 million in withdrawals (meaning these unknown entities withdrew a net $24.0 million from the enterprise during this timeframe).

715 NW Hoyt Street #4364
Portland, Oregon 97208

(855) 880-0100
www.americanfiduciaryservices.com

2300 W. Sahara Avenue, Suite 839
Las Vegas, Nevada 89102

**AMERICAN FIDUCIARY SERVICES**

**Preliminary Analysis of Vesta Realty Account Ending 2390 Jan-Feb 2025**

This account had a negative -$132,971 balance on 1/1/2025 and ended the period with a balance of $126 on 2/28/2025. For 43% of the days in this period this account ended the day with a balance of $0 or less. During this period, the account incurred 98 overdraft fees. The average daily balance in the account over this period was a negative -$86,190 and it cleared 340 outgoing transactions for $10,208,756. The sources of funding for this account were: 1) transfers from Vesta Holdings (69.5%); 2) Inflows from known managed properties' accounts (13.0%); funds from apparent commercial loans (6.6%); and other unknown sources (10.8%).

$1.9 million was used for payroll, $1.2 million was used to pay for Marc Kulick's personal American Express bills, pay for auto loans, taken in cash or directly sent to other Marc Kulick accounts, $3.1 million was used to pay the Vest American Express card, $887k paid for apparent commercial loan repayments, $3,430 paid for 98 overdraft charges, and there were $372k in other outflows for normal operations and other small unknown wires.

We observed similar flows and transactions in the subsequent months' activity in this account. For example, a further $1,357,640 was sent to pay the Marc Kulick personal American Express in March.

There is a very high likelihood that the activities in this account are not accurately being tracked in the management's accounting books because management is overdrawing the account constantly and sometimes multiple times per day. This account is behaving like an account for a business that is rapidly approaching insolvency as it lacks the working capital to maintain a positive balance as its payments are clearing.

Based on the negative average balance in this account we will be able to demonstrate through cash tracing that significant unavoidable commingling of funds occurred in this account.

**Preliminary Analysis of Vesta Account Ending 5657 Jan-Feb 2025**

This account had a $0 balance on 1/1/2025 and finished February with a $523,212 ending balance. The average daily balance in this period was $82,288 versus $58.7 million in outflows, indicating the account turnover ratio, otherwise know as the velocity of funds in this account was 357:1 per month during this period. The account had a day-end balance of $0 or less on 30% of the days in this period. This result is highly correlated with observations made in classic Ponzi-like schemes and is highly demonstrative of commingled sources and uses of funds. Because the account lack a sufficient funding balance on an ongoing basis, we will likely be able to trace every source fund to its eventual use to demonstrate commingling. The results measured in January and February 2025 are also anecdotally observed in March and April 2025 as well.

715 NW Hoyt Street #4364
Portland, Oregon 97208

2300 W. Sahara Avenue, Suite 839
Las Vegas, Nevada 89102

(855) 880-0100
www.americanfiduciaryservices.com



The sources of the $58.5 million of funding in this account during this period are: 1) 43 wires deposited from unknown third parties (52.4%); 2) Inflows from known properties' accounts (19.7%); 3) transfers from 53 unknown controlled accounts (13.6%); 4) YSA Investments I LLC (9.0%); and 4) apparent commercial loans (5.3%).

$58.0 million flowed out of this account during these two months. 54.8% of these outflows were transfers to unknown controlled accounts, including $29.2 million that was transferred to an unknown account a/e 5643. 14.7% of these outflows were transferred to known properties. 9.1% of these funds were sent to Vesta Realty. 3.8% of these funds paid for apparent commercial loans. 12.0% of these funds were wired to unknown third parties, and the remaining 4.7% of these outflows covered a Vesta Realty bounced payroll, payments to YSA Investments I LLC, 17 unreviewable checks, and personal payments made to Marc Kulick in the form of transfers or cash.

