# Exhibit G



September 2, 2025

Via Email
Stein Mitchell Beato & Missner LLP
2000 K Street, NW, Suite 600
Washington, DC 20006
Attention: Robert B. Gilmore
Email: rgilmore@steinmitchell.com

RE:    YOUR LETTER DATED AUGUST 25, 2025

Dear Mr. Gilmore:

We were disappointed to receive your letter. We find corresponding through lawyers (much less resolving disputes through lawyers) to be inefficient. However, sometimes things have to get worse before they get better, so let's dive in.

### ENTITIES

Mr. Loeffler or his affiliates is a member of these entities (the "Companies"): Argenta's Best Living Investors, LLC; Barcelona Best Living, LLC; Bartlesville Best Living Investors, LLC; Bixby's Delaware, LLC; Briarwood's Best Living, LLC; Canopy Best Living, LLC; Capitol on 28th Investors, LLC; Copperfield Investors, LLC; Drexel Flats Holdings, LLC; Eaton Place Investor, LLC; Jenk's Best Living Investors, LLC; Lakeside Best Living Investors, LLC; Lofts Vesta Investors, LLC; Putnam Investors, LLC; Regency Holdings, LLC; Remington Ranch Investors, LLC; Ridge Vesta Investors, LLC; Riverpark Best Living Investors, LLC; Tuscany Village Holdings, LLC; Vesta Creek, LLC; Vesta Realty, LLC ("Property Manager"); Vesta Shoreline, LLC; W.O. Holding Co., LLC; Waterford's Best Living Investors, LLC; Woodland Manor Holdings, LLC; and WoodScape Investors, LLC.

### CONCERNS

Responses to your claimed concerns follow.

### Distributions

Investing in any business comes with risks. No company can guaranty its financial performance. This is particularly true of any company involved in real estate. Yes: several of the Companies have not regularly distributed money to their members. The cause is a difficult macroeconomic environment over the last five years. Operating costs have risen significantly, particularly real estate taxes and insurance. Re: real estate taxes, some properties' bills have nearly doubled due to assessors becoming desperate for revenue. Re: insurance, every property's premiums have increased (some by over 50%), which has eaten away revenue.[1] As a whole, operating costs for multifamily real estate have increased approximately 10%/year for the last five years.

Then there's debt service, which has skyrocketed due to *the sixfold increase* in the 10-year treasury yield over the last five years—from 0.7%/year to 4.2%/year. Almost always, debt service is the single largest expense in owning commercial real estate. Every property that has a mortgage loan with a floating interest rate (which is the vast majority of Vesta's properties) has seen the cost of its debt service increase by 50-250%. Because of this increase, some of these properties do not meet covenants such as debt coverage service ratio, thereby causing the mortgage lender to institute cash management (which means the lender sweeps any cash that is left after debt service and other property-related expenses have been paid). Additionally, whether or not a property meets its debt service coverage ratio, some lenders have required cash management as part of

---

[1] This problem is occurring industry-wide. See, e.g., https://www.fanniemae.com/media/51396/display and https://www.moodyscre.com/insights/market-insights/cre-insurance-gobbles-revenue/.



extending their loan.

It is hard to make distributions (i.e., a profit) in this environment.

The riskiness of investing in commercial real estate is known to the Companies' members. For example, it was disclosed to Mr. Loeffler in every subscription agreement he signed. Some examples of the disclosures follow.

> Subscriber understands that an investment in the Company involves substantial risks and has taken full cognizance of and understands all of the risk factors relating to the purchase of Units….

> Subscriber understands that the business plan set forth in the Memorandum is a statement of the Company's goals and why the Company believes those goals are attainable, while providing information about the Company's business and management team. There is no assurance that the Company will be able to attain these goals and that the predictions and projections of future performance in said business plan are by their nature speculative, may not be attainable and are subject to change.

