# Exhibit N

# Fannie Mae Q&A

**How did the trouble start? -** In Q4 2022, Vesta's average occupancy was over 90%. By the end of Q1 2023, portfolio occupancy had fallen to 76%. The biggest reason was the end of the COVID-era rent programs for tenants, which led to mass evictions and skips.

In Q2, I hired a Director of Property Management in Oklahoma City. He reported a tremendous amount of unpaid vendor balances, unmet capital needs, and various other issues. I started lending money to the assets to address those issues at 0% interest.

By 2024, things were moving in a more positive direction. However, new problems began to arise. Our 2021 loans started maturing, and with them came forced principal paydowns, extension fees, and expensive interest rate caps. I ran out of my own money and started borrowing from investors and partners.

By 2025, problems were everywhere: physical issues from storms, extremely high insurance deductibles, and 2 to 3 loan maturities every month. I did my best to keep pace, but the only path forward seemed to be taking more loans.

In July and August of 2025, our properties hit all-time highs in NOI. On a portfolio basis, the value in excess of debt was around $350,000,000. However, in August, I started defaulting on some of my loans, my access to capital dwindled, and the properties still needed money.

**How did we end up in this cash position? -** It truly varies across properties. We distributed all available cash we could through 2024. We had been counting on liquidity events to recapitalize deals, which we believed would allow us to make the distributions we were making without further concern for reserves. However, with lending markets effectively barren throughout late 2024 and 2025, that strategy proved to be a mistake.

Additionally, normal costs skyrocketed from our initial underwriting. Things many investors do not consider, like tax returns, went from $5,000–$7,500 per property in 2018 to upwards of $75,000 for some properties. Many properties were unable to cover those tax return costs on a timely basis, which caused delays with CPAs.

Insurance went up 43% between 2023 and 2024 alone, while coverage worsened, which left us very vulnerable to wind and hailstorms.

On the floating-rate portfolio, our cash positions were crushed by high interest rates, cash management requirements, loan maturities, and interest rate caps.

Overall, we did the best we could to navigate the ship through the storm. We continue to work through very rough conditions. However, we are confident that the majority of the portfolio still has substantial upside and value, and investors should understand that our recent issues are not indicative of the end of the road.

**Why didn't we do capital calls? -** Many of our partnerships require consent from multiple parties for capital calls. Simply put, we struggled to get those consents. Additionally, we had feedback from our investor network that capital calls would not be well received.

We believed the loans we were taking would be short term in nature, and we thought sales and refinances would cover both the principal on the secondary loans and healthy investor returns. All interest on those loans was, and remains, my responsibility.

**Did good properties support bad properties? -** By 2025, there was only one property that did not have issues to resolve, and only a few other assets could cover their issues from their own cash flow.

**Why were investors not told sooner, and what is changing going forward? -** I have mentioned this problem on most calls I've had with investors. However, with so much in the air and the fact that all of the information I was getting was coming from back channels, I wanted to have real answers and real situations for investors. As recently as 2 weeks ago we received feedback from a back channel that Fannie Mae wouldn't pursue foreclosure without discussions with us first. Now that we have surety and clarity around the situation it is easier to update investors.

**What should we have done? -** I do not have a great answer for this. According to my new legal team, I should have called capital on the deals where I had authority to do so. On the deals where I needed approval, I should have sent legal demand letters to partners and co-sponsors who had blocked those calls. If people refused to fund, my attorneys said I should have simply given the deals back.

While I understand the logic and can see how, one year later, we may have benefited from that approach, I still cannot stand the idea of giving up on investors.

**What is the path forward? -** We have hired a management consultant to help us rebuild investor confidence at a time when we understand our credibility has taken multiple hits.

As people who speak with me frequently know, I have had concerns about the Fannie Mae portfolio for months. It was difficult to give formal updates because I did not know what was going to happen, and covering all the possibilities and concepts in a short summary was impossible.

During that time, I worked through refinance opportunities for all nine Fannie Mae assets and also listed two on the market for sale. The combination of these efforts should help protect investor equity.

While I deserve questions and scrutiny, please understand that it is essential for us to remain unified as a partnership in order to either get Fannie Mae to reinstate the loans or finalize refinance opportunities.

**What protections or changes are being put in place, so this situation does not happen again? -** That is one of the reasons we brought on the management consultants. We wanted an outside firm to help us understand best practices and how to deal with these issues moving forward. First and foremost, the reinstatement offers we are making to Fannie involve increased reserves and working capital. With our management consultants we are doing daily cash management calls to go through the cash available and the needs for each property, so we are prioritizing properly.

**What should investors expect over the next 30, 60, and 90 days? -** Over the next 30 days we expect to have a firm answer from Fannie Mae on reinstatement. Additionally, we will have finalized term sheets for every asset that can be refinanced. On the 2 assets for sale over the next 30 days, we will welcome any preemptive offers but aren't calling for offers formally for 45 days.

Over the next 60 days we will be closing on either a reinstatement or in the last tranche of closing requirements for a refinance.

Within 90 days I would expect a full resolution to this situation though I could see a future where it takes 120 days.

**What is Vesta's overall operational plan moving forward? -** We are in the process of selling or refinancing six of the floating-rate deals. We also plan to list at least five more this year. In addition, we plan to recapitalize four to five additional deals this year.

Combined with resolving the Fannie Mae portfolio issues, that should put us on a good path toward the type of returns we were providing investors prior to 2025.

We are going to invite investors to a webinar or call in a few days, once we have additional details on Fannie Mae's actions and plans.

**Have any lenders, partners, or third-party groups expressed a willingness to support resolutions or recapitalizations? -** Yes. We have institutional partnerships in Woodscape, Barcelona, One Eton, Remington, and Copperfield that have already confirmed participation and are actively participating in the reinstatement process with Fannie. We are still awaiting further feedback from the partnerships in the other deals.

**Are management fees, asset management fees, or other sponsor payments still being taken? -** Management fees are paid to Vesta Realty so Vesta can pay its employees. No asset management fees or sponsor fees are being paid at this time nor since 2024. We are accruing management fees for deals that have not been able to afford to pay those, and we have fully accrued all sponsor fees. No sponsor fees will be paid on deals that lose money.

**Are any Vesta principals or affiliates personally investing additional money into these situations today? -** I have personally lent millions to the portfolio as a whole at 0% interest. I

will also be funding my share of any capital call. Finally, along with partners of mine are prepared to back stop additional money per the OA.

**If I'm an investor, why should I stay supportive of Vesta given all the issues? -** I think the best answer is that our biggest partners—those with bank account access, monthly reporting, reconciliations, and similar visibility—understand that we have done everything imaginable to bring money into these properties and into the broader endeavor.

That is why, through all of our issues, most of our co-sponsors and joint venture equity partners are still supportive. What that means for investors is that, despite the noise and rumors, the people closest to me know we are truly doing everything we can in a very difficult situation.

**What is the deal with the video of me playing poker? -** In 2024, when life was going well, I took a trip to Las Vegas that went well. While I was winning, I was invited to play in a televised higher-stakes game. It was not a financial risk, since I was already up, and I thought it was a cool, once-in-a-lifetime experience.

I had never done anything like that before. I called several larger investors and asked whether they had any issue with me playing. No one expressed any concern. Please understand that life and the portfolio were very different back then, and since that time, I have not played poker at any level.