### Overdraft Activity – Account Ending 2390

Between January and February 2025, there were a total of 2,089 transactions across the two bank accounts ending in 2390 and 5657. All the overdraft activity, however, occurred only in the 2390 account. During this period, the account was charged $3,430 in overdraft fees, made up of 101 separate overdraft incidents caused by non-sufficient funds. This means that nearly one hundred times, payments or withdrawals were attempted when there was not enough money in the account to cover them.

This pattern shows repeated shortfalls and suggests that the accounts often did not have enough available cash to meet outgoing payments. It may also point to weak oversight or poor cash management practices. When we compare the timing of these overdrafts to incoming deposits or transfers between related accounts, it could also suggest that money was being moved around to temporarily cover shortages or create the appearance of available funds. For this reason, the overdraft activity in this account stands out as a warning sign that deserves a closer look in the larger context of how funds were being handled.

The frequency and timing of these overdrafts do not appear to be part of normal, day-to-day business activity. While occasional overdrafts can happen, having this many in such a short time is unusual and can be indicative of deepening insolvency.

### Payroll Transactions with Incorrect Dates

During the review of bank activity for January and February 2025, a total of 61 payroll-related transactions were identified with incorrect or inconsistent transaction dates. These transactions were labeled with dates such as December 24, April 19, and October 6, 2023, even though the corresponding bank activity took place in 2025. The total value of these transactions was $605,894.43.

715 NW Hoyt Street #4364
Portland, Oregon 97208

2300 W. Sahara Avenue, Suite 839
Las Vegas, Nevada 89102

(855) 880-0100
www.americanfiduciaryservices.com



This means that the data recorded for these payroll items does not align with the actual statement period being reviewed. Inconsistent or backdated entries of this nature can make it difficult to clearly trace the timing and purpose of the payments and may suggest errors in payroll processing, data entry, or deliberate mislabeling. Such discrepancies are important to note because they can affect how cash flow and payroll obligations appear in the records.

Further review is needed to confirm whether these dates were carried over from an internal payroll system, manually entered in error, or intentionally altered. Depending on the findings, these inconsistencies could indicate anything from simple administrative mistakes to an attempt to disguise when payroll expenses were actually incurred or paid. Given the high total value of these items, this issue should be investigated in more detail to determine the source and impact of the date irregularities.

This pattern of transactions is clear red flag and may be indicative of a billing scheme, payroll fraud and/or financial statement fraud.

**Payments to Personal Credit Card – Account Ending 2390**

A review of disbursements from bank account ending in 2390 identified payments totaling $1,156,837.13 made directly to the personal American Express credit card of Marc Kulick. These payments occurred during the same review period of January and February 2025.

Payments of this nature are significant because they represent the use of company funds to pay a personal financial obligation of the principal. Unless such payments were properly documented as owner draws, reimbursements for legitimate business expenses, or other approved disbursements, they could indicate commingling of personal and business funds. This type of activity makes it difficult to distinguish between company and personal expenditures and raises concerns about whether company resources were being used for non-business purposes.

Further investigation is recommended to determine the nature, supporting documentation, and approval of these payments. If these transactions lack adequate backup or appear unrelated to business operations, they may need to be reclassified as personal withdrawals or potential misuse of company assets. Special care should be taken to compare the balance sheet of the underlying entity to these transactions to make sure they are being appropriately booked as compensation to the principal. We have had success in recovering funds from credit card companies where business funds were used to pay personal credit card bills in the presence of Ponzi-scheme findings.

**Auto Loan Payments**

During the review of January and February 2025, a total of 13 auto loan payments were identified across the entity's bank activity, even though the nature of the business does not

715 NW Hoyt Street #4364
Portland, Oregon 97208

2300 W. Sahara Avenue, Suite 839
Las Vegas, Nevada 89102

(855) 880-0100
www.americanfiduciaryservices.com



involve vehicle financing or ownership. In January 2025, there were 8 payments totaling $16,740.76, and in February 2025, there were 5 payments totaling $7,131.50.