> Prior to executing this Agreement, Subscriber has received, read carefully, and become familiar with (i) this Agreement (including the Risk Factors attached hereto as Exhibit A) and (ii) the Operating Agreement, which governs the rights, privileges, and obligations of the Units. Subscriber acknowledges that there are substantial risks involved in an investment in a company engaged in the business of the Company. **Subscriber understands the speculative nature of this investment and the fact that it is possible that Subscriber may lose his/her/its entire investment.**

> Real Estate Risks Generally. The Company's investments will be subject to the risks incident to the ownership and operation of real estate and real estate-related businesses and assets. These risks include, but are not limited to, the quality and philosophy of management, *general economic and local conditions*, *negative developments in the economy that depress business*, *national or international conditions* (such as an oversupply of space or a reduction in demand for space), competition based on rental rates, attractiveness and location of the properties and changes in the relative popularity of property types and locations, changes in the financial condition of tenants, buyers and sellers of property, *changes in operating costs and expenses*, uninsured losses or delays from casualties or condemnation, changes in applicable laws, *government regulations* (including those governing usage, improvement and zoning) *and fiscal policies*, *the availability of financing*, *real property tax rates*, *interest rate levels and the availability of mortgage funds which may render the sale or refinancing of properties difficult or impractical*, environmental liabilities, contingent liabilities, successor liability for investments in existing entities, pandemics, acts of God, acts of war (declared or undeclared), terrorist acts, work stoppages, shortages of labor, strikes, union relations and contracts, fluctuating prices and supply of labor and/or other labor-related factors, and other factors beyond the control of Manager, the Company and their respective affiliates. (emphasis added)

> Failure to Generate Cash Flow. A decrease in cash flows due to declines in rental revenue could negatively affect Property Owner's ability to make financing payments and distributions to its investors, which, in turn, would negatively affect the Company's ability to make distributions to its investors. Significant expenditures associated with the Property, such as real estate taxes, insurance, utilities, maintenance costs and employee wages and benefits, may also negatively impact cash flows and



not decline as quickly or at the same rate as revenues when circumstances might cause a reduction at the Property.

Capital Markets. In the past, the capital markets and banking sectors have experienced high volatility, market disruption, and substantial losses. This turmoil (whether regulatory or financial in nature) had an adverse effect on real estate valuations and resulted in a lack of available credit, declining real estate values, and higher foreclosure rates for an extended period of time. Disruptions in the capital markets (including a slowdown in economic growth and/or changes in interest rates or foreign exchange rates) can significantly limit the availability of debt and equity for investments in the multifamily sector, resulting in fewer buyers and lower property values. If such economic conditions occur, they could interfere with the successful implementation of Property Owner's business strategy, negatively impact fundamentals in the multifamily sector and result in declining property values. It is not possible to project the date when market conditions will change or the length or severity of such conditions. Prospective investors should be aware that these types of conditions could present significant challenges to the Company and its profitability.

The fact that a Company has not made distributions, or has not made as many as were projected, does not indicate malfeasance or entitle a member to broadly inspect the Companies' operations.

Reporting and Transparency

A member, by its status as a member, is not entitled to reporting from a company or regular discussions with the managers of that company. Such rights must be provided in the company's operating agreement or negotiated separately between the company and the member. With respect to the Companies, their reporting requirements to members are minimal to non-existent. At most, a member of the Company is entitled to an annual summary of the company's status.

The Companies have provided far, far more reporting to Mr. Loeffler than he is entitled. Information such as rent rolls and profit-and-loss statements has been provided. An analysis of each property's value has been provided. Several discussions with Mr. Loeffler and/or his attorney have occurred. (More would have, but Mr. Loeffler would often not attend the phone call/Zoom meeting despite saying he would.) The Companies were not obligated to provide any of this information, nor are they now.

K-1s

No company must provide K-1s on a member's desired schedule. Nor does any company guaranty the accuracy of its accountant's work.