The presence of these transactions is unusual and inconsistent with the normal business operations. In addition, the decrease in the number of payments from one month to another raises questions about who these loans belong to and whether they are related to business or personal use. Without supporting documentation identifying the vehicles or loan holders, it is unclear whether these payments were legitimate business expenses, employee reimbursements, or personal obligations paid using company funds.

Interestingly, in March 2025, there were no further auto loan payments recorded. The sudden stop in activity, after two consecutive months of payments, adds to the irregularity. This could suggest that the payments were not tied to ongoing business obligation and may instead have been personal in nature or connected to short-term use of company funds.

Further review is recommended to determine the purpose and ownership of the vehicles tied to these payments. If found to be personal in nature these amounts should be reclassified as personal withdrawals or non-business disbursements. The inconsistency in payment frequency and the lack of clear business purpose make these transactions noteworthy and deserve additional scrutiny.

**Short-Term Commercial Loans**

During the review of activity for January and February 2025, the entity received several short-term commercial loans from outside lending companies. In January 2025, six separate loan deposits totaling $1,950,000 were received from a single lender, Oak Lending. In February 2025, the entity obtained an additional five loans totaling $1,657,154.98., this time from three different lending companies. Also in February, three repayments were made to these lenders totaling $325,000.

In total, during just these two months, the entity borrowed $3,607,154 while repaying only $3,122,639. The size, frequency, and short-term nature of these loans ae significant. This level of borrowing suggests the company may have been relying heavily on external financing to meet its immediate cash needs. The fact that loans were obtained from multiple lenders in such a short period could indicate cash flow strain or an effort to cover ongoing obligations when internal funds were insufficient.

Without corresponding business expansion or investment activity to justify these inflows, the borrowing pattern appears reactive rather than strategic. It raises the question or whether loan proceeds were being used to fund routine operating costs, prior debts, or potential investor payments rather than genuine business growth. Additional analysis of how these loans proceeds were used is necessary to determine whether the borrowing aligns with legitimate business

715 NW Hoyt Street #4364
Portland, Oregon 97208

(855) 880-0100
www.americanfiduciaryservices.com

2300 W. Sahara Avenue, Suite 839
Las Vegas, Nevada 89102



purposes or reflects a cycle of short-term borrowing or sustain cash flow, which may be an early sign of financial distress.

**Bounced Payroll Payments (ADP)**

During the review of January and February 2025, it was noted that payroll payments processed through ADP were returned twice due to insufficient funds or other payment errors. These failed transactions indicate that payroll was initiated without adequate available balance in the account to support the disbursement.

Bounced payroll transactions are a serious operational red flag because they directly affect employees and suggest weaknesses in cash flow management and internal controls. Rejected payroll payments can also indicate liquidity problems – that is, the company may have been struggling to maintain enough funds to cover regular obligations like salaries.

For the second bounced payroll payment, the company did not attempt to reprocess the payroll from the same account (ending 2390). Instead, payroll was later processed and paid out of 5657. This substitution strongly suggests commingling of funds between related entities, as one account was used to satisfy the obligations of another. This behavior points to poor fund segregation and could indicate improper use of one entity's cash to fund another's expenses.

**Major Transfers to Unidentified External Account (Account Ending 5643)**

During the review of January and February 2025, a total of 58 transfers were identified between the entity's account ending in 5657 and another account ending in 5643, whose ownership has not been confirmed. Of these, 54 transfers were outgoing from the 5657 account to 5643, totaling $29,216,579 while 4 transfers were incoming from 5643 back into 5657, totaling $1,643,587.

Several of the transfer descriptions included the word "loan", suggestion that the transactions may have been labeled as loan related; however no supporting documentation or loan agreements were identified to confirm this.

Further analysis indicates that the account ending in 5643 functioned as a holding account, while account ending in 5657 acted as a clearing account through which funds were routinely moved before swept into 5643. This structure, where one account consistently clears its balances into another, reflects a comingle of funds between accounts and a lack of clear separation of financial activity.