The reality is that we had to find new accounting firms to handle the companies' tax returns because our previous accounting firm (which Blue Star recommended) had insufficient knowledge to handle the accounting for §1031 exchanges, for example. Finding new CPAs[2], getting them up to speed, etc. is challenging and laborious. The process increases the risk of errors—beyond, of course, the baseline that no one's work is errorproof.

To our knowledge, K-1s have not caused a significant monetary issue for any of our members. A member's dissatisfaction with the realities of the accounting profession in the United States is insufficient grounds for that member to inspect anything beyond the Companies' tax returns.

Loans

Each company is a manager-managed LLC. As such, the manager controls that company's decisions,

---

[2] See, e.g., https://fortune.com/article/cpa-shortage-could-ruin-tax-season/ and https://www.kiplinger.com/taxes/the-cpa-shortage-problem.

A.J. Jindal



and members do not have a say.  Mr. Loeffler's claimed "concern" is that, what, Marc should not have lent money to properties to cover operating deficits?  Should the properties not have had apartment units ready for lease (which would have led to a downward spiral of decreasing potential and actual revenue)?  Should the properties have been foreclosed on?

A member may say that he or she would have done better or differently, but that statement does not become fact.  In all events, second guessing does not entitle a member to broadly inspect the Companies' operations.

<u>Delays in Refinancing Properties</u>

Commercial real estate has been facing several problems that impede capital events (whether refinancings or sales), including (1) the overall loss of properties' values (as a whole, multifamily is down 19% over the last three years[3]), (2) high interest rates, and (3) macroeconomic uncertainty caused by tariffs, wars, and other largescale concerns.  These realities have decreased capital events across all market sectors.  Lending to commercial real estate has declined by almost half—from approximately $816 billion of loans in 2022 to only $498 billion in 2024[4].  The depression in activity is compounding the problem because not only are lenders making fewer new loans, but they are also still holding loans that they expected to be refinanced out of by now[5].

Additionally, the parameters for mortgage loans have become tighter.  Before, lenders would lend at higher leverages (up to 80% LTV) with lower debt service coverage ratios (often 1:1).  Now, lenders generally lend at no more than 65% LTV and often require a DSCR of 1.35:1.  Even when a property's NOI has increased significantly (e.g., The Ridge Apartments and Fairfax Apartments), the combination of (1) higher cap rates decreasing their market value and (2) lower available loan amounts due to tighter lending standards has negated the increase.

Blaming Vesta for macroeconomic problems does not entitle a member to broadly inspect the Companies' operations.

<u>Financial Mismanagement and High-risk Borrowing</u>

By your standard, one error in a spreadsheet is malfeasance.  That is nowhere close to the legal standard.  Further, if Mr. Loeffler believes that the loan he may have knowledge of is "high-risk" and improper, then what does that say about Mr. Loeffler's loan to Marc?  Mr. Loeffler insisted on charging 10% interest per month.  Per month.

Mr. Loeffler's claimed concern exemplifies the disconnection between the parties.  To Mr. Loeffler, imperfections equal misconduct.  Macroeconomic realities are irrelevant.  Hearsay is damning.

How else could y'all believe your allegations are financial mismanagement?  Financial mismanagement means *misusing a company's funds*.  Without any evidence, *you are asserting that Marc has misused the Companies' funds*.

Even further, the alleged "misconduct" is that he obtained money to pay for properties' operating deficits.  Do you believe a court will find that a manager obtaining funds to cover a company's shortfall is

---

[3] https://www.globest.com/2025/08/26/commercial-property-prices-post-first-back-to-back-annual-gains-since-2022/?kw=Commercial%20Property%20Prices%20Post%20First%20Back-to-Back%20Annual%20Gains%20Since%202022&utm_position=1&utm_source=email&utm_medium=enl&utm_campaign=nationala malert&utm_content=20250826&utm_term=rem&enlcmp=nltrplt4&user_id=b84f71551bba5541aed57799ac65ae83c12cb1b96284cf 30f6725ee27492c4a9

[4] https://www.mba.org/news-and-research/newsroom/blog-post/chart-of-the-week--total-commercial-real-estate-lending--2020-2024

[5] https://www.mba.org/news-and-research/newsroom/blog-post/chart-of-the-week--commercial-multifamily-mortgage-debt-outstanding

A.J. Jindal



improper, negligent, or incompetent handling of the company's assets?  Do you believe that even after considering the business judgment rule?