Until the ownership and the purpose of 5643 account are confirmed, these transfers should be treated as unverified fund movements. Their frequency, volume, and timing particularly the recurring pattern of clearing daily balances – suggest that this account may have been used to temporarily hold, consolidate, or obscure cash flows, which warrants further tracing and verification.

715 NW Hoyt Street #4364
Portland, Oregon 97208

(855) 880-0100
www.americanfiduciaryservices.com

2300 W. Sahara Avenue, Suite 839
Las Vegas, Nevada 89102



**Significant Borrowing to Cover Outflows**

In addition to the identified short-term commercial loans, further review of the January and February 2025 bank activity revealed 43 inflow transactions that included the word "loan" in their descriptions. These inflows totaled $6,809,878. Notable, the majority of these transactions are $6,109,372. – originated from the account ending in 5657, indicating that many of the so called "loan" deposits were internal transfers rather than true external financing.

This suggests that the company may have been labelling internal fund movements as "loans", potentially to create the appearance of new capital being introduced or to justify the inflows when reconciling accounts. When viewed together with the verified short-term loans from outside lenders, the pattern reinforces the conclusion that the company was repeatedly borrowing -or appearing to borrow – to cover cash shortfalls, rather than generating sufficient operating income to support disbursements.

**Executive Summary**

Based on the limited analysis conducted to-date, our professional experience suggests that absent significant evidence to the contrary and based on what we have seen so far, we will be likely to demonstrate in a fulsome analysis and accounting reconciliation that: 1) significant commingling of the funds of entities occurred and that funds from certain entities were used to cover the expenses of other entities; 2) high levels personal spending patterns of executives occurred among accounts and deepened the enterprise insolvency; 3) the lack of liquidity demonstrated in the operating accounts will uncover an insolvent position when the entity's balance sheet is reconstructed and audited; and 4) that I will be able to determine precisely how every significant inflow was used because these accounts lack sufficient fungible reserves to lead to doubt in such analyses.

**Confidential**   10/24/2025   Page 1

| PRELIMINARY ACCOUNT ANALYSIS JAN-FEB 2025 | VESTA REALTY XXXXXX239O | VESTA HOLDINGS XXXXXX5657 | BOTH |
|---|---|---|---|
| Tranfers Out | (780,897) | (6,109,373) | (6,890,269) |
| Transfers In | 6,109,373 | 780,897 | 6,890,269 |
| **Transfers Between Vesta Accounts** | 5,328,476 | (5,328,476) | - |
| **SOURCES** | | | |
| Inflows From Known Properties Accounts | 996,939 | 11,518,715 | 12,515,654 |
| Apparent Commerial Loans | 507,155 | 3,100,000 | 3,607,155 |
| Other Unknown Sources | 833,448 | | 833,448 |
| Returned Items | 1,894,940 | | 1,894,940 |
| YSA Investments I LLC | | 5,288,333 | 5,288,333 |
| Wires From ~43 Unknown Third Parties | | 30,659,316 | 30,659,316 |
| Transfers From ~53 Unknown Controlled Accounts | | 7,958,878 | 7,958,878 |
| **Total Sources of Funds** | 4,232,482 | 58,525,242 | 62,757,723 |
| **USES** | | | |
| Bank Transfers to Known Properties Accounts | | 8,617,950 | 8,617,950 |
| Bank Transfers to Unknown Controlled Accounts | | 32,050,678 | 32,050,678 |
| Returned Items | 1,869,940 | | 1,869,940 |
| Payroll | 1,906,951 | 893,171 | 2,800,122 |
| MK Personal Amex/Auto Loans/Cash/Pmts to MK | 1,205,709 | 142,486 | 1,348,195 |
| 98 Overdraft Fees | 3,430 | | 3,430 |
| Apparent Commerial Loans | 887,639 | 2,235,000 | 3,122,639 |
| Vesta Realty Amex | 3,181,899 | | 3,181,899 |
| 17 Unreviewed Checks | | 722,044 | 722,044 |
| Payment to YSA Investments LLC | | 975,000 | 975,000 |
| All Other Unknown | 372,291 | 7,037,226 | 7,409,518 |
| **Total Uses of Funds** | 9,427,860 | 52,673,554 | 62,101,414 |