<u>Outstanding Amounts on Mr. Loeffler's Loan to Marc</u>
See above.

Also, a concern about a personal transaction does not translate to business concerns.  It is not proper cause to broadly inspect the Companies' operations.

Lastly, we note that if Mr. Loeffler had been so concerned about the Companies' financial health, then he could have invested more money in the Companies instead of lending money to Marc at a usurious rate.

<u>General Note</u>
Applicable law requires a member's concerns to be his actual concerns—not a pretext for personal issues that may exist between the member and a manager of the company.  Everyone knows about the personal issues that exist between Mr. Loeffler and Marc, many of which stem from Marc branching away from Mr. Loeffler approximately six years ago.  (Mr. Loeffler seems to believe that he and Marc are in a joint venture, yet he only wants to make money off Marc.  That is not how joint ventures work.  That is not even how the investor-company or member-manager relationship works.)  Whether the concerns written in your letter are Mr. Loeffler's actual concerns—his actual frustration with Marc—would be a matter for a Kansas district court or the Delaware Chancery Court, as applicable, to decide.

**DEMANDED INFORMATION**
As you know (and as your letter cites), requests for information are governed by (i) the relevant provision in the operating agreement or limited liability company agreement of the company, and (ii) the law of the state in which that company was formed.  The Companies are either Kansas LLCs or Delaware LLCs. Accordingly, either the Kansas Revised Limited Liability Company Act (K.S.A. §17-7662 et seq.) or the Delaware Limited Liability Company Act (Del. Code Ann. tit. 6, §18-101 et seq.) governs the requestor's rights and each Company's obligations.  These Acts are largely the same.  Each of them entitles a member to only the information listed below:

(1) True and full information regarding the status of the business and financial condition of the limited liability company;

(2) Promptly after becoming available, a copy of the limited liability company's federal, state and local income tax returns for each year;

(3) A current list of the name and last known business, residence or mailing address of each member and manager;

(4) A copy of any written [operating agreement/limited liability company agreement] and [articles of organization/certificate of formation] and all amendments thereto, together with executed copies of any written powers of attorney pursuant to which the [operating agreement/limited liability company agreement] and any certificate and all amendments thereto have been executed;

(5) True and full information regarding the amount of cash and a description and statement of the agreed value of any other property or services contributed by each member and which each member has agreed to contribute in the future, and the date on which each became a member; and

(6) Other information regarding the affairs of the limited liability company as is just and reasonable.

A.J. Jindal



Your request for information from the Companies far exceeds the scope permitted under the Acts. The concerns you have raised are not a credible basis for your requests, nor have you tailored your requests to information that is necessary and essential to addressing your concerns.

Related to that, it is important to note that Vesta is an umbrella term—a brand, essentially—for individual apartment communities that have been acquired in separate transactions. Mr. Loeffler is not an in investor in every property Vesta owns. Surely, we can all agree that Mr. Loeffler's status as a member of the Companies does not give him the right to inspect the books and records of companies that own properties in which Mr. Loeffler is not a member—such as, for example, The Montgomery Apartments, 23 East Apartments, Village Creek Apartments, or the OKC3 Portfolio.

You are treating Vesta as a monolith—as though Property Manager owns all properties, as though Mr. Loeffler has invested in each property owner, and as though any agreements between Mr. Loeffler and Marc pertaining to Property Manager apply to all of its affiliates. None of this is accurate. Property Manager does not own a single property. Any agreements between Mr. Loeffler and Marc on Property Manager apply only to Property Manager.

Further, the Companies are not property owners. Whether directly or indirectly, they own a portion or all of an entity that owns an apartment community.

Under applicable law, a member of a company has the right to request information about that company—not its affiliates. Just as Mr. Loeffler does not have the right to inspect the books and records of the companies involved in owning The Montgomery Apartments, 23 East Apartments, Village Creek Apartments, or the OKC3 Portfolio, he does not have the right to inspect the books and records of any company in which he is not a member. WoodScape Investors, LLC does not have tenants, for example. Argenta's Best Living Investors, LLC does not have employees, as another example. Remington Ranch Investors, LLC is not party to a mortgage loan, nor does Jenk's Best Living Investors, LLC have a property manager (as further examples). The entities that actually own these properties—i.e., B & J WoodScape/Oklahoma City LLC, Thrive Argenta Owner, LLC, Remington Ranch's Best Living, LLC, and Jenk's Best Living, LLC—are the entities that have tenants, have vendors, and so on. Mr. Loeffler does not have the right to inspect these companies' books and records.

Moreover, a concern that Mr. Loeffler may have about a specific issue with a company (e.g., distributions by Vesta Avana Investors, LLC) does not entitle Mr. Loeffler to treat all companies as having this concern. Any concern must be *specific* to each company for which Mr. Loeffler requests information. If his concern about that company is legitimate, then that company becomes obligated to provide information that is necessary and essential to addressing that concern. A member cannot use a concern about one company to inspect every company. That brush is too broad. Each Company is obligated only to provide information that is necessary and essential to addressing justifiable concerns that Mr. Loeffler has *about that Company*.

Further, the Companies may withhold disclosing requested information that "the manager in good faith believes is not in the best interest of the limited liability company or could damage the limited liability company or its business or which the limited liability company is required by law or by agreement with a third party to keep confidential." For this reason, each Company will not make available for inspection a list of the other members of that Company. Subscriptions are often subject to confidentiality restrictions. Additionally, a syndicator's contacts are a trade secret, often among his most important assets.

Provided Mr. Loeffler and you agree to keep the information confidential, the Companies are willing to allow Mr. Loeffler and you to inspect each Company's tax returns (with redacted K-1s for each member); a list of the name and last-known address of each manager of the Company; a copy of each Company's operating agreement or limited liability company agreement (as applicable) as well as its articles of organization or certificate of formation (as applicable) and any amendments thereto; and a list (redacted as to names) of the capital contributed by each member of the Company along with the date on which such member became a



member.  Vesta's headquarters are in Tulsa.  Please contact us to schedule a time there.

Litigation would be counterproductive.  #1, it would create concern with mortgage lenders.  #2, it would be expensive, particularly because the manager of each Company is entitled to be indemnified by the Company, and the Company would be obligated to pay the manager's defense costs.  (Also, several operating agreements have a prevailing party provision.)  #3, litigation is remarkably time consuming for not only lawyers but also principals.  It takes time away from things such as running their business.

Each of us is autonomous.  No one controls another person's actions.  So, if you truly believe you will substantially prevail in a lawsuit to obtain more information than we are offering to provide, then we'll be unable to convince you otherwise.  In a litigious environment, we are unwilling to provide more than the law requires us to provide. (This is partly because we previously provided much more information than the law requires, yet y'all are threatening to sue us for failing to provide information.)  However, if you prefer a non-litigation outcome that brings the virtues of being immediate, inexpensive, and net positive for the Companies and their members—of which Mr. Loeffler and his friends own less than 6%, which means your decisions will affect hundreds of people and over $100,000,000 of money beyond your collective total of ≈$7,000,000—then we will be willing to discuss providing monthly reporting to Mr. Loeffler with phone discussions along the lines of the information we previously provided.  This would include, for example, rent rolls; occupancy, prelease, and related information; P&L statements; trailing NOI; debt service information; and estimated valuations.

Sincerely,

A.J. Jindal, General Counsel