| *PRELIMINARY ACCOUNT ANALYSIS* | VESTA REALTY | VESTA HOLDINGS | |
|---|---|---|---|
| **Account** | **XXXXXX239O** | **XXXXXX5657** | **BOTH** |
| 1/1/2025 Beginning Balance | (132,971) | - | (132,971) |
| 2/28/2025 Ending Balance | 126 | 523,212 | 523,338 |
| **Change In Cash** | 133,097 | 523,212 | 656,309 |
| Average Daily Balance | (86,190) | 82,288 | (3,902) |
| Volume of Account Outflows | 10,208,757 | 58,782,927 | 68,991,683 |
| Turnover Per 40 Days | (118) | 714 | (17,680) |
| Turnover Per Calendar Month | (59) | 357 | (8,840) |
| Days with $0 balance or Less | 43% | 30% | 35% |
| **Daily Balances** | **XXXXXX239O** | **XXXXXX5657** | **BOTH** |
| 1/2/2025 | (208,755) | - | (208,755) |
| 1/3/2025 | 3,943 | 937 | 4,880 |
| 1/6/2025 | 1,219 | (0) | 1,219 |
| 1/7/2025 | (19,596) | (0) | (19,596) |
| 1/8/2025 | (99,757) | (0) | (99,757) |
| 1/9/2025 | 613 | 61 | 674 |
| 1/10/2025 | 761 | 119 | 880 |
| 1/13/2025 | 848 | 1 | 849 |
| 1/14/2025 | 492 | 229 | 721 |
| 1/15/2025 | 330 | 202,347 | 202,677 |
| 1/16/2025 | (217,212) | (0) | (217,212) |
| 1/17/2025 | 16,427 | 210,239 | 226,667 |
| 1/21/2025 | (70,993) | (0) | (70,993) |
| 1/22/2025 | 44 | (0) | 44 |
| 1/23/2025 | (192,320) | (0) | (192,320) |
| 1/24/2025 | 196 | (0) | 196 |
| 1/27/2025 | 729 | 1,597 | 2,327 |
| 1/28/2025 | 618 | (0) | 618 |
| 1/29/2025 | 596 | 186,626 | 187,222 |
| 1/30/2025 | 725 | 250,000 | 250,725 |
| 1/31/2025 | 907 | 71,609 | 72,516 |
| 2/3/2025 | (59,215) | 10,887 | (48,328) |
| 2/4/2025 | (72,724) | 661 | (72,063) |
| 2/5/2025 | 126 | 89,674 | 89,801 |
| 2/6/2025 | 1,540 | 174 | 1,715 |
| 2/7/2025 | 485 | 62,383 | 62,868 |
| 2/10/2025 | (103,797) | 10,610 | (93,187) |
| 2/11/2025 | (731,193) | 250,000 | (481,193) |
| 2/12/2025 | (62,015) | (0) | (62,015) |
| 2/13/2025 | 9,774 | 58,912 | 68,686 |
| 2/14/2025 | (293,038) | 109,530 | (183,508) |
| 2/18/2025 | (300,878) | 51,667 | (249,211) |
| 2/19/2025 | (201,729) | 61,446 | (140,284) |
| 2/20/2025 | 24,177 | 905 | 25,081 |
| 2/21/2025 | (128,377) | 257,000 | 128,623 |
| 2/24/2025 | (751,172) | 850,439 | 99,266 |
| 2/25/2025 | 0 | 20,968 | 20,969 |
| 2/26/2025 | 3 | 12 | 15 |
| 2/27/2025 | 503 | 9,256 | 9,760 |
| 2/28/2025 | 126 | 523,212 | 523,338